UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

EVANSVILLE GREENWAY AND    )
REMEDIATION TRUST,            )
                                  )
         Plaintiff,          )
                                  )
     v.                  )  CASE NO. 3:07-cv-0066-DFH-WGH
                                  )
SOUTHERN INDIANA GAS       )
AND ELECTRIC COMPANY,    )
INC., *et al.*,                 )
                                  )
         Defendants.       )

ENTRY ON PENDING MOTIONS

Several pending motions for summary judgment present issues under the federal Comprehensive Environmental Response, Compensation and Liability Act, better known as CERCLA, 42 U.S.C. § 9601 *et seq.* From approximately 1956 through 1998, third-party defendant General Waste Products owned and operated two adjacent sites that have become known as the "River Yard" and the "Main Yard." The "Main Yard" site is located at 201 South Seventh Street, and the "River Yard" site is located at 2350 Broadway (Rear) Avenue, both where Pigeon Creek empties into the Ohio River in downtown Evansville, Indiana. General Waste operated a scrap metal business at the sites. Over the course of its business at the sites, General Waste arranged for the transport and/or disposal or hazardous substances at both sites. Third-party defendant Allan Trockman is the former

president and shareholder of General Waste.  He operated the Main Yard and River Yard sites at the time hazardous substances were disposed on the sites.

After General Waste had closed its business, the City of Evansville became interested in acquiring both sites to include them in a "greenway" of bicycle and walking trails in the city.  Analysis of the sites showed high concentrations of lead and polychlorinated biphenyls (PCBs) in the soil.  General Waste sought clean-up costs from its liability insurers.  The insurers disputed coverage, and litigation ensued.

As part of the settlement of that lawsuit in 2004, General Waste, Trockman, and General Waste's insurers entered into the Evansville Greenway and Remediation Trust Agreement ("the Greenway Trust" or "the Trust").  The Trust Agreement stated that the purposes of the Greenway Trust were to "collect and disburse amounts for 'environmental remediation'" and to "engage in the activities in furtherance of its obligation to collect and disburse amounts for environmental remediation."  Dkt. No. 426, Ex. F at 1, ¶ 2.3.  The funds deposited in the Greenway Trust were to be used exclusively for the purpose of implementing the investigative, remedial, and enforcement actions required by the Trust Agreement. The insurers of General Waste contributed approximately $3.5 million to the Greenway Trust.  Most of that money has been spent to remediate the Main Yard. That remediation has been completed, and the Main Yard is now part of the

Evansville Greenway.  The Greenway Trust has little money left now, however, and does not have funds to remediate the River Yard.

This action began when the Greenway Trust brought suit against defendants Southern Indiana Gas and Electric Company ("SIGECO"), Heritage Coal Co., Mead Johnson and Co., Midwest Coal Co., Black Beauty Coal Co., Squaw Creel Coal Co., and Mulzer Crushed Stone, Inc. under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and the Indiana Environmental Legal Actions statute, Ind. Code § 13-30-9-1 *et seq.*  Section 107(a) allows a party who has voluntarily undertaken to clean up a hazardous waste site to recover its costs from parties legally responsible for the contamination.  The Greenway Trust alleges that the defendants are responsible for lead and/or PCB contamination of the General Waste sites.  Dkt. No. 62, ¶ 268.  The Trust brought suit on its own behalf and as assignee of General Waste, Trockman, and the City of Evansville, although it purports to bring its section 107(a) claim only as itself and as the assignee of the City.  Dkt. No. 62, ¶¶ 262-74.

Several of the named defendants assigned their claims against the Greenway Trust, other defendants, and third party defendants to the third-party plaintiff PRP Group.  Dkt. No. 103 ¶ 3.  The PRP Group then filed a third-party complaint against third-party defendants General Waste, Trockman, the City of Evansville, General Electric Co., Indianapolis Power and Light Company, National Tire and Battery, Old Ben Coal Co., Solar Sources, Inc., Tennessee Valley

Authority, Whirlpool, White County Coal, PSI Energy, Tell City Electric Department, Frontier Kemper, and Speed Queen.  The third-party complaint alleges that those third-party defendants are liable or potentially liable under section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for contribution to the necessary costs of response allegedly incurred by the Greenway Trust, General Waste, Trockman, and the City of Evansville.

Three summary judgment motions are now ripe.  First, the PRP Group has moved for summary judgment on the issue of contributor liability against General Waste and Trockman under CERCLA section 113(f).  Dkt. No. 200.  The court grants the motion.  Second, defendants Heritage Coal, Mead Johnson, and Black Beauty Coal have moved for summary judgment against plaintiff Greenway Trust on the claims raised in the Trust's first amended complaint.  Dkt. No. 425.  The court denies that motion in all respects.  Third, Greenway Trust has moved for summary judgment holding that defendant Southern Indiana Gas and Electric Company ("SIGECO") is jointly and severally liable for all clean-up costs for both the Main Yard and the River Yard under CERCLA section 107(a).  Dkt. No. 388. That motion is granted in part and denied in part.  The court also grants the PRP Group's motion to strike the third party defendants' requests for a jury trial (Dkt. No. 226) and denies the PRP Group's motion for leave to amend its third-party complaint to add the United States Navy as a party (Dkt. No. 491).

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255. However, a party must present more than mere speculation or conjecture to defeat a summary judgment motion. The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record. *Id.* at 251-52. These standards apply to all pending motions for summary judgment and require the court to change the lenses through which it views the record evidence so as to give the non-moving parties the benefits of all conflicts in the evidence and favorable inferences from that evidence.

*Discussion*

I.     *CERCLA*

The federal Comprehensive Environmental Response, Compensation and Liability Act was "designed to effectuate the cleanup of toxic waste sites [and] to compensate those who have attended to the remediation of environmental hazards." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996) (comparing purposes of CERCLA with purposes of Resource Conservation and Recovery Act). To achieve that purpose, Congress expressly provided for the recovery of cleanup costs in CERCLA.  Section 107 of the statute (42 U.S.C. § 9607) provides a private right of action for the recovery of such costs in certain circumstances.   To establish a case for reimbursement of clean-up costs under section 107(a), a plaintiff must establish four elements:  (1) the property is a facility; (2) there has been a release or threatened release of a hazardous substance; (3) the release has caused the plaintiff to incur necessary costs of response that are consistent with the National Contingency Plan; and (4) the defendant is in one of four categories of potentially responsible parties.  See *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994); *City of Martinsville v. Masterwear Corp.*, 2006 WL 2710628 at *2 (S.D. Ind. Sept. 20, 2006).

The four categories of potentially responsible parties or "PRPs" under section 107(a) are:

(1)     the owner and operator of a vessel or a facility,

> (2)     any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3)     any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4)     any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

42 U.S.C. §§ 9607(a).  The definition is so broad "as to sweep in virtually all persons likely to incur cleanup costs."  *United States v. Atlantic Research Corp.*, 551 U.S. 128, 136 (2007).

Once identified as a PRP, an entity may be compelled by the government to clean up a contaminated area.  See *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 161 (2004).  PRPs may also be held liable for:

> (A)     all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
>
> (B)     any other necessary costs of response incurred by any other person consistent with the national contingency plan;
>
> (C)     damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D)     the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. §§ 9607(a)   The Supreme Court held in *Atlantic Research* that the meaning of the phrase "any other person" in section 107(a)(4)(B) includes other PRPs, so that a PRP who has incurred necessary response costs may bring suit against other PRPs to recover those costs.  551 U.S. at 131.

The courts have interpreted liability under this section in most cases to be strict, joint, and several.  The only established exception to liability is when the harm is divisible.  See *Metropolitan Water Reclamation Dist. of Greater Chicago v. North American Galvanizing & Coatings, Inc.*, 473 F.3d 824, 827 & n.3 (7th Cir. 2007) (describing divisible harm as "rare").   Joint and several liability under section 107(a) enables the government or another party who has incurred cleanup costs to follow the path of least resistance by suing one or only a few PRPs for all of the costs, leaving those targeted PRPs the task of finding other PRPs and seeking allocation of liability in an equitable way under section 113(f)(1) of CERCLA.

CERCLA section 113(f)(1) complements section 107(a) by permitting private parties to seek contribution from joint tortfeasors during or following a civil action under § 106 or § 107(a).  42 U.S.C. § 9613(f)(1); *Atlantic Research*, 551 U.S. at 139; *Cooper Industries*, 543 U.S. at 168 (holding that a private party could not seek contribution from other liable parties under § 113(f)(1) where it had not been sued

under § 106 or § 107(a)).  Section 113(f)(3)(B) permits private parties to seek contribution after they have settled their liability with the government.  42 U.S.C. § 9613(f)(3)(B).  But a so-called "voluntary" PRP – a potentially responsible party who incurs cleanup costs voluntarily and not after being sued under section 106 or 107(a) – cannot sue for contribution from its fellow PRPs under section 113(f) of CERCLA.  *Cooper Industries*, 543 U.S. at 160-61.  A PRP who carries out a voluntary cleanup, as General Waste and Trockman have done through the Greenway Trust in this case, can seek recovery from other PRPs only by suing under 107(a).

As noted, the remedies available under sections 107(a) and 113(f) are meant to complement each other.  *Atlantic Research*, 551 U.S. at 139.  As the Supreme Court explained:

> [A] PRP that pays money to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution.  But by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a).  As a result, though eligible to seek contribution under § 113(f)(1), the PRP cannot simultaneously seek to recover the same expenses under § 107(a).
>
> *     *     *
>
> For similar reasons, a PRP could not avoid § 113(f)'s equitable distribution of reimbursement costs among PRPs by instead choosing to impose joint and several liability on another PRP in an action under 107(a).  The choice of remedies simply does not exist.  In any event, a defendant PRP in such a 107(a) suit could blunt any inequitable distribution of costs by filing a § 113(f) counterclaim.  Resolution of a § 113(f) counter-claim would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the § 107(a) action.

*Atlantic Research*, 551 U.S. at 139-40 (internal citations omitted).

II.     *PRP Group's Motion for Partial Summary Judgment*

By naming General Waste and Trockman as third-party defendants in its third-party complaint, the PRP Group in essence seeks to close the circle of liability here.   General Waste and Trockman and their insurers set up the Greenway Trust, which sued the members of the PRP Group.  The PRP Group then sued other PRPs, including General Waste and Trockman.   The third-party complaint seeks contribution and a declaratory judgment under section 113(f)(1) of  CERCLA (42 U.S.C. § 9613(f)(1)) (Counts I and II) and the Indiana Environmental Legal Actions ("ELA") statute (Ind. Code § 13-30-9-1 *et seq.*) (Counts III and IV) against the third-party defendants, including General Waste and Trockman.  The PRP Group has moved for partial summary judgment against third-party defendants General Waste and Trockman.   The PRP Group seeks judgment on the issue of the liability of General Waste and Trockman under CERCLA section 113(f)(1), which allows "any person" to "seek contribution from any other person who is liable or potentially liable under section 9607(a) . . . during or following any civil action under section 9606 . . . or section 9607(a)." For purposes of its motion, the PRP Group does not seek now a specific contribution *allocation* under section 113(f)(1), but only a finding of *liability*.  The PRP Group's motion for partial summary judgment is granted.

A.     *Undisputed Facts*

The PRP Group's claims arise from the disposal and cleanup of hazardous substances at the General Waste sites.  General Waste admitted that it was the owner of the River Yard site.  Dkt. No. 178, ¶ 10. It owned and operated the General Waste sites at a time when hazardous substances were disposed of at the sites.  *Id.* at ¶ 11.  It also arranged for transport or disposal of hazardous waste products on the General Waste sites.  *Id.* at ¶ 28.

Likewise, in his answer, Trockman admitted that he operated the General Waste sites at a time when hazardous substances were disposed of at the General Waste sites.  Dkt. No. 177, ¶ 12.  He also admitted that he arranged for transport or disposal of hazardous waste products at the General Waste sites.  *Id.* at ¶ 28.

The Greenway Trust sued the members of the PRP Group pursuant to section 107(a) of CERCLA on its own behalf and in its position as an assignee of the City of Evansville.  See Dkt. No. 62, ¶¶ 267-74; Dkt. No. 103, ¶ 2.

At least some members of the PRP Group – SIGECO, Heritage Coal, and Mead Johnson – have incurred "PRP search costs" by investigating the history of operation at the General Waste sites to identify other PRPs.  They have incurred costs reviewing documents, taking and evaluating witness statements, and in other activities to identify other PRPs who have been brought into this case as

third-party defendants.  Dkt. No. 267, Ex. A, ¶¶ 2, 4; Ex. B, ¶¶ 3-4; Ex. C, ¶ 5.

Also, PRP Group member SIGECO has engaged the services of an environmental

consulting firm to assist in the remediation effort.  That firm has incurred costs

developing a remediation plan.  Dkt. No. 267, Ex. D, ¶¶ 2-4.


　　　　B.　　*Analysis*

The PRP Group seeks summary judgment on the question of whether

General Waste and Trockman are liable or potentially liable parties as defined by

section 107(a) of CERCLA.  If and when that finding is made, the members of the

PRP Group, as defendants to the Trust's CERCLA section 107(a) lawsuit, will have

a right of contribution from General Waste and Trockman under section 113(f) of

CERCLA, assuming that the PRP Group is able to account satisfactorily for its

response costs.  See 42 U.S.C. § 9613(f)(1); *Cooper Industries*, 543 U.S. at 168

(holding that a private party could seek contribution under § 113(f) from other

liable parties only after having been sued under § 106 or 107(a)).  General Waste

and Trockman oppose the PRP Group's motion, arguing that the PRP Group must

first show that it has actually paid response costs and that its members have

already paid more than their fair shares.


The Greenway Trust sued the members of the PRP Group under section

107(a) of CERCLA.  Dkt. No. 62, ¶¶ 267-74.  Under the plain language of section

113(f), therefore, the PRP Group is entitled to seek contribution from any liable or

potentially liable party under section 107(a).  42 U.S.C. § 9613(f).  Once more, that section includes the following categories of individuals:

> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances . . . and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . .

42 U.S.C. §§ 9607(a).  By their own admissions, General Waste and Trockman are potentially liable parties as defined by section 107(a).  General Waste was the owner of the River Yard site and admitted that it owned and operated both sites at the time hazardous substances were disposed of at those locations.  Dkt. No. 178, ¶¶ 10, 11.  It also admitted that it arranged for the transport or disposal of hazardous substances at both sites.  *Id.* at ¶ 28.  Likewise, Trockman admitted that he operated the sites at the time hazardous substances were disposed and that he arranged for the transport to or disposal of hazardous substances at the sites.  Dkt. No. 177, ¶¶ 12, 28.  The PRP Group, as assignee of defendants on the section 107(a) claim brought by the Greenway Trust created by General Waste and Trockman, is entitled to seek contribution from General Waste and Trockman

under section 113(f) as liable parties or potentially liable parties as defined by CERCLA.

In *Atlantic Research*, the Supreme Court defined "contribution" as the word is used in section 113(f) as the "'tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault.'" 551 U.S. at 138, quoting Black's Law Dictionary 353 (8th ed. 1999). Because section 113(f) permits a PRP to seek liability for contribution "during or following" a suit under section 106 or 107(a), the Court explained that section 113(f) "permits suit before or after the establishment of common liability. In either case, a PRP's right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties." *Id.* at 138-39.

Focusing on this language, General Waste and Trockman argue that the PRP Group must show that its members have *already* incurred response costs disproportionate to their fair share of liability as a prerequisite to the PRP Group's contribution claim under section 113(f). Dkt. No. 232 at 7-8; Dkt. No. 274 at 3. In response to this argument, the PRP Group provided affidavits showing that its members have incurred some costs. General Waste and Trockman argue that the affidavits are insufficient because they are "conclusory," do not provide an "accurate accounting," and do not demonstrate that the PRP Group members have already paid more than their proportionate shares. Dkt. No. 274 at 4-6. The

capstone of General Waste's and Trockman's argument is that "the PRP Group is not entitled to judgment until it can satisfy the elements required for establishing liability under CERCLA section 113, including that the members of the PRP Group have themselves been held liable under CERCLA section 107, and that there has been an 'inequitable distribution of common liability among liable parties.'"  Dkt. No. 274 at 7, citing *Atlantic Research*, 551 U.S. at 138.  Arguing that because the PRP Group has failed to satisfy its section 113 case (Count I), the third-party defendants further argue that a declaratory judgment (Count II) would be inappropriate under the Declaratory Judgment Act because there is no case or controversy.  Dkt. No. 232 at 10-13.

General Waste's and Trockman's argument is not persuasive.  The PRP Group's motion seeks a finding only that General Waste and Trockman are PRPs who are subject to claims for contribution if allocation of cleanup costs would otherwise be inequitable.  If and when such a finding might be made in the future, the PRP Group would presumably return to the court with a detailed accounting of its response costs and arguments regarding how and why those response costs were more than the PRP Group's proportionate share.  That day has not yet come, and the question of allocation of that liability for purposes of contribution under section 113(f)(1) is not yet before the court.  But on the immediate, narrow question of whether General Waste and Trockman, based on their own admissions, are liable or potentially liable parties under section 107(a), the undisputed facts show that they are.  There is no point in delaying that

determination.  The PRP Group's motion is granted on the issue of liability on Counts I and II of its third-party complaint against General Waste and Trockman.

III.   *Heritage Coal Motion for Summary Judgment*

The Greenway Trust seeks joint and several liability against PRP defendants Heritage Coal Co., Mead Johnson Nutrition Co., and Black Beauty Coal Co., among others, for soil contamination of the Main Yard and River Yard sites under section 107(a) of CERCLA.  Heritage Coal, Mead Johnson, and Black Beauty (for purposes of the court's discussion of Dkt. No. 425 and related filings only, the "Heritage Coal defendants") have moved for summary judgment against the Greenway Trust on all of its claims, arguing that the Trust is not a valid legal entity and thus lacks capacity to bring suit.  The Heritage Coal defendants also move for summary judgment on Count I of the Trust's amended complaint on the ground that the Trust is not entitled to joint and several liability under CERCLA 107(a) because it is not an innocent party.  For reasons set forth below, the court denies the Heritage Coal defendants' motion in its entirety.

A.   *Undisputed Facts*

General Waste admitted that in the course of its scrap metal business, it arranged for the transport and/or disposal of hazardous substances, including lead acid contained in batteries, at both sites.  Dkt. No. 178, ¶¶ 10-12.  Allan Trockman admitted that he operated the sites at the time hazardous substances,

including lead, were disposed on the sites.  Dkt. No. 426, Ex. A ¶¶ 2, 6; Dkt. No. 177, ¶ 12.  General Waste reclaimed the lead contained in the batteries by breaking them open and extracting the plates, causing battery acid to seep into the soil.  Because General Waste stored batteries outside to avoid damaging the concrete floor of the warehouse, battery acid leaked onto the ground.  Dkt. No. 426, Ex. A, ¶¶ 24, 30, 32; Ex. B, 162-64, 429.  Stacks of batteries would sometimes fall, be knocked over, or be crushed by trucks, resulting in battery acid and lead leaking into the ground.  Dkt. No. 426, Ex. A, ¶ 32.  Sometimes when the batteries arrived, they were already damaged.  Dkt. No. 426, Ex. A, ¶ 27.  The batteries stored at the sites came from customers including the Heritage Coal defendants.  *Id.* at ¶¶ 26-27.

Mead Johnson admitted that it used batteries in at least one of its manufacturing facilities in Evansville and that General Waste transported spent lead-acid forklift batteries that were not used in the direct manufacture of its products for a brief period from Mead Johnson's Evansville facility.  Dkt. No. 87, ¶¶ 144-46.

Heritage Coal, formerly known as Peabody Coal, once had mining interests in Indiana.  Dkt. No. 69, ¶ 21.  Black Beauty also operated coal mines in Indiana. Dkt. No. 193, ¶ 59.  Trockman testified that General Waste received batteries from several coal mining operations, including Heritage and Black Beauty.  Dkt. No. 426, Ex. A, ¶ 27.  The batteries contained lead and were not operational.  *Id.* at ¶

24.  General Waste commonly found crushed batteries or lead battery plates in the bottom of trailers received from the mining companies.  *Id.* at ¶ 27.  Trockman testified that Heritage Coal sent spent lead batteries to General Waste for more than a decade, that Black Beauty had also been a General Waste customer for more than a decade, and that most of the loads General Waste received from Black Beauty contained a battery.  Dkt. No. 458, Ex. 2 at 143, 176, 422-24.

Collectively, SIGECO, Mead Johnson, and Heritage Coal provided between 80 and 85 percent of the batteries received by General Waste, with SIGECO as the largest contributor, and with Mead Johnson and Heritage Coal as the next two largest contributors.  Dkt. No. 458, Ex. 2 at 520-21, 544-45.

On June 4, 2002, General Waste invited SIGECO, Mead Johnson, and Heritage Coal to participate in the remediation of the Main Yard.  Dkt. No. 458, Ex. 4, ¶ 4 & Att. A.  In November 2002, court-sponsored settlement discussions began, overseen by Magistrate Judge Hussman.  SIGECO and Mead Johnson were invited to attend those discussions.  Although settlement conferences were held, a settlement was not reached.

On July 29, 2004, Trockman, General Waste and General Waste's insurers entered into the Evansville Greenway and Remediation Trust Agreement.  Dkt. No. 426, Ex. F ("Trust Agreement").  The "Whereas" clauses of the Trust Agreement

stated that "General Waste and Trockman have actual or potential liability or a reasonable expectation of liability under federal, state or local laws for environmental remediation of the Main Yard Site and the River Yard Site."  The introductory clauses also stated that the Greenway Trust was:

> being established to resolve and satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that have occurred and have given rise to at least one claim asserting liability under state and federal environmental statutes, including, but not limited to [CERCLA] and The Indiana Environmental Legal Action Statute.

Dkt No. 426, Ex. F (internal citations omitted).  The Trust Agreement stated that the purposes of the Greenway Trust were to "collect and disburse amounts for 'environmental remediation'" and to "engage in the activities in furtherance of its obligation to collect and disburse amounts for environmental remediation."  Dkt. No. 426, Ex. F at 1, ¶ 2.3.  It also stated that the funds deposited in the Trust were to be used exclusively for the purpose of implementing the investigative, remedial, and enforcement actions required by the Trust Agreement.  Dkt. No. 426, Ex. F at 2.  The Trust Agreement mandated that the Trust would "enter into contracts and agreements as needed to fulfill the purposes of this Trust Agreement."  Dkt. No. 426, Ex. F, ¶ 2.3(6).  The Trust had a federal tax identification number, and it filed federal, state, and local tax returns but did not conduct business for profit.  Dkt. No. 426, Ex. F, ¶¶ 4.6.1, 4.7; Ex. G (letter from the Internal Revenue Service to the Trust dated September 2, 2004);  Dkt. No.

458, Ex. 1, ¶ 5.  The Trust itself had not been subject to a CERCLA lawsuit or a consent decree.  Dkt. No. 389, Ex. 6, ¶¶ 11-12.

The Greenway Trust was required to provide General Waste, Trockman, and the insurers an accounting of the Trust's assets every month and an accounting of all Trust activity.  Dkt No. 426, Ex. F, ¶¶ 6.3, 6.5.  The Trust was bound to provide a defense for General Waste and Trockman for claims asserted against them "as the result of the contamination that is the subject of the lawsuits that will be asserted against the PRPs."[1]  *Id.* at ¶ 10.1.  Once the River Yard site was remediated and a covenant not to sue was obtained from the Governor of Indiana, the Trust would be obligated to reimburse CNA for amounts "loaned" to the Trust. To the extent any recoveries remained after that, lawyers representing the Trust, General Waste, and Trockman would be reimbursed for their costs, and then if any funds remained, fifty percent would go to Trockman and fifty percent would go to the insurers.  *Id.* at ¶¶ 9.2.2, 9.2.3.

On August 31, 2004, Magistrate Judge Hussmann entered an order declaring that the Greenway Trust was a qualified settlement fund pursuant to Treasury Regulation 26 C.F.R. § 1.468B-1 *et seq.*  Dkt. No. 426, Ex. H.  The Trust was not registered as a business trust, a corporation, a limited liability company,

---

[1]In this lawsuit, the Greenway Trust, General Waste, and Trockman are represented by the same attorneys.

or any other business entity registered with the Indiana Secretary of State.  Dkt. No. 426, Exs. I & J.

Contemporaneously with the creation of the Greenway Trust, on July 29, 2004, the insurers irrevocably assigned to the Trust any rights they possessed or later would acquire "in connection with the environmental conditions at the Main Yard Site and any rights it has for costs incurred . . . for the River Yard Site."  Dkt. No. 426, Ex. D, ¶ 2.1.  General Waste and Trockman also entered an assignment of rights with the Trust, which provided:

> 2.1  In exchange for the Trust's agreement to remediate the Main Yard Site and to the extent possible, the River Yard Site, and to pursue the PRPs for the remediation of the Main Yard Site and River Yard Site, General Waste and Trockman hereby agree as follows:
>
> 2.1.1  General Waste and Trockman irrevocably assign, transfer, and convey to the Trust any and all rights General Waste and Trockman have or may have for contribution from the PRPs relating to the Main Yard Site and the River Yard Site, including but not limited to, any rights to obtain payment of Response Costs of attorney's fees from the PRPs.
>
> 2.1.2  General Waste and Trockman irrevocably assign, transfer, and convey to the Trust any and all rights General Waste and Trockman have or may have in the proceeds of sale of the River Yard Site.
>
> 2.1.3  General Waste and Trockman agree that the Trust will cause this Assignment to be filed with the Recorder of Deeds for Vanderburgh County, Indiana and any other applicable governmental or regulatory agency responsible for maintaining such records.

Dkt. No. 426, Ex. E.  When these rights were assigned, General Waste was the owner of the Main Yard site and the River Yard site, and Trockman was the president of General Waste.

On September 15, 2004, the City of Evansville purchased the Main Yard site from General Waste through a settlement agreement among General Waste, the City of Evansville, and the insurers.  Dkt. No. 426, Ex. C.

The Greenway Trust paid in excess of three million dollars for work necessary to investigate and clean up the PCB and lead contamination of the Main Yard site.  Dkt. No. 389, Ex. 6, ¶ 16.  On April 18, 2007, the Indiana Department of Environmental Management issued a Certificate of Completion to the City of Evansville for the successful completion of the remediation of the Main Yard site.  Dkt. No. 389, Ex. 5, Att. C.  Also, the Greenway Trust has spent more than one hundred thousand dollars for remedial work at the River Yard, including preparation of a remedial work plan necessary to meet IDEM's requirements for investigation of PCB and lead contamination.  Dkt. No. 389, Ex. 5, ¶¶ 24-25; Ex. 6, ¶ 18.  The Trust lacked the funds necessary to clean up the River Yard or to pay the ongoing costs of the Trust.  Dkt. No. 458, Ex. 1, ¶ 7.

On May 6, 2008, the Greenway Trust filed its six-count first amended complaint against defendants SIGECO, Heritage Coal Company, Mead Johnson Nutrition Company, Midwest Coal Company, Black Beauty Coal Company, Squaw Creek Coal Company, and Mulzer Crushed Stone.  Dkt. No. 62.  The Trust brought claims against the defendants pursuant to CERCLA section 107(a).  Dkt. No. 62, ¶ 80.

B.    *Analysis*

1.    *Trust's Validity and Capacity to Sue*

The Heritage Coal defendants argue that the Trust is not a valid trust under Indiana law and thus lacks capacity to sue.  See *Miller's Estate v. St. Joseph County Home*, 87 N.E.2d 886, 887 (Ind. App. 1949) ("[The plaintiff] is not a legal entity of any kind.  It is merely the name of a place.  It therefore lacks the right or power to maintain in action.").  The trust has a clear purpose, but it lacks a beneficiary and is not a charitable trust.  The parties' briefs on this issue of trust validity have not collided directly.  The Heritage Coal defendants argued that the Greenway Trust did not qualify as a business trust under Indiana Code § 23-5-1-2(a), and the Trust agrees.  It does not conduct activity for purposes of making a profit.

The trust relies on the Indiana Trust Code generally and on Indiana Code § 30-4-2-19, which allows the creation of a trust for a noncharitable purpose without an identifiable beneficiary.  The Indiana Trust Code does not require formal language for the trust to be created, but it requires written terms that are sufficiently definite so that the trust property, the identity of the trustee, the nature of the trustee's interest and the purpose of the trust may be ascertained with reasonable certainty.  See Ind. Code § 30-4-2-1(b).  The Trust Agreement satisfies these requirements.  See Dkt. No. 426, Ex. F, § 2.3 (purposes of the

trust), § 3.1 (designation of trustee), § 4 (duties and responsibilities of the trustee), § 5 (funding of the Trust), § 7 (trustee compensation).

The Trust Code also requires a beneficiary, Ind. Code § 30-4-2-1(b), but provides that noncharitable trusts established under section 30-4-2-19 are deemed to have beneficiaries.   Ind. Code § 30-4-2-1(d).[2]   The Heritage Coal defendants focus on the absence of a beneficiary and point out that section 30-4-2-19 took effect only on July 1, 2005, a year after the Greenway Trust was created.   The defendants contend that the 2005 statute cannot retroactively

---

[2]Section 19 provides:

(a) Except as provided in section 18 of this chapter, a trust may be created for a:
    (1) noncharitable purpose without a beneficiary; or
    (2) noncharitable and valid purpose to be selected by the trustee.
(b) A trust authorized by this section may be enforced for not more than twenty-one (21) years.
(c) A trust authorized by this section may be enforced by the following:
    (1) A person appointed in the terms of the trust.
    (2) A person appointed by the court, if the terms of the trust do not appoint a person.
(d) Property of a trust authorized by this section may be applied only to the trust's intended use, except to the extent the court determines that the value of the trust property exceeds the amount required for the trust's intended use.
(e) Except as provided in the terms of the trust, property not required for the trust's intended use must be distributed to the following:

    (1) The settlor, if the settlor is living.
    (2) The settlor's successors in interest, if the settlor is deceased.

validate a trust created improperly, in defendants' view, in 2004.   The court disagrees for three reasons.

First, it is not at all clear that applying the 2005 statute to allow the Trust to file a lawsuit in 2007 amounts to giving the law retroactive effect.   See *Landsgraf v. USI Film Products*, 511 U.S. 244, 270 (1994) ("The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event."); *Estate of Moreland v. Dieter*, 576 F.3d 691 (7th Cir. 2009) (analyzing whether an Indiana statutory amendment applied retroactively);   *Stewart v. Marson Construction Corp.*, 191 N.E.2d 320, 321 (Ind. 1963) (construing statute so as not to "impose liabilities not existing at the time of its passage" or to "affect an existing liability to the detriment of a defendant").   Applying the 2005 statute here does not impair any vested rights, create new liabilities, or create new rights not intended by the Trust's settlors.

Second, the Indiana Trust Code shows a strong preference for upholding the validity of trusts and enforcing them according to their terms.   When the Trust Code was enacted, it did away with overly formal requirements and provided that its terms would apply to already existing trusts to the extent that doing so would not impair vested rights or create new rights that a settlor did not intend to create. Ind. Code § 30-4-1-4.   It is reasonable to apply that same approach to the 2005

legislation and to already existing trusts.  Doing so does not impair any vested rights, create new liabilities, or create new rights not intended by the settlors.

Third, and more generally, the Trust Code provides:

> The rules of law contained in this article shall be interpreted and applied to the terms of the trust so as to implement the intent of the settlor and the purposes of the trust.  If rules of law and the terms of the trust conflict, the terms of the trust shall control unless the rules of law clearly prohibit or restrict the article which the terms of the trust purport to authorize.

Ind. Code § 30-4-1-3.  In other words, the Trust Code is designed to empower the creation of trusts and to uphold their validity and enforce their intended terms, unless doing so is "clearly" prohibited or restricted.  There is no such clear prohibition or restriction here.  The court is confident that Indiana courts would uphold the validity of the Greenway Trust under the 2005 legislation.

The Heritage Coal defendants also contend that the Greenway Trust is invalid because its purpose is contrary to public policy.  This argument is a non-starter.  The undisputed facts show that the Greenway Trust was created to settle a lawsuit and to fund and carry out the remediation of a hazardous waste site so that it could become part of a significant civic improvement, the Evansville Greenway.  Despite these salutary purposes, defendants argue, the Greenway Trust is contrary to public policy because it is an attempt to shield General Waste and Trockman from liability for their role in causing the environmental harm and to shift financial responsibility for the harm to other PRPs under CERCLA.

To the extent the Trust was intended to shield General Waste and Trockman, the trust device will not and cannot work, as explained above and below.   To the extent the Trust may have been intended to shift financial responsibility, the public policy argument begs the questions discussed below.  If the courts find that the Trust has some valid role in causing other PRPs to take all or most of the financial responsibility for cleanup of these hazardous waste sites, there would be no public policy problem at all.  If the courts disregard the creation and existence of the Trust in resolving these issues among the many PRPs, the failure to achieve one possible purpose among several would not undermine the validity of the trust.  See Ind. Code § 30-4-2-12 (trust may not require trustee to commit act contrary to public policy; invalid but severable provisions do not undermine validity of trust or other provisions).  In sum, the Greenway Trust is a valid trust and has the capacity to sue the other PRPs, including the Heritage Coal defendants, under section 107(a) of CERCLA.[3]

2.      *The Greenway Trust's "Innocent Party" Status*

The Heritage Coal defendants argue that the creation and use of the Greenway Trust to file this suit under section 107(a) of CERCLA is an attempt to manipulate CERCLA to impose joint and several liability on companies of its choosing while "whitewashing" the liabilities of the trust settlors, who owned and

_____

[3]Because this court finds that the Trust is a valid entity under Indiana law, the Heritage Coal defendants' argument regarding Judge Hussmann's order in the insurance coverage lawsuit is moot.   See *General Waste Products, Inc. v. Continental Casualty Co.*, EV 01-96-c-H/Y (S.D. Ind. Aug. 31, 2004).

operated the sites and oversaw their contamination.  The Heritage Coal defendants argue that as settlors of the Trust, General Waste and Trockman could assign to the Trust only the right to pursue contribution (liability that is several but not joint), and that General Waste and Trockman could not assign rights to the Trust without assigning corresponding liabilities.

The Heritage Coal defendants are correct that under Indiana law, an assignee stands in the shoes of the assignor.  See *Press-A-Dent v. Weigel*, 849 N.E.2d 661, 669 (Ind. App. 2006); see also *In re Doctors Hospital of Hyde Park, Inc.*, 337 F.3d 951, 957 (7th Cir. 2006) (purpose of the rule is to prevent "shucking off [existing] obligations"); *Brown v. Indiana Nat'l Bank*, 476 N.E.2d 888, 894 (Ind. App. 1985) ("The assignee takes no greater rights than those possessed by the assignor.").  It is also true that General Waste and Trockman were owners and operators of the sites during the time those sites became contaminated and that they arranged for the disposal and transport of hazardous substances to the sites.  General Waste and Trockman are PRPs under CERCLA.  The court assumes for purposes of discussion that the Greenway Trust may have assumed General Waste's and Trockman's mantle as PRPs.

When the Greenway Trust was created in 2004, it was not clear how a voluntary PRP – a liable (and thus not "innocent") party who stepped forward and spent money to clean a hazardous waste site without a court order – might have been able to obtain compensation from other PRPs.  By now, however, the path

is open and clear.  The Heritage Coal defendants are not correct in their assertion that, as PRPs, General Waste and Trockman would not be entitled to seek relief under section 107(a) and would be limited to pursuing a contribution remedy against other PRPs under CERCLA.  In two important decisions focusing closely on the language of section 107(a) and 113(f), the Supreme Court has re-shaped CERCLA law and removed several non-statutory glosses that lower courts had added to the statute.  It is now clear that a PRP who has been sued under section 106 or 107(a) may pursue contribution under section 113(f).  It is equally clear that a PRP who has carried out a voluntary cleanup may seek recovery of its costs from other PRPs under section 107(a).  As the Supreme Court explained, "section 113(f) authorizes a contribution action to PRPs with common liability stemming from an action instituted under § 106 or § 107(a).  And 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs."  *Atlantic Research*, 551 U.S. at 139.

Only PRPs who have been sued under CERCLA section 106 or 107(a) may turn around and seek contribution from other PRPs under section 113(f)(1).  *Cooper Industries*, 543 U.S. at 160-61.  Trockman and General Waste have not been sued under section 106 or 107(a).[4]  Nor has the Trust.  Participation as a defendant in such a proceeding is a recognized statutory prerequisite to a contribution claim.  Whatever rights or liabilities the Greenway Trust may have

_____

[4]The PRP Group has now sued General Waste and Trockman, among other third-party defendants, for contribution under section 113(f)(1), but to date neither General Waste nor Trockman has been sued under section 106 or 107(a).

acquired from settlors General Waste and Trockman, it is clear that the Trust did not acquire the right to bring a contribution claim.

If the Heritage Coal defendants were correct and General Waste and Trockman would also be barred from seeking relief under section 107(a), that conclusion would make the voluntary PRP extinct.  No rational PRP would step forward and take upon itself the costs of cleanup if it had no prospect of recovering any share of those costs from other PRPs, yet that is the result advocated by the Heritage Coal defendants.  But section 107(a) says nothing about the plaintiff having to be "innocent," and it is now clear that a section 107(a) plaintiff need not be innocent, at least not after *Atlantic Research*, which overruled contrary decisions by many circuits.

Known as the "innocent landowner" exception, the exception originated in the Seventh Circuit in *Azko Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994).  When *Azko Coatings* was decided, it was widely held that a claim by one PRP against another must be brought, if at all, as a section 113(f) contribution claim.  The *Azko Coatings* exception permitted a PRP-landowner to bring a section 107(a) action rather than a section 113(f) contribution action to recover for its direct injuries if it was not responsible for having caused any of the hazardous materials to be spilled onto the property.  *Azko Coatings*, 30 F.3d at 764; see also *Metropolitan Water Reclamation Dist.*, 473 F.3d at 828-29 (explaining that the exception "blunt[ed] the force of a rule that limits the rights of . . . 'innocent'

parties to contribution under § 113(f)," such as an absentee landowner who might be liable under §107(a) for the full cost of remedying a hazardous site caused by its tenant).  Another panel explained before *Atlantic Research*:

> Nevertheless, one of two outcomes would follow from a landowner suit under § 107(a):  either the facts would establish that the landowner was truly blameless, in which case the other PRPs would be entitled to bring a suit under § 113(f) within three years of the judgment to establish their liability among themselves, or the facts would show that the landowner was also partially responsible, *in which case it would not be entitled to recover under its § 107(a) theory and only the § 113(f) claim would go forward.*

*Rumpke of Indiana, Inc. v. Cummins Engine Co., Inc.*, 107 F.3d 1235, 1240 (7th Cir. 1997) (emphasis added); see also *Metropolitan Water Reclamation Dist.*, 473 F.3d at 828-29 (under the "innocent landowner" exception, "a joint and several cost recovery under Section 107(a) remains available [after *Cooper Industries*] to 'landowners who allege that they did not pollute the site in any way.'")

But after *Cooper Industries* and *Atlantic Research*, it is clear that the question is no longer one of "innocence."  Sticking to the terms of the statute itself, if a party has incurred "any other necessary costs of response . . . consistent with the national contingency plan," that party is eligible to seek recoupment of those response costs via § 107(a) *even if it is itself a PRP*.  See *Atlantic Research*, 551 U.S. at 139-40.  If a party has been sued under § 106 or § 107(a), it may seek contribution under § 113(f).  The Supreme Court reasoned that a "guilty" party, or PRP, could not avoid equitable distribution of reimbursement costs by seeking to impose joint and several liability on another PRP in an action under § 107(a).

The Court explained that "a defendant PRP in such a 107(a) suit could blunt any inequitable distribution of costs by filing a § 113(f) counterclaim." *Atlantic Research*, 551 U.S. at 140.   The Heritage Coal defendants concede that the Greenway Trust has incurred response costs.   The Trust's claim falls under the broad sweep of CERCLA section 107(a), and is not defeated as a result of its settlors' status as liable PRPs.[5]

### 3.   *City of Evansville's "Innocent Owner" Status*

The Heritage Coal defendants also argue that the Trust cannot avail itself of any exemption from liability that the City of Evansville might enjoy, even though the City assigned its rights under CERCLA to the Trust.   Dkt. No. 426 at 20.   The Heritage Coal defendants contend that when the City became the owner of the Main Yard site in 2004, it became an "owner" of the site under CERCLA section 107(a)(1) and thus is subject to liability as a PRP.   As a PRP, they argue, the City would be entitled to seek contribution from other PRPs under section 113(f), but could not impose joint and several liability on the defendants under section 107(a).   The court disagrees with the Heritage Coal defendants on this point.

Again, the split between sections 107(a) and 113(f) is no longer as simple as the Heritage Coal defendants have contended.   After *Atlantic Research*, the path

---

[5]Because of these changes in the law since the Trust was created, the court need not address the Heritage Coal defendants' arguments against use of the trust device to "whitewash" the liability of General Waste and Trockman.   There is no longer any legal need to create or find an "innocent" party to conduct the cleanup.

to strict liability under § 107(a) is open to PRPs as plaintiffs if they have incurred response costs. Nevertheless, the court considers whether the City is exempt from CERCLA liability due not to whether it is "innocent" but whether it had a contractual relationship with Trockman or General Waste.

The City claims that it is exempt from CERCLA liability under sections 107(b) and 101(35)(A)(ii), 42 U.S.C. §§ 9607(b) and 9601(35)(A)(ii). Section 107(b) exempts persons otherwise liable who can establish by a preponderance of the evidence that the releases of a hazardous substance were caused solely by an act of God, an act of war, or:

> an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . , if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned . . . and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions . . . or any combination of the foregoing.

42 U.S.C. § 9607(b). For purposes of section 107(b), the definition of "contractual relationships" includes "land contracts, deeds, easements, leases, or other instruments transferring title or possession." 42 U.S.C. § 9601(35).

This issue turns on section 101(35)(A)(ii), which excludes from the definition of "contractual relationships" situations in which the real property was acquired by the defendant after the disposal of the hazardous substance and "the defendant

is a government entity which acquired the facility by escheat, or through any other involuntary transfer or acquisition, *or through the exercise of eminent domain authority by purchase or condemnation.*"   42 U.S.C. § 9601(35)(A)(ii) (emphasis added).  That provision is essential for local and state governments who would like to help solve a problem without turning themselves into deep-pocket PRPs who might be subjected to vast and unexpected liability.

The Heritage Coal defendants do not contend that the City contributed any hazardous substances to either the Main Yard or the River Yard.   They also do not contend the City had a contractual relationship with General Waste, Trockman, or any other defendant connected with the disposal of hazardous substances at the General Waste Sites.  The Heritage Coal defendants also do not argue that the City failed to exercise due care with respect to the hazardous substances concerned or failed to take precautions against foreseeable acts or omissions of any third party.  (The Heritage Coal defendants state in reply only that they "take no position" on that point.  Dkt. No. 481 at 16.)  But the Heritage Coal defendants argue that the City did not acquire the Main Yard site through eminent domain because it acquired the site through a purchase rather than through a court order condemning the property.  According to these defendants, the City's acquisition of the property in this manner did not satisfy the eminent domain requirements of section 101(35)(A)(ii), and the City is a PRP under section 107.

The record shows that the City paid $912,000 to acquire the Main Yard in September 2004 after entering into a settlement agreement with General Waste and the insurers.  Dkt. No. 426, Ex. C.  Reference to the contamination of the site was made in the settlement agreement, and the parties to the agreement specifically referenced 42 U.S.C. §§ 9601(35)A(ii) and 9607(b) in the recitals of the agreement, acknowledging that the City was acquiring the Main Yard through the exercise of eminent domain by purchase.  *Id.*  The recitals also state that as a condition to the City's acquisition of the Main Yard, General Waste had committed to remediating the Main Yard under the Indiana Voluntary Remediation Program. The settlement agreement provided that the City had required financial assurances to ensure that the remediation of the Main Yard was completed in accordance with the voluntary remedial work plan approved by IDEM.

By its terms, CERCLA section 101(35)(A)(ii) acknowledges that a formal condemnation action and court judgment are not always necessary for a public entity's acquisition of property to be deemed an exercise of eminent domain so that the government can avoid becoming a PRP.  The statute refers explicitly to "the exercise of eminent domain authority *by purchase or condemnation*."   Also, at least in Indiana, eminent domain is governed by Ind. Code § 32-24-1-1 *et seq.* Indiana Code § 32-24-1-3(a) directs that "any person that may exercise the power of eminent domain for any public use under any statute may exercise the power *only* in the manner provided in this article, except as otherwise provided by law." (emphasis added).  The first requirement following that statutory directive is that

"before proceeding to condemn, the person . . . *must* make an effort to purchase for the use intended the land, right-of-way, easement, or other interest, in the property." Ind. Code § 32-24-1-3(b)(2) (emphasis added). The Indiana Court of Appeals has held that a purchase agreed upon without resorting to condemnation proceedings in court can be a taking by use of eminent domain power, such that leases of the property are also cancelled (when they could not be as part of an ordinary sale). See *P.C. Management, Inc. v. Page Two, Inc.*, 573 N.E.2d 434, 437-38 (Ind. App. 1991). Without direct reference to the statutory provision, the Indiana Court of Appeals has also recognized that "a conveyance in lieu of actual condemnation of real property constitutes a condemnation proceeding because it is tantamount to a taking under the power of eminent domain." *Schwartz v. Castleton Christian Church*, 594 N.E.2d 473, 475 (Ind. App. 1992). Indiana law clearly recognizes that a condemnation action is not necessary for a public entity to acquire property by eminent domain.

The cases relied on by the Heritage Coal defendants do not support their contention that a condemnation action is required for acquisition by eminent domain. The courts in *City of Wichita v. Aero Holdings, Inc.*, 177 F. Supp. 2d 1153, 1167-69 (D. Kan. 2000), and *United States v. Occidental Chemical Corp.*, 965 F. Supp. 408, 413-14 (W.D.N.Y. 1997), held – prior to *Atlantic Research*, of course – that the cities of Wichita and Niagara Falls, respectively, were not innocent owners because those cities had acquired the polluted properties voluntarily through negotiated purchases and not through eminent domain. Those courts were

considering whether the cities might be exempt from being "owners or operators" under section 101(20)(D), without discussing the meaning of the eminent domain language in section 101(35)(A)(ii).  The Heritage Coal defendants also rely on *City of Toledo v. Beazer Materials and Services, Inc.*, 923 F. Supp. 1013 (N.D. Ohio 1996), which is a CERCLA § 101(35)(A)(ii) case.  In that case the court was persuaded by a plain reading of the Ohio eminent domain statute, which required not only that the agency seeking to acquire the property negotiate with the owner of the property, but that the agency and the property owner be unable to agree prior to a taking by eminent domain.  *City of Toledo,* 923 F. Supp. at 1020-21. Because Toledo was able to reach an agreement with the property owner, the court did not find Toledo's purchase to be an act of eminent domain.  *Id*. However, the *City of Toledo* court did not address the plain language of CERCLA section 101(35)(A)(ii), which plainly assumes that eminent domain may be exercised *by purchase*, indicating that the impasse required by Ohio law is not a federal requirement under CERCLA.

Indiana's eminent domain law, by contrast, does not require that the public entity and the property owner disagree.  Indiana law requires only that the public entity make an effort to purchase the property, which the City successfully did here.  Both CERCLA and Indiana law recognize eminent domain by purchase, and the Heritage Coal defendants have not shown that the City's acquisition of the General Waste sites was not through eminent domain.  The Heritage Coal defendants' motion is denied in its entirety.

IV.    *Greenway Trust's Motion for Partial Summary Judgment against SIGECO*

The Greenway Trust has also moved for summary judgment against defendant SIGECO seeking a determination that SIGECO is in fact a PRP. SIGECO concedes properly that it is, and the Trust's motion is granted to that extent.  The Trust also seeks a determination that SIGECO is jointly and severally liable under section 107 of CERCLA for all costs of remediation of the soil contamination of both the Main Yard and River Yard sites.  If the Trust is correct, then SIGECO would be on the hook for 100 percent of the remediation costs, a liability that could be limited only in the form of contribution orders directed to other (solvent) PRPs under CERCLA section 113(f)(1).  On this issue, the court denies summary judgment and will defer a definitive ruling on the issue until the parties have presented their evidence at trial.

A.    *Facts Related to the Trust's Motion for Summary Judgment*

Most of the facts set forth above are also relevant for the Trust's motion against SIGECO and are incorporated here.  SIGECO was a utility company that provided energy delivery services to residents of southwestern Indiana.  Dkt. No. 67, ¶ 55.  It used batteries at its facilities located in and near Evansville, Indiana, and at various times between 1935 and 1998, SIGECO entered into agreements to sell scrap metal to General Waste.  Dkt. No. 389, Ex. 1, ¶¶ 14-15; Ex. 2 at 394-95; Ex. 3, No. 7-8.  SIGECO was one of General Waste's most regular customers.  Dkt. No. 389, Ex. 1, ¶ 14; Ex. 2 at 389-95.  General Waste hauled scrap metal from SIGECO's main facility and its substations, and SIGECO brought material to General Waste using its own trucks.  Dkt. No. 389, Ex. 1, ¶ 14; Ex. 2 at 395-96.  The materials sold by SIGECO to General Waste included used batteries.  Dkt. No. 389, Ex. 1, ¶ 29; Ex. 3, No. 19.  SIGECO was General Waste's largest source of batteries, and the batteries contained lead.  Dkt. No. 389, Ex. 2 at 400; Ex. 3, No. 20.  General Waste transported scrap, including batteries, from SIGECO to both the Main Yard and the River Yard sites.  Dkt. No. 389, Ex. 1, ¶ 8; Ex. 2 at 395.

B.    *Analysis*

1.    *SIGECO's Liability Under CERCLA § 107(a)(4)(B)*

As discussed above, CERCLA section 107(a)(4)(B) provides that PRPs are liable for "necessary costs of response incurred by any other person consistent

with the National Contingency Plan."  42 U.S.C. § 9607(a)(4)(B).  This section governs cost recovery for parties who voluntarily incur response costs in responding to releases of hazardous substances.  *Atlantic Research*, 551 U.S. at 139, n.6.  Cleanups are deemed voluntary where the plaintiff has neither settled any liability with a  government entity nor been the subject of a CERCLA suit.  See *id*. at 139; *Metropolitan Water Reclamation Dist.*, 473 F.3d at 835.  Neither General Waste, Trockman, nor the Greenway Trust has been under the legal compulsion of a consent decree or has been the subject of a CERCLA enforcement action under section 106 or 107.  SIGECO admits that the General Waste sites are "facilities," that a "release of hazardous substances" has occurred at the sites, that "response costs" were incurred in remediation of the sites, and that it is a PRP under CERCLA.[6]  Dkt. No. 67, ¶ 119;  Dkt. No. 389, Ex. 3, Nos. 22-24, 27; Dkt. No. 419 at 3.  Under the plain language of the statute, the Greenway Trust argues, it is entitled to hold SIGECO jointly and severally liable for the costs it has incurred in remediating the sites.

---

[6]In its response to the Trust's Request for Admissions, SIGECO admitted that response costs were incurred at the sites, but denied that the Trust incurred those costs.  See Dkt. No. 389, Ex. 3, Nos. 24, 26, 27, 29.  In response to the Trust's motion for summary judgment, SIGECO did not raise and thus waived for purpose of summary judgment any argument related to the source of the response costs.  SIGECO also denied that the response costs were necessary and consistent with the national contingency plan, but failed to raise necessity or consistency in response to the Trust's motion for summary judgment.  See Dkt. No. 389, Ex. 3, Nos. 25, 28.  The court considers those points to have been waived for purposes of summary judgment as well.

SIGECO argues that only an innocent landowner may impose *joint and several* liability on another for its response costs, and that the Trust, as assignee of General Waste, Trockman and the insurers, is not an innocent landowner.[7] SIGECO argues that the Supreme Court's *Atlantic Research* decision supports its position. The court addressed these arguments above. *Atlantic Research* did not turn on the relative innocence of the parties. The key for purposes of section 107(a) was whether the parties incurred response costs. The key for purposes of section 113(f)(1) was whether a party had been sued in a civil action under section 106 or 107(a). The Supreme Court specifically held that a PRP – a potentially responsible party under section 107(a)(1) – could bring suit against its fellow PRPs under section 107(a)(4)(B). Any inequity in this result could be remedied by a section 113(f) counterclaim, the resolution of which "would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the 107(a) action." *Atlantic Research*, 551 U.S. at 140. Allowing courts to sort out the equities among PRPs through a section 113(f) contribution action is very different from not allowing a voluntary PRP to set the CERCLA ball in motion through a section 107(a) action.

Once liability is established under section 107(a) of CERCLA, section 113(g) of CERCLA requires entry of a declaratory judgment as to liability for future response costs. That section states that in any action for recovery of costs under

---

[7]The parties do not address the fact that the City of Evansville also assigned its claims to the Trust, and neither will the court.

section 107, "the court *shall* enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  42 U.S.C. § 9613(g)(2) (emphasis added).  SIGECO argues that a declaratory judgment is premature because it is likely that many other parties, some unknown, are also liable under CERCLA for lead contamination.  Again, however, to the extent that SIGECO might pay more than its equitable share, it has a remedy available by bringing section 113(f) contribution claims as third-party claims or counterclaims.  The Greenway Trust has established that SIGECO is liable for response costs related to lead remediation, and the Trust is entitled to a declaratory judgment to that effect.

### 2.    *Divisibility of Harm and Joint and Several Liability*

Is SIGECO jointly and severally liable for the entire costs of the cleanups?  The Seventh Circuit has said that the only defense to joint and several liability under section 107(a) is to demonstrate that the harm is divisible, but "this is a rare scenario."  *Metropolitan Water Reclamation Dist.*, 473 F.3d at 827 n.3.  The Trust argues that both sites were contaminated with high levels of lead, that General Waste's activities were conducted so that the River Yard and the Main Yard sites were a single operation, and that it would be impossible for SIGECO to meet its burden to show that the harm done was divisible.  SIGECO responds that it might have met its burden if General Waste had not destroyed its detailed business records showing the source, type, quantity, and value of the scrap it

purchased.  Dkt. No. 419 at 15;  Ex. C at 69-71.  It argues that General Waste's act of destroying its business records makes it impossible for SIGECO or the other defendants to attempt to prove that the harm is divisible between the various PRPs or between the sites.

Prior to the Supreme Court's decision in *Burlington Northern and Santa Fe Railway Co. v. United States*, 129 S. Ct. 1870 (2009), issued during the course of the briefing on the Trust's motion against SIGECO, the court would have had little difficulty concluding that the harm here is not divisible, that SIGECO would be jointly and severally liable for all remediation costs of both sites, and that SIGECO could rely on contribution claims under section 113(f)(1) to force other PRPs to share the costs of remediation.  SIGECO argues, however, that *Burlington Northern* reflects a significant change in the law governing the apportionment of CERCLA responsibility.

In *Burlington Northern*, a company called Brown & Bryant had operated an agricultural chemical distribution business on property it owned.  Over the years, Brown & Bryant had expanded its operations by leasing two tracts of land owned jointly by two railroads.  Brown & Bryant's operations had resulted in various spills and leaks of hazardous substances that had contaminated both the original site and the tracts owned by the railroads.  129 S. Ct. at 1874-76.  Brown & Bryant became insolvent, and the federal government eventually spent more than eight million dollars to remediate the property.  The government also ordered the

railroads to clean up the property, and they spent more than three million dollars to do so.   (The liability of another party, Shell, was also in dispute, but the Supreme Court eventually held that it was not liable under CERCLA.)

For present purposes, the key point is that the district court found that the contamination of the site created a "single harm" but that the harm was divisible and was subject to apportionment among the several PRPs, without imposing joint and several liability.   129 S. Ct. at 1876.   Based on several factors – the percentage of land owned by the railroads, the duration of the railroads' lease divided by the duration of Brown & Bryant's operations, and the relative roles of the different spilled chemicals in requiring remediation – the district court apportioned the liability so that the railroads were responsible for only nine percent of the government's total cleanup costs.

The Ninth Circuit had reversed and held that the railroads were jointly and severally liable for all of the government's cleanup costs.  The Supreme Court  in turn reversed the Ninth Circuit and affirmed the district court's apportionment of liability to the railroads.  The Supreme Court explained that the scope of liability in a CERCLA case is to "'be determined from traditional and evolving principles of common law.'" 129 S. Ct. at 1881, quoting *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 808 (S.D. Ohio 1983).   The starting point for analyzing divisibility of the harm is § 433A of the Restatement (Second) of Torts.  Under the Restatement,

> "when two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused.  Restatement (Second) of Torts, §§ 433A, 881 (1976); Prosser, Law of Torts, pp. 313-314 (4th ed. 1971). . . .  But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm.  Restatement (Second) of Torts, § 875; Prosser, at 315-316."

*Burlington Northern*, 129 S. Ct. at 1881, quoting *Chem-Dyne Corp.,* 572 F.Supp., at 810.  In other words, as the Court explained, "apportionment is proper when 'there is a *reasonable* basis for determining the contribution of each cause to a single harm.'"  *Id.* (emphasis added), quoting Restatement (Second) of Torts, § 433A(1)(b), 434 (1963-64).

Although equitable factors relevant to section 113(f)(1) contribution claims do not play a role in determining the divisibility of the harm, reasonableness does. *Burlington Northern*, 129 S. Ct. at 1881-82 & n. 9 (2009).  "Apportionment [of the harm] is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs."  *Id.* at 1882, n.9. In *Burlington Northern*, the lower courts had agreed that the harm created by contamination of the site was "singular" but was at least theoretically capable of apportionment.  129 S. Ct. at 1881.  The issue was whether the record provided a reasonable basis for doing so. As noted, the district court had apportioned harm based on the portion of the surface area each party had controlled, the volume of hazardous waste released as a result of each party's activities, and the time over which those activities

extended, with a generous allowance for imprecision in the estimates of those matters. *Id.* at 1882. The Supreme Court held that the district court's approach was reasonable and upheld its apportionment of liability for the government's cleanup costs, which did not hold each party jointly and severally liable for the entire loss. For present purposes, the Supreme Court held that joint and several liability was not required for all PRPs where the harm was "singular," so long as the record provided a reasonable basis for apportioning the harm among the PRPs.

The full import of *Burlington Northern* is hotly debated, in this case and elsewhere. SIGECO argues that it effected a dramatic change that will make it much easier for PRPs to avoid the burden of joint and several liability. The Trust argues that *Burlington Northern* amounts to nothing new; it merely restated the old principles widely adopted since *Chem-Dyne* was decided in 1983. The court declines at this point to commit to a particular interpretation of *Burlington Northern* and how it might apply in a case like this one, in which a trust formed by the owner-operators of the site has carried out part of the remediation and might have found a way to protect the owner-operators from joint and several liability for the full amount of remediation. This is a case in which the Supreme Court's new decision has presented what might be called genuine questions of material law.

The court could try to answer those questions on the basis of the existing record, but the timing of the Supreme Court's decision has meant that the record

is more limited than it otherwise would have been.  More important, where the applicable law appears to be in flux like this, perhaps the best role the district court can play in the process is to hold a trial and make the detailed findings of fact needed to inform higher courts as they address the questions of law.  See, *e.g.*, *Lalonde v. Textron, Inc.*, 369 F.3d 1, 6 (1st Cir. 2004) (reversing Rule 12(b)(6) dismissal to allow further development of record in emerging area of law); *Nelson v. IPALCO Enterprises, Inc.*, 2005 WL 1924332, at *3-4 (S.D. Ind. Aug. 11, 2005) (denying cross-motions for summary judgment to allow for more complete presentation and determination of facts); *In re JDS Uniphase Corp. ERISA Litigation*, 2005 WL 1662131, at *8 (N.D. Cal. July 14, 2005) (denying in principal part a motion to dismiss in emerging area of law).  The court expects to hold a trial that will allow each side to present evidence relevant to its own and its opponents' different interpretations of *Burlington Northern*.  That approach will allow full development of a record and a decision on the basis of real facts rather than the artificial and even hypothetical versions of facts the court must assume for purposes of deciding motions for summary judgment.  The court recognizes that this approach might delay the remediation of the River Yard while these issues are sorted out.  But *Burlington Northern* raises new questions and legal uncertainty sufficient to make this approach of a full airing of apportionment issues the better approach at this time.

Accordingly, the court grants plaintiff's motion to the extent that it holds SIGECO liable for remediation costs under section 107(a) and declares that

SIGECO will be liable for future remediation costs, pursuant to section 113(g) of CERCLA.  The court denies plaintiff's motion to the extent that it seeks a conclusive determination that SIGECO would be jointly and severally liable for all past and future remediation costs of the General Waste sites.  A portion of the trial will need to focus on the issue of apportionment of liability to SIGECO and to other PRPs.

VI.    *PRP Group's Motion to Strike Jury Trial Demand*

Arguing that the contribution claims it has brought against the third-party defendants are all equitable in nature, the PRP Group moves to strike the third-party defendants' requests for trial by jury.  That motion is granted, and the third-party defendants' demands for a jury trial are stricken.

With its third-party complaint, the PRP Group seeks contribution and a declaratory judgment under CERCLA (42 U.S.C. § 9613) (Counts I and II) and the Indiana Environmental Legal Actions ("ELA") Statute (Ind. Code § 13-30-9-1 *et seq.*) (Counts III and IV).  The PRP group argues that its claims are equitable in nature and that, because the Seventh Amendment guarantees a jury trial only in suits that would have been tried in courts of law rather than courts of equity before the merger of law and equity, the third-party defendants have no right to a trial by jury in this case.  Some third-party defendants have raised various

arguments in opposition to the PRP Group's motion.  The court discusses those arguments in turn.

A.    *Jury Trials Under CERCLA*

Third-party defendant Frontier Kemper, joined by third-party defendant Sears, argues in response that sometimes juries do play a role in CERCLA actions. Dkt. No. 240, 247.  In support of its argument, Frontier Kemper cites *GL Industries of Michigan v. Forstmann-Little*, 800 F. Supp. 695 (S.D. Ind. 1991) (Barker, J.).  According to Frontier Kemper, Judge Barker "left open the possibility" that a party may be entitled to a jury on a CERCLA liability question. Dkt. No. 240 at 2, citing *GL Industries*, 800 F. Supp. at 699.  Judge Barker did not leave open the possibility of a jury trial.  She relied on the line of authority holding that no right to a jury trial exists in CERCLA cases, and she noted that the party seeking to preserve the possibility of a jury trial had not developed an argument in support of its position.  *GL Industries*, 800 F. Supp. at 699.  Frontier Kemper's reliance on this case is misplaced.

Frontier Kemper also relies on cases from other circuits that articulated the summary judgment standard in terms of the familiar "reasonable jury."  See Dkt. No. 240 at 2-3, citing *Consolidated Edison Co. v. UGI Utilities, Inc.*, 153 Fed. Appx. 749, 751-52 (2d Cir. 2005) (reviewing grant of summary judgment); *Concrete Sales and Services, Inc. v. Blue Bird Body Co.*, 211 F.3d 1333, 1337 (11th Cir. 2000)

(same).  Those courts were applying the usual standard for summary judgment, which is often stated in terms of whether or not a "reasonable jury" (or more generically, a reasonable trier of fact) could find in favor of a particular plaintiff as articulated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  These decisions are silent with regard to the litigants' right to a jury trial in CERCLA cases.  They offer no support for the third-party defendants' jury demands.

### B.   *Jury Trials Under the Indiana ELA*

Indiana's ELA statute echoes CERCLA, providing that "a court shall allocate the costs of the [cleanup] . . . using legal and equitable factors that the court determines are appropriate."  Ind. Code § 13-30-9-3(a).  Although Frontier Kemper argues that the ELA leaves the issue open, the statutory language clearly states that the *court* shall allocate costs between the parties, and the parallels to CERCLA are apparent.  This court has previously indirectly recognized the equitable nature of the ELA, and Frontier Kemper has raised no argument sufficient to prompt reconsideration of that finding.  See *Armstrong Cleaners, Inc. v. Erie Ins. Exchange*, 364 F. Supp. 2d 797, 811-13 (S.D. Ind. 2005).

### C.   *Jury Trials in Declaratory Judgment Actions*

For purposes of deciding a right to jury trial in an action seeking a declaratory judgment, the answer depends on whether the underlying dispute "is the counterpart of a suit in equity" or "is essentially an inverted lawsuit – an

action brought by one who would have been a defendant at common law." *Marseilles Hydro Power, LLC v. Marseilles Land and Water Co.*, 299 F.3d 643, 649 (7th Cir. 2002), quoting *Owens-Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1189 (3d Cir. 1979).  Here, the PRP Group seeks a declaratory judgment to ensure that any equitable allocation of response costs that might be made by this court under CERCLA or the ELA will apply to future response costs.  The declaratory judgments sought here, then, are the "counterpart" to the PRP Group's CERCLA and ELA claims and are equitable in nature.

Third-party defendant Frontier Kemper argues that in Indiana, juries may be and have been used in declaratory judgment actions.  Citing *Jamrosz v. Resource Benefits, Inc.*, 839 N.E.2d 746, 764-65 (Ind. App. 2005), Frontier Kemper argues that any issues of fact relating to the PRP Group's claims for declaratory relief may properly be submitted to a jury.  Dkt. No. 240 at 3.  However, the claims in *Jamrosz* centered on a contract dispute and included claims of breach of contract, fraud, conversion, and civil conspiracy.  839 N.E.2d at 754.  Although the propriety of a jury trial was not discussed by the court in *Jamrosz*, the claims underlying the declaratory judgment action would have been properly tried before a jury – unlike the CERCLA and ELA claims underlying the PRP Group's declaratory judgment action here.  The PRP Group's declaratory judgment action is based entirely on equitable claims.  Its declaratory judgment also sounds in equity, so there is no right to a jury trial.

D.    *Ripeness*

Third-party defendant White County Coal, LLC ("White County"), joined by Duke Energy, Sears, and the City of Evansville, argues that striking a demand for a jury trial at this stage would be premature because not every third-party defendant has answered the PRP Group's complaint and because certain deadlines – amending the pleadings, the trial date – had not been established. Dkt. No. 244 at 2-3.   Thus, White County argues, the court cannot determine whether a jury trial is proper because it does not know what claims will be litigated at trial.   *Id.* at 3.   A trial date has been set and every third-party defendant who has appeared and participated in the lawsuit has now answered. This issue is ripe for decision.   If a particular claim is legal in nature, the Seventh Amendment guarantees a right to trial by jury.   All of the claims between the PRP Group and the third-party defendants are equitable in nature, and there is no right to a jury trial on equitable claims.   The PRP Group's motion to strike the third-party defendants' requests for a jury trial is granted.

VII.   *PRP Group's Motion for Leave to File First Amended Complaint*

This action began on May 21, 2007, when the Trust initially filed suit. The Trust's complaint was amended on May 6, 2008, and on July 3, 2008, the PRP Group filed its third-party complaint.  Dkt. Nos. 1, 62, 103.  At argument on September 22, 2009, the parties assured the court that they stand ready to try this case in the summer of 2010.  However, the PRP Group has moved for leave to amend its third-party complaint to add the United States Navy as a defendant. Dkt. No. 492.  The Trust opposes the PRP Group's motion, arguing that the addition of the Navy as a third-party defendant at this time will lead to undue delay and will prejudice both the Trust and Trockman.[8]  Dkt. No. 508.  The PRP Group's motion for leave to amend is denied.

Under the Federal Rules of Civil Procedure, leave to amend a complaint should be "freely given" except in circumstances where an amendment would cause undue delay, would unduly prejudice the non-moving party, would be futile, or was prompted by the movant's bad faith or dilatory motive.  Fed. R. Civ. P. 15(a)(2); see also *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The court believes that undue delay would result from granting the PRP Group's motion for leave to amend.  This litigation is already two years old, discovery is underway and heading towards resolution, dispositive motions have been filed and are being

_____

[8]The Trust argued in the alternative that if the court were to allow the PRP Group's contribution claim to proceed against the Navy, it should move forward on a track separate from the main litigation.  Because the court denies the PRP Group's motion, it does not address that suggestion.

resolved, and trial is around the corner.  The addition of a new third-party defendant is not sufficient reason to stall or slow these proceedings.  Remediation of the General Waste sites has been already too long in coming, and both the parties and the court have a strong interest in seeing the immediate case come to a close.

The PRP Group will not be prejudiced by the court's refusal to allow it to amend its complaint.  The PRP Group or its individual PRP members still might seek contribution from the Navy or any other previously unidentified PRP as part of a separate contribution action under CERCLA section 113(f).  A separate action is obviously not an ideal solution, for it would probably be less efficient than rolling all PRPs and their claims and defenses into one action.  As a trailing action, however, a separate contribution action could take advantage of much work that has already been done.  After a trial in this action as it is currently framed, the interested parties should know most of the facts and should have good information about the extent of any Navy responsibility.  As between these two less than palatable alternatives – delay final resolution until the Navy can be brought up to speed, or separate the overall dispute into two cases – the court opts in favor of the course that should speed up the eventual clean-up of the River Yard.

*Conclusion*

The PRP Group's motion for summary judgment against General Waste and Trockman under CERCLA section 113(f) (Dkt. No. 200) is granted.  The Heritage Coal defendants' motion for summary judgment against the Greenway Trust (Dkt. No. 425) is denied.  The Trust's motion for leave to file a response to SIGECO's surreply (Dkt. No. 474) is granted.  The Trust's motion for a finding of liability on summary judgment against SIGECO under CERCLA section 107(a) (Dkt. No. 388) is granted in part and denied in part, as explained above.  The PRP Group's motion to strike the third party defendants' requests for a jury trial (Dkt. No. 226) is granted.   The PRP Group's motion for leave to file its first amended third-party complaint (Dkt. No. 491) is denied.

So ordered.

Date:  September 29, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Scott R. Alexander
TAFT STETTINIUS & HOLLISTER LLP
salexander@taftlaw.com, docket@taftlaw.com

John P. Arranz
SWANSON MARTIN & BELL
jarranz@smbtrials.com, mhernandez@smbtrials.com

Stephen J. Axtell
THOMPSON HINE LLP
steve.axtell@thompsonhine.com, diane.macleod@thompsonhine.com

Jennifer C. Baker
HUNSUCKER GOODSTEIN & NELSON
jbaker@hgnlaw.com

Brian C. Bosma
KROGER GARDIS & REGAS, LLP
bcb@kgrlaw.com

Jayna Morse Cacioppo
TAFT STETTINIUS & HOLLISTER LLP
jcacioppo@taftlaw.com, akwilosz@taftlaw.com, docket@taftlaw.com

Gregory P. Cafouros
KROGER GARDIS & REGAS, LLP
gpc@kgrlaw.com, pad@kgrlaw.com

Michael D. Chambers
TAFT STETTINIUS & HOLLISTER LLP
mchambers@taftlaw.com, docket@taftlaw.com

Robert R. Clark
TAFT STETTINIUS & HOLLISTER LLP
rclark@taftlaw.com, docket@taftlaw.com, malexander@taftlaw.com

Travis A. Crump
STOLL KEENON OGDEN PLLC
Travis.Crump@skofirm.com

Michael E. DiRienzo
KAHN DEES DONOVAN & KAHN
mdirienzo@kddk.com, sherri.k.sprinkle@travelers.com

EVANSVILLE GREEWAY PRP GROUP
gpc@kgrlaw.com

Hallie Miller Fahey
TROUTMAN SANDERS LLP
hallie.fahey@troutmansanders.com

Andrew Rudolph Falk
KROGER GARDIS & REGAS LLP
arf@kgrlaw.com

Maria V. Gillen
TENNESSEE VALLEY AUTHORITY
mvgillen@tva.gov

Adam T. Goebel
STOLL KEENON OGDEN PLLC
adam.goebel@skofirm.com, jessica.mcgee@skofirm.com

Michael D. Goodstein
HUNSUCKER GOODSTEIN & NELSON PC
mgoodstein@hgnlaw.com

Edward S. Griggs
BARNES & THORNBURG LLP
sean.griggs@btlaw.com, nancy.wagner@btlaw.com

Timothy A. Haley
BARNES & THORNBURG LLP
thaley@btlaw.com

Elizabeth Schroer Harvey
SWANSON MARTIN & BELL LLP
eharvey@smbtrials.com

Samuel D. Hinkle, IV
STOLL KEENON OGDEN PLLC
sam.hinkle@skofirm.com, adam.goebel@skofirm.com, travis.crump@skofirm.com,
ashley.ragsdale@skofirm.com

David L. Jones
JONES WALLACE, LLC
djones@joneswallace.com, nevans@joneswallace.com, ljones@joneswallace.com

Jody E. Kahn
SWANSON MARTIN & BELL LLP
jkahn@smbtrials.com, jodykahn@gmail.com

G. Daniel Kelley, Jr.
ICE MILLER LLP
daniel.kelley@icemiller.com, chris.webb@icemiller.com

Matthew Theron Kinst
SWANSON MARTIN & BELL LLP
mkinst@smbtrials.com

Thomas A. Knoth
THOMPSON HINE LLP
tom.knoth@thompsonhine.com, diane.macleod@thompsonhine.com

John Milton Kyle, III
BARNES & THORNBURG LLP
john.kyle@btlaw.com

Douglas W. Langdon
FROST BROWN & TODD, LLC
dlangdon@fbtlaw.com, tdooley@fbtlaw.com

Kyle Andrew Lansberry
LEWIS & WAGNER
klansberry@lewiswagner.com, gbrackett@lewiswagner.com

Richard J. Lewandowski
WHYTE HIRSCHBOECK DUDEK S.C.
rlewandowski@whdlaw.com

Michael John Maher
SWANSON MARTIN & BELL
mmaher@smbtrials.com, jpodlin@smbtrials.com

Stacey H. Myers
HUNSUCKER GOODSTEIN & NELSON PC
smyers@hgnlaw.com, cdavis@hgnlaw.com

Michael Orville Nelson
HUNSUCKER, GOODSTEIN & NELSON
mnelson@hgnlaw.com, mschulz@boselaw.com, wgarrison@hgnlaw.com

Reed W Neuman
NOSSAMAN, LLP/ O'CONNOR & HANNAN
rneuman@nossaman.com, kbrayton@nossaman.com

Victoria L. Nilles
THOMPSON HINE LLP
victoria.nilles@thompsonhine.com, diane.macleod@thompsonhine.com

Anthony W. Overholt
FROST BROWN TODD LLC
aoverholt@fbtlaw.com, sdunn@fbtlaw.com

Tina Marie Richards
BAKER & DANIELS - Indianapolis
tina.richards@bakerd.com, dianne.armstroff@bakerd.com

Robert W. Rock
JONES WALLACE LLC
rrock@joneswallace.com,   cheim@joneswallace.com,   nevans@joneswallace.com,
ljones@joneswallace.com

Keith E. Rounder
TERRELL BAUGH SALMON & BORN
krounder@tbsblaw.com, pperry@tbsblaw.com

Ross E. Rudolph
RUDOLPH FINE PORTER & JOHNSON
rer@rfpj.com, smo@rfpj.com, mch@rfpj.com, trg@rfpj.com

James P. Ryan
NOSSAMAN, LLP/O'CONNOR & HANNAN
jryan@nossaman.com

Douglas B. Sanders
BAKER & McKENZIE LLP
douglas.b.sanders@bakernet.com

G. Michael Schopmeyer
KAHN DEES DONOVAN & KAHN
mschopmeyer@kddk.com

John A. Sheehan
HUNTON & WILLIAMS LLP
JSheehan@hunton.com, STerrell@hunton.com

Kate E. Shelby
TAFT STETTINIUS & HOLLISTER LLP
kshelby@taftlaw.com, dinville@taftlaw.com

Katherine L. Shelby
BINGHAM MCHALE LLP
kshelby@binghammchale.com, kbarnett@binghammchale.com

Donald M. Snemis
ICE MILLER LLP
donald.snemis@icemiller.com, nikki.hunter@icemiller.com

William T. Terrell
TENNESSEE VALLEY AUTHORITY
wtterrell@tva.gov, ogcecffiles@tva.gov

Kevin Morris Toner
BAKER & DANIELS - Indianapolis
kevin.toner@bakerd.com, judy.ferber@bakerd.com, kay.cook@bakerd.com

John William Watson, III
BAKER & McKENZIE LLP
john.w.watson@bakernet.com

Thomas E. Wheeler, II
FROST BROWN TODD LLC
twheeler@fbtlaw.com, kdickerson@fbtlaw.com

Kenneth Thomas Williams, II
STOLL KEENON & OGDEN PLLC
kt.williams@skofirm.com

David E. Wright
KROGER GARDIS & REGAS LLP
dew@kgrlaw.com, mem@kgrlaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

EVANSVILLE GREENWAY AND )
REMEDIATION TRUST, )
)
Plaintiff, )
)
v. )   CASE NO. 3:07-cv-0066-DFH-WGH
)
SOUTHERN INDIANA GAS )
AND ELECTRIC COMPANY, )
INC., *et al.*, )
)
Defendants. )

ENTRY ON PENDING MOTIONS

Several pending motions for summary judgment present issues under the
federal Comprehensive Environmental Response, Compensation and Liability Act,
better known as CERCLA, 42 U.S.C. § 9601 *et seq.* From approximately 1956
through 1998, third-party defendant General Waste Products owned and operated
two adjacent sites that have become known as the "River Yard" and the "Main
Yard." The "Main Yard" site is located at 201 South Seventh Street, and the "River
Yard" site is located at 2350 Broadway (Rear) Avenue, both where Pigeon Creek
empties into the Ohio River in downtown Evansville, Indiana. General Waste
operated a scrap metal business at the sites. Over the course of its business at
the sites, General Waste arranged for the transport and/or disposal or hazardous
substances at both sites. Third-party defendant Allan Trockman is the former

president and shareholder of General Waste.  He operated the Main Yard and River Yard sites at the time hazardous substances were disposed on the sites.

After General Waste had closed its business, the City of Evansville became interested in acquiring both sites to include them in a "greenway" of bicycle and walking trails in the city.  Analysis of the sites showed high concentrations of lead and polychlorinated biphenyls (PCBs) in the soil.  General Waste sought clean-up costs from its liability insurers.  The insurers disputed coverage, and litigation ensued.

As part of the settlement of that lawsuit in 2004, General Waste, Trockman, and General Waste's insurers entered into the Evansville Greenway and Remediation Trust Agreement ("the Greenway Trust" or "the Trust").  The Trust Agreement stated that the purposes of the Greenway Trust were to "collect and disburse amounts for 'environmental remediation'" and to "engage in the activities in furtherance of its obligation to collect and disburse amounts for environmental remediation."  Dkt. No. 426, Ex. F at 1, ¶ 2.3.  The funds deposited in the Greenway Trust were to be used exclusively for the purpose of implementing the investigative, remedial, and enforcement actions required by the Trust Agreement. The insurers of General Waste contributed approximately $3.5 million to the Greenway Trust.  Most of that money has been spent to remediate the Main Yard. That remediation has been completed, and the Main Yard is now part of the

Evansville Greenway.  The Greenway Trust has little money left now, however, and does not have funds to remediate the River Yard.

This action began when the Greenway Trust brought suit against defendants Southern Indiana Gas and Electric Company ("SIGECO"), Heritage Coal Co., Mead Johnson and Co., Midwest Coal Co., Black Beauty Coal Co., Squaw Creel Coal Co., and Mulzer Crushed Stone, Inc. under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and the Indiana Environmental Legal Actions statute, Ind. Code § 13-30-9-1 *et seq.*  Section 107(a) allows a party who has voluntarily undertaken to clean up a hazardous waste site to recover its costs from parties legally responsible for the contamination.  The Greenway Trust alleges that the defendants are responsible for lead and/or PCB contamination of the General Waste sites.  Dkt. No. 62, ¶ 268.  The Trust brought suit on its own behalf and as assignee of General Waste, Trockman, and the City of Evansville, although it purports to bring its section 107(a) claim only as itself and as the assignee of the City.  Dkt. No. 62, ¶¶ 262-74.

Several of the named defendants assigned their claims against the Greenway Trust, other defendants, and third party defendants to the third-party plaintiff PRP Group.  Dkt. No. 103 ¶ 3.  The PRP Group then filed a third-party complaint against third-party defendants General Waste, Trockman, the City of Evansville, General Electric Co., Indianapolis Power and Light Company, National Tire and Battery, Old Ben Coal Co., Solar Sources, Inc., Tennessee Valley

Authority, Whirlpool, White County Coal, PSI Energy, Tell City Electric Department, Frontier Kemper, and Speed Queen. The third-party complaint alleges that those third-party defendants are liable or potentially liable under section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for contribution to the necessary costs of response allegedly incurred by the Greenway Trust, General Waste, Trockman, and the City of Evansville.

Three summary judgment motions are now ripe. First, the PRP Group has moved for summary judgment on the issue of contributor liability against General Waste and Trockman under CERCLA section 113(f). Dkt. No. 200. The court grants the motion. Second, defendants Heritage Coal, Mead Johnson, and Black Beauty Coal have moved for summary judgment against plaintiff Greenway Trust on the claims raised in the Trust's first amended complaint. Dkt. No. 425. The court denies that motion in all respects. Third, Greenway Trust has moved for summary judgment holding that defendant Southern Indiana Gas and Electric Company ("SIGECO") is jointly and severally liable for all clean-up costs for both the Main Yard and the River Yard under CERCLA section 107(a). Dkt. No. 388. That motion is granted in part and denied in part. The court also grants the PRP Group's motion to strike the third party defendants' requests for a jury trial (Dkt. No. 226) and denies the PRP Group's motion for leave to amend its third-party complaint to add the United States Navy as a party (Dkt. No. 491).

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party. See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255. However, a party must present more than mere speculation or conjecture to defeat a summary judgment motion. The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record. *Id.* at 251-52. These standards apply to all pending motions for summary judgment and require the court to change the lenses through which it views the record evidence so as to give the non-moving parties the benefits of all conflicts in the evidence and favorable inferences from that evidence.

*Discussion*

I.      *CERCLA*

The federal Comprehensive Environmental Response, Compensation and Liability Act was "designed to effectuate the cleanup of toxic waste sites [and] to compensate those who have attended to the remediation of environmental hazards." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996) (comparing purposes of CERCLA with purposes of Resource Conservation and Recovery Act). To achieve that purpose, Congress expressly provided for the recovery of cleanup costs in CERCLA.  Section 107 of the statute (42 U.S.C. § 9607) provides a private right of action for the recovery of such costs in certain circumstances.   To establish a case for reimbursement of clean-up costs under section 107(a), a plaintiff must establish four elements:  (1) the property is a facility; (2) there has been a release or threatened release of a hazardous substance; (3) the release has caused the plaintiff to incur necessary costs of response that are consistent with the National Contingency Plan; and (4) the defendant is in one of four categories of potentially responsible parties.  See *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994); *City of Martinsville v. Masterwear Corp.*, 2006 WL 2710628 at *2 (S.D. Ind. Sept. 20, 2006).

The four categories of potentially responsible parties or "PRPs" under section 107(a) are:

(1)      the owner and operator of a vessel or a facility,

(2)     any person who at the time of disposal of any hazardous substance
owned or operated any facility at which such hazardous substances
were disposed of,

(3)     any person who by contract, agreement, or otherwise arranged for
disposal or treatment, or arranged with a transporter for transport for
disposal or treatment, of hazardous substances owned or possessed
by such person, by any other party or entity, at any facility or
incineration vessel owned or operated by another party or entity and
containing such hazardous substances, and

(4)     any person who accepts or accepted any hazardous substances for
transport to disposal or treatment facilities, incineration vessels or
sites selected by such person, from which there is a release, or a
threatened release which causes the incurrence of response costs, of
a hazardous substance . . . .

42 U.S.C. §§ 9607(a).  The definition is so broad "as to sweep in virtually all

persons likely to incur cleanup costs."  *United States v. Atlantic Research Corp.*,

551 U.S. 128, 136 (2007).

Once identified as a PRP, an entity may be compelled by the government to

clean up a contaminated area.  See *Cooper Industries, Inc. v. Aviall Services, Inc.*,

543 U.S. 157, 161 (2004).  PRPs may also be held liable for:

(A)     all costs of removal or remedial action incurred by the United States
Government or a State or an Indian tribe not inconsistent with the national
contingency plan;

(B)     any other necessary costs of response incurred by any other person
consistent with the national contingency plan;

(C)     damages for injury to, destruction of, or loss of natural resources,
including the reasonable costs of assessing such injury, destruction, or loss
resulting from such a release; and

(D)     the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. §§ 9607(a)   The Supreme Court held in *Atlantic Research* that the meaning of the phrase "any other person" in section 107(a)(4)(B) includes other PRPs, so that a PRP who has incurred necessary response costs may bring suit against other PRPs to recover those costs.  551 U.S. at 131.

The courts have interpreted liability under this section in most cases to be strict, joint, and several.  The only established exception to liability is when the harm is divisible.  See *Metropolitan Water Reclamation Dist. of Greater Chicago v. North American Galvanizing & Coatings, Inc.*, 473 F.3d 824, 827 & n.3 (7th Cir. 2007) (describing divisible harm as "rare").   Joint and several liability under section 107(a) enables the government or another party who has incurred cleanup costs to follow the path of least resistance by suing one or only a few PRPs for all of the costs, leaving those targeted PRPs the task of finding other PRPs and seeking allocation of liability in an equitable way under section 113(f)(1) of CERCLA.

CERCLA section 113(f)(1) complements section 107(a) by permitting private parties to seek contribution from joint tortfeasors during or following a civil action under § 106 or § 107(a).  42 U.S.C. § 9613(f)(1); *Atlantic Research*, 551 U.S. at 139; *Cooper Industries*, 543 U.S. at 168 (holding that a private party could not seek contribution from other liable parties under § 113(f)(1) where it had not been sued

under § 106 or § 107(a)).  Section 113(f)(3)(B) permits private parties to seek contribution after they have settled their liability with the government.  42 U.S.C. § 9613(f)(3)(B).  But a so-called "voluntary" PRP – a potentially responsible party who incurs cleanup costs voluntarily and not after being sued under section 106 or 107(a) – cannot sue for contribution from its fellow PRPs under section 113(f) of CERCLA.  *Cooper Industries*, 543 U.S. at 160-61.  A PRP who carries out a voluntary cleanup, as General Waste and Trockman have done through the Greenway Trust in this case, can seek recovery from other PRPs only by suing under 107(a).

As noted, the remedies available under sections 107(a) and 113(f) are meant to complement each other.  *Atlantic Research*, 551 U.S. at 139.  As the Supreme Court explained:

> [A] PRP that pays money to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution.  But by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a).  As a result, though eligible to seek contribution under § 113(f)(1), the PRP cannot simultaneously seek to recover the same expenses under § 107(a).
>
> *   *   *
>
> For similar reasons, a PRP could not avoid § 113(f)'s equitable distribution of reimbursement costs among PRPs by instead choosing to impose joint and several liability on another PRP in an action under 107(a). The choice of remedies simply does not exist.  In any event, a defendant PRP in such a 107(a) suit could blunt any inequitable distribution of costs by filing a § 113(f) counterclaim.  Resolution of a § 113(f) counter-claim would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the § 107(a) action.

*Atlantic Research*, 551 U.S. at 139-40 (internal citations omitted).

II.    *PRP Group's Motion for Partial Summary Judgment*

By naming General Waste and Trockman as third-party defendants in its third-party complaint, the PRP Group in essence seeks to close the circle of liability here.   General Waste and Trockman and their insurers set up the Greenway Trust, which sued the members of the PRP Group.  The PRP Group then sued other PRPs, including General Waste and Trockman.   The third-party complaint seeks contribution and a declaratory judgment under section 113(f)(1) of   CERCLA  (42  U.S.C.  §  9613(f)(1))  (Counts  I  and  II)  and  the  Indiana Environmental  Legal  Actions  ("ELA")  statute  (Ind.  Code  §  13-30-9-1  *et seq.*) (Counts III and IV) against the third-party defendants, including General Waste and Trockman.  The PRP Group has moved for partial summary judgment against third-party defendants General Waste and Trockman.   The PRP Group seeks judgment on the issue of the liability of General Waste and Trockman under CERCLA section 113(f)(1), which allows "any person" to "seek contribution from any other person who is liable or potentially liable under section 9607(a) . . . during or following any civil action under section 9606 . . . or section 9607(a)." For  purposes  of  its  motion,  the  PRP  Group  does  not  seek  now  a  specific contribution *allocation* under section 113(f)(1), but only a finding of *liability*.  The PRP Group's motion for partial summary judgment is granted.


A.    *Undisputed Facts*

The PRP Group's claims arise from the disposal and cleanup of hazardous substances at the General Waste sites.  General Waste admitted that it was the owner of the River Yard site.  Dkt. No. 178, ¶ 10. It owned and operated the General Waste sites at a time when hazardous substances were disposed of at the sites.  *Id.* at ¶ 11.  It also arranged for transport or disposal of hazardous waste products on the General Waste sites.  *Id.* at ¶ 28.

Likewise, in his answer, Trockman admitted that he operated the General Waste sites at a time when hazardous substances were disposed of at the General Waste sites.  Dkt. No. 177, ¶ 12.  He also admitted that he arranged for transport or disposal of hazardous waste products at the General Waste sites.  *Id.* at ¶ 28.

The Greenway Trust sued the members of the PRP Group pursuant to section 107(a) of CERCLA on its own behalf and in its position as an assignee of the City of Evansville.  See Dkt. No. 62, ¶¶ 267-74; Dkt. No. 103, ¶ 2.

At least some members of the PRP Group – SIGECO, Heritage Coal, and Mead Johnson – have incurred "PRP search costs" by investigating the history of operation at the General Waste sites to identify other PRPs.  They have incurred costs reviewing documents, taking and evaluating witness statements, and in other activities to identify other PRPs who have been brought into this case as

-11-

third-party defendants.  Dkt. No. 267, Ex. A, ¶¶ 2, 4; Ex. B, ¶¶ 3-4; Ex. C, ¶ 5.

Also, PRP Group member SIGECO has engaged the services of an environmental

consulting firm to assist in the remediation effort.  That firm has incurred costs

developing a remediation plan.  Dkt. No. 267, Ex. D, ¶¶ 2-4.


    B.    *Analysis*

The PRP Group seeks summary judgment on the question of whether

General Waste and Trockman are liable or potentially liable parties as defined by

section 107(a) of CERCLA.  If and when that finding is made, the members of the

PRP Group, as defendants to the Trust's CERCLA section 107(a) lawsuit, will have

a right of contribution from General Waste and Trockman under section 113(f) of

CERCLA, assuming that the PRP Group is able to account satisfactorily for its

response costs.  See 42 U.S.C. § 9613(f)(1); *Cooper Industries*, 543 U.S. at 168

(holding that a private party could seek contribution under § 113(f) from other

liable parties only after having been sued under § 106 or 107(a)).  General Waste

and Trockman oppose the PRP Group's motion, arguing that the PRP Group must

first show that it has actually paid response costs and that its members have

already paid more than their fair shares.


The Greenway Trust sued the members of the PRP Group under section

107(a) of CERCLA.  Dkt. No. 62, ¶¶ 267-74.  Under the plain language of section

113(f), therefore, the PRP Group is entitled to seek contribution from any liable or

potentially liable party under section 107(a).  42 U.S.C. § 9613(f).  Once more, that
section includes the following categories of individuals:

(1)     the owner and operator of a vessel or a facility,

(2)     any person who at the time of disposal of any hazardous substance
        owned or operated any facility at which such hazardous substances
        were disposed of,

(3)     any person who by contract, agreement, or otherwise arranged for
        disposal or treatment, or arranged with a transporter for transport for
        disposal or treatment, of hazardous substances . . . and

(4)     any person who accepts or accepted any hazardous substances for
        transport to disposal or treatment facilities, incineration vessels or
        sites selected by such person, from which there is a release, or a
        threatened release which causes the incurrence of response costs, of
        a hazardous substance . . .

42 U.S.C. §§ 9607(a).  By their own admissions, General Waste and Trockman are
potentially liable parties as defined by section 107(a).  General Waste was the
owner of the River Yard site and admitted that it owned and operated both sites
at the time hazardous substances were disposed of at those locations.  Dkt. No.
178, ¶¶ 10, 11.  It also admitted that it arranged for the transport or disposal of
hazardous substances at both sites.  *Id.* at ¶ 28.  Likewise, Trockman admitted
that he operated the sites at the time hazardous substances were disposed and
that he arranged for the transport to or disposal of hazardous substances at the
sites.  Dkt. No. 177, ¶¶ 12, 28.  The PRP Group, as assignee of defendants on the
section 107(a) claim brought by the Greenway Trust created by General Waste and
Trockman, is entitled to seek contribution from General Waste and Trockman

under section 113(f) as liable parties or potentially liable parties as defined by CERCLA.

In *Atlantic Research*, the Supreme Court defined "contribution" as the word is used in section 113(f) as the "'tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault.'"  551 U.S. at 138, quoting Black's Law Dictionary 353 (8th ed. 1999).  Because section 113(f) permits a PRP to seek liability for contribution "during or following" a suit under section 106 or 107(a), the Court explained that section 113(f) "permits suit before or after the establishment of common liability.  In either case, a PRP's right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties."  *Id.* at 138-39.

Focusing on this language, General Waste and Trockman argue that the PRP Group must show that its members have *already* incurred response costs disproportionate to their fair share of liability as a prerequisite to the PRP Group's contribution claim under section 113(f).  Dkt. No. 232 at 7-8; Dkt. No. 274 at 3. In response to this argument, the PRP Group provided affidavits showing that its members have incurred some costs.  General Waste and Trockman argue that the affidavits are insufficient because they are "conclusory," do not provide an "accurate accounting," and do not demonstrate that the PRP Group members have already paid more than their proportionate shares.  Dkt. No. 274 at 4-6.  The

capstone of General Waste's and Trockman's argument is that "the PRP Group is not entitled to judgment until it can satisfy the elements required for establishing liability under CERCLA section 113, including that the members of the PRP Group have themselves been held liable under CERCLA section 107, and that there has been an 'inequitable distribution of common liability among liable parties.'" Dkt. No. 274 at 7, citing *Atlantic Research*, 551 U.S. at 138.  Arguing that because the PRP Group has failed to satisfy its section 113 case (Count I), the third-party defendants further argue that a declaratory judgment (Count II) would be inappropriate under the Declaratory Judgment Act because there is no case or controversy.  Dkt. No. 232 at 10-13.

General Waste's and Trockman's argument is not persuasive.  The PRP Group's motion seeks a finding only that General Waste and Trockman are PRPs who are subject to claims for contribution if allocation of cleanup costs would otherwise be inequitable.  If and when such a finding might be made in the future, the PRP Group would presumably return to the court with a detailed accounting of its response costs and arguments regarding how and why those response costs were more than the PRP Group's proportionate share.  That day has not yet come, and the question of allocation of that liability for purposes of contribution under section 113(f)(1) is not yet before the court.  But on the immediate, narrow question of whether General Waste and Trockman, based on their own admissions, are liable or potentially liable parties under section 107(a), the undisputed facts show that they are.  There is no point in delaying that

determination.  The PRP Group's motion is granted on the issue of liability on Counts I and II of its third-party complaint against General Waste and Trockman.

III.    *Heritage Coal Motion for Summary Judgment*

The Greenway Trust seeks joint and several liability against PRP defendants Heritage Coal Co., Mead Johnson Nutrition Co., and Black Beauty Coal Co., among others, for soil contamination of the Main Yard and River Yard sites under section 107(a) of CERCLA.  Heritage Coal, Mead Johnson, and Black Beauty (for purposes of the court's discussion of Dkt. No. 425 and related filings only, the "Heritage Coal defendants") have moved for summary judgment against the Greenway Trust on all of its claims, arguing that the Trust is not a valid legal entity and thus lacks capacity to bring suit.  The Heritage Coal defendants also move for summary judgment on Count I of the Trust's amended complaint on the ground that the Trust is not entitled to joint and several liability under CERCLA 107(a) because it is not an innocent party.  For reasons set forth below, the court denies the Heritage Coal defendants' motion in its entirety.

A.    *Undisputed Facts*

General Waste admitted that in the course of its scrap metal business, it arranged for the transport and/or disposal of hazardous substances, including lead acid contained in batteries, at both sites.  Dkt. No. 178, ¶¶ 10-12.  Allan Trockman admitted that he operated the sites at the time hazardous substances,

including lead, were disposed on the sites.  Dkt. No. 426, Ex. A ¶¶ 2, 6; Dkt. No. 177, ¶ 12.  General Waste reclaimed the lead contained in the batteries by breaking them open and extracting the plates, causing battery acid to seep into the soil.  Because General Waste stored batteries outside to avoid damaging the concrete floor of the warehouse, battery acid leaked onto the ground.  Dkt. No. 426, Ex. A, ¶¶ 24, 30, 32; Ex. B, 162-64, 429.  Stacks of batteries would sometimes fall, be knocked over, or be crushed by trucks, resulting in battery acid and lead leaking into the ground.  Dkt. No. 426, Ex. A, ¶ 32.  Sometimes when the batteries arrived, they were already damaged.  Dkt. No. 426, Ex. A, ¶ 27.  The batteries stored at the sites came from customers including the Heritage Coal defendants.  *Id.* at ¶¶ 26-27.

Mead Johnson admitted that it used batteries in at least one of its manufacturing facilities in Evansville and that General Waste transported spent lead-acid forklift batteries that were not used in the direct manufacture of its products for a brief period from Mead Johnson's Evansville facility.  Dkt. No. 87, ¶¶ 144-46.

Heritage Coal, formerly known as Peabody Coal, once had mining interests in Indiana.  Dkt. No. 69, ¶ 21.  Black Beauty also operated coal mines in Indiana.  Dkt. No. 193, ¶ 59.  Trockman testified that General Waste received batteries from several coal mining operations, including Heritage and Black Beauty.  Dkt. No. 426, Ex. A, ¶ 27.  The batteries contained lead and were not operational.  *Id.* at ¶

24.  General Waste commonly found crushed batteries or lead battery plates in the bottom of trailers received from the mining companies.  *Id*. at ¶ 27.  Trockman testified that Heritage Coal sent spent lead batteries to General Waste for more than a decade, that Black Beauty had also been a General Waste customer for more than a decade, and that most of the loads General Waste received from Black Beauty contained a battery.  Dkt. No. 458, Ex. 2 at 143, 176, 422-24.

Collectively, SIGECO, Mead Johnson, and Heritage Coal provided between 80 and 85 percent of the batteries received by General Waste, with SIGECO as the largest contributor, and with Mead Johnson and Heritage Coal as the next two largest contributors.  Dkt. No. 458, Ex. 2 at 520-21, 544-45.

On June 4, 2002, General Waste invited SIGECO, Mead Johnson, and Heritage Coal to participate in the remediation of the Main Yard.  Dkt. No. 458, Ex. 4, ¶ 4 & Att. A.  In November 2002, court-sponsored settlement discussions began, overseen by Magistrate Judge Hussman.  SIGECO and Mead Johnson were invited to attend those discussions.  Although settlement conferences were held, a settlement was not reached.

On July 29, 2004, Trockman, General Waste and General Waste's insurers entered into the Evansville Greenway and Remediation Trust Agreement.  Dkt. No. 426, Ex. F ("Trust Agreement").  The "Whereas" clauses of the Trust Agreement

stated that "General Waste and Trockman have actual or potential liability or a reasonable expectation of liability under federal, state or local laws for environmental remediation of the Main Yard Site and the River Yard Site."  The introductory clauses also stated that the Greenway Trust was:

> being established to resolve and satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that have occurred and have given rise to at least one claim asserting liability under state and federal environmental statutes, including, but not limited to [CERCLA] and The Indiana Environmental Legal Action Statute.

Dkt No. 426, Ex. F (internal citations omitted).  The Trust Agreement stated that the purposes of the Greenway Trust were to "collect and disburse amounts for 'environmental remediation'" and to "engage in the activities in furtherance of its obligation to collect and disburse amounts for environmental remediation."  Dkt. No. 426, Ex. F at 1, ¶ 2.3.  It also stated that the funds deposited in the Trust were to be used exclusively for the purpose of implementing the investigative, remedial, and enforcement actions required by the Trust Agreement.  Dkt. No. 426, Ex. F at 2.  The Trust Agreement mandated that the Trust would "enter into contracts and agreements as needed to fulfill the purposes of this Trust Agreement."  Dkt. No. 426, Ex. F, ¶ 2.3(6).  The Trust had a federal tax identification number, and it filed federal, state, and local tax returns but did not conduct business for profit.  Dkt. No. 426, Ex. F, ¶¶ 4.6.1, 4.7; Ex. G (letter from the Internal Revenue Service to the Trust dated September 2, 2004);  Dkt. No.

458, Ex. 1, ¶ 5.  The Trust itself had not been subject to a CERCLA lawsuit or a consent decree.  Dkt. No. 389, Ex. 6, ¶¶ 11-12.

The Greenway Trust was required to provide General Waste, Trockman, and the insurers an accounting of the Trust's assets every month and an accounting of all Trust activity.  Dkt No. 426, Ex. F, ¶¶ 6.3, 6.5.  The Trust was bound to provide a defense for General Waste and Trockman for claims asserted against them "as the result of the contamination that is the subject of the lawsuits that will be asserted against the PRPs."[1]  *Id.* at ¶ 10.1.  Once the River Yard site was remediated and a covenant not to sue was obtained from the Governor of Indiana, the Trust would be obligated to reimburse CNA for amounts "loaned" to the Trust.  To the extent any recoveries remained after that, lawyers representing the Trust, General Waste, and Trockman would be reimbursed for their costs, and then if any funds remained, fifty percent would go to Trockman and fifty percent would go to the insurers.  *Id.* at ¶¶ 9.2.2, 9.2.3.

On August 31, 2004, Magistrate Judge Hussmann entered an order declaring that the Greenway Trust was a qualified settlement fund pursuant to Treasury Regulation 26 C.F.R. § 1.468B-1 *et seq.*  Dkt. No. 426, Ex. H.  The Trust was not registered as a business trust, a corporation, a limited liability company,

---

[1]In this lawsuit, the Greenway Trust, General Waste, and Trockman are represented by the same attorneys.

or any other business entity registered with the Indiana Secretary of State.  Dkt. No. 426, Exs. I & J.

Contemporaneously with the creation of the Greenway Trust, on July 29, 2004, the insurers irrevocably assigned to the Trust any rights they possessed or later would acquire "in connection with the environmental conditions at the Main Yard Site and any rights it has for costs incurred . . . for the River Yard Site."  Dkt. No. 426, Ex. D, ¶ 2.1.  General Waste and Trockman also entered an assignment of rights with the Trust, which provided:

> 2.1    In exchange for the Trust's agreement to remediate the Main Yard Site and to the extent possible, the River Yard Site, and to pursue the PRPs for the remediation of the Main Yard Site and River Yard Site, General Waste and Trockman hereby agree as follows:
>
> 2.1.1  General Waste and Trockman irrevocably assign, transfer, and convey to the Trust any and all rights General Waste and Trockman have or may have for contribution from the PRPs relating to the Main Yard Site and the River Yard Site, including but not limited to, any rights to obtain payment of Response Costs of attorney's fees from the PRPs.
>
> 2.1.2  General Waste and Trockman irrevocably assign, transfer, and convey to the Trust any and all rights General Waste and Trockman have or may have in the proceeds of sale of the River Yard Site.
>
> 2.1.3  General Waste and Trockman agree that the Trust will cause this Assignment to be filed with the Recorder of Deeds for Vanderburgh County, Indiana and any other applicable governmental or regulatory agency responsible for maintaining such records.

Dkt. No. 426, Ex. E.  When these rights were assigned, General Waste was the owner of the Main Yard site and the River Yard site, and Trockman was the president of General Waste.

On September 15, 2004, the City of Evansville purchased the Main Yard site from General Waste through a settlement agreement among General Waste, the City of Evansville, and the insurers.  Dkt. No. 426, Ex. C.

The Greenway Trust paid in excess of three million dollars for work necessary to investigate and clean up the PCB and lead contamination of the Main Yard site.  Dkt. No. 389, Ex. 6, ¶ 16.  On April 18, 2007, the Indiana Department of Environmental Management issued a Certificate of Completion to the City of Evansville for the successful completion of the remediation of the Main Yard site. Dkt. No. 389, Ex. 5, Att. C.  Also, the Greenway Trust has spent more than one hundred thousand dollars for remedial work at the River Yard, including preparation of a remedial work plan necessary to meet IDEM's requirements for investigation of PCB and lead contamination.  Dkt. No. 389, Ex. 5, ¶¶ 24-25; Ex. 6, ¶ 18.  The Trust lacked the funds necessary to clean up the River Yard or to pay the ongoing costs of the Trust.  Dkt. No. 458, Ex. 1, ¶ 7.

On May 6, 2008, the Greenway Trust filed its six-count first amended complaint against defendants SIGECO, Heritage Coal Company, Mead Johnson Nutrition Company, Midwest Coal Company, Black Beauty Coal Company, Squaw Creek Coal Company, and Mulzer Crushed Stone.  Dkt. No. 62.  The Trust brought claims against the defendants pursuant to CERCLA section 107(a).  Dkt. No. 62, ¶ 80.

B.   *Analysis*

1.   *Trust's Validity and Capacity to Sue*

The Heritage Coal defendants argue that the Trust is not a valid trust under Indiana law and thus lacks capacity to sue.  See *Miller's Estate v. St. Joseph County Home*, 87 N.E.2d 886, 887 (Ind. App. 1949) ("[The plaintiff] is not a legal entity of any kind.  It is merely the name of a place.  It therefore lacks the right or power to maintain in action.").  The trust has a clear purpose, but it lacks a beneficiary and is not a charitable trust.  The parties' briefs on this issue of trust validity have not collided directly.  The Heritage Coal defendants argued that the Greenway Trust did not qualify as a business trust under Indiana Code § 23-5-1-2(a), and the Trust agrees.  It does not conduct activity for purposes of making a profit.

The trust relies on the Indiana Trust Code generally and on Indiana Code § 30-4-2-19, which allows the creation of a trust for a noncharitable purpose without an identifiable beneficiary.  The Indiana Trust Code does not require formal language for the trust to be created, but it requires written terms that are sufficiently definite so that the trust property, the identity of the trustee, the nature of the trustee's interest and the purpose of the trust may be ascertained with reasonable certainty.  See Ind. Code § 30-4-2-1(b).  The Trust Agreement satisfies these requirements.  See Dkt. No. 426, Ex. F, § 2.3 (purposes of the

trust), § 3.1 (designation of trustee), § 4 (duties and responsibilities of the trustee), § 5 (funding of the Trust), § 7 (trustee compensation).

The Trust Code also requires a beneficiary, Ind. Code § 30-4-2-1(b), but provides that noncharitable trusts established under section 30-4-2-19 are deemed to have beneficiaries.   Ind. Code § 30-4-2-1(d).[2]   The Heritage Coal defendants focus on the absence of a beneficiary and point out that section 30-4-2-19 took effect only on July 1, 2005, a year after the Greenway Trust was created.   The defendants contend that the 2005 statute cannot retroactively

---

[2]Section 19 provides:

(a) Except as provided in section 18 of this chapter, a trust may be created for a:
    (1) noncharitable purpose without a beneficiary; or
    (2) noncharitable and valid purpose to be selected by the trustee.
(b) A trust authorized by this section may be enforced for not more than twenty-one (21) years.
(c) A trust authorized by this section may be enforced by the following:
    (1) A person appointed in the terms of the trust.
    (2) A person appointed by the court, if the terms of the trust do not appoint a person.
(d) Property of a trust authorized by this section may be applied only to the trust's intended use, except to the extent the court determines that the value of the trust property exceeds the amount required for the trust's intended use.
(e) Except as provided in the terms of the trust, property not required for the trust's intended use must be distributed to the following:

    (1) The settlor, if the settlor is living.
    (2) The settlor's successors in interest, if the settlor is deceased.

validate a trust created improperly, in defendants' view, in 2004.   The court disagrees for three reasons.

First, it is not at all clear that applying the 2005 statute to allow the Trust to file a lawsuit in 2007 amounts to giving the law retroactive effect.   See *Landsgraf v. USI Film Products*, 511 U.S. 244, 270 (1994) ("The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event."); *Estate of Moreland v. Dieter*, 576 F.3d 691 (7th Cir. 2009) (analyzing whether an Indiana statutory amendment applied retroactively);   *Stewart v. Marson Construction Corp.*, 191 N.E.2d 320, 321 (Ind. 1963) (construing statute so as not to "impose liabilities not existing at the time of its passage" or to "affect an existing liability to the detriment of a defendant").   Applying the 2005 statute here does not impair any vested rights, create new liabilities, or create new rights not intended by the Trust's settlors.

Second, the Indiana Trust Code shows a strong preference for upholding the validity of trusts and enforcing them according to their terms.   When the Trust Code was enacted, it did away with overly formal requirements and provided that its terms would apply to already existing trusts to the extent that doing so would not impair vested rights or create new rights that a settlor did not intend to create. Ind. Code § 30-4-1-4.   It is reasonable to apply that same approach to the 2005

legislation and to already existing trusts.  Doing so does not impair any vested rights, create new liabilities, or create new rights not intended by the settlors.

Third, and more generally, the Trust Code provides:

> The rules of law contained in this article shall be interpreted and applied to the terms of the trust so as to implement the intent of the settlor and the purposes of the trust.  If the rules of law and the terms of the trust conflict, the terms of the trust shall control unless the rules of law clearly prohibit or restrict the article which the terms of the trust purport to authorize.

Ind. Code § 30-4-1-3.  In other words, the Trust Code is designed to empower the creation of trusts and to uphold their validity and enforce their intended terms, unless doing so is "clearly" prohibited or restricted.  There is no such clear prohibition or restriction here.  The court is confident that Indiana courts would uphold the validity of the Greenway Trust under the 2005 legislation.

The Heritage Coal defendants also contend that the Greenway Trust is invalid because its purpose is contrary to public policy.  This argument is a non-starter.  The undisputed facts show that the Greenway Trust was created to settle a lawsuit and to fund and carry out the remediation of a hazardous waste site so that it could become part of a significant civic improvement, the Evansville Greenway.  Despite these salutary purposes, defendants argue, the Greenway Trust is contrary to public policy because it is an attempt to shield General Waste and Trockman from liability for their role in causing the environmental harm and to shift financial responsibility for the harm to other PRPs under CERCLA.

To the extent the Trust was intended to shield General Waste and Trockman, the trust device will not and cannot work, as explained above and below.  To the extent the Trust may have been intended to shift financial responsibility, the public policy argument begs the questions discussed below.  If the courts find that the Trust has some valid role in causing other PRPs to take all or most of the financial responsibility for cleanup of these hazardous waste sites, there would be no public policy problem at all.  If the courts disregard the creation and existence of the Trust in resolving these issues among the many PRPs, the failure to achieve one possible purpose among several would not undermine the validity of the trust.  See Ind. Code § 30-4-2-12 (trust may not require trustee to commit act contrary to public policy; invalid but severable provisions do not undermine validity of trust or other provisions).  In sum, the Greenway Trust is a valid trust and has the capacity to sue the other PRPs, including the Heritage Coal defendants, under section 107(a) of CERCLA.[3]

2.    *The Greenway Trust's "Innocent Party" Status*

The Heritage Coal defendants argue that the creation and use of the Greenway Trust to file this suit under section 107(a) of CERCLA is an attempt to manipulate CERCLA to impose joint and several liability on companies of its choosing while "whitewashing" the liabilities of the trust settlors, who owned and

---

[3]Because this court finds that the Trust is a valid entity under Indiana law, the Heritage Coal defendants' argument regarding Judge Hussmann's order in the insurance coverage lawsuit is moot.  See *General Waste Products, Inc. v. Continental Casualty Co.*, EV 01-96-c-H/Y (S.D. Ind. Aug. 31, 2004).

operated the sites and oversaw their contamination.  The Heritage Coal defendants argue that as settlors of the Trust, General Waste and Trockman could assign to the Trust only the right to pursue contribution (liability that is several but not joint), and that General Waste and Trockman could not assign rights to the Trust without assigning corresponding liabilities.

The Heritage Coal defendants are correct that under Indiana law, an assignee stands in the shoes of the assignor.  See *Press-A-Dent v. Weigel*, 849 N.E.2d 661, 669 (Ind. App. 2006); see also *In re Doctors Hospital of Hyde Park, Inc.*, 337 F.3d 951, 957 (7th Cir. 2006) (purpose of the rule is to prevent "shucking off [existing] obligations"); *Brown v. Indiana Nat'l Bank*, 476 N.E.2d 888, 894 (Ind. App. 1985) ("The assignee takes no greater rights than those possessed by the assignor.").  It is also true that General Waste and Trockman were owners and operators of the sites during the time those sites became contaminated and that they arranged for the disposal and transport of hazardous substances to the sites. General Waste and Trockman are PRPs under CERCLA.  The court assumes for purposes of discussion that the Greenway Trust may have assumed General Waste's and Trockman's mantle as PRPs.

When the Greenway Trust was created in 2004, it was not clear how a voluntary PRP – a liable (and thus not "innocent") party who stepped forward and spent money to clean a hazardous waste site without a court order – might have been able to obtain compensation from other PRPs.  By now, however, the path

is open and clear.  The Heritage Coal defendants are not correct in their assertion that, as PRPs, General Waste and Trockman would not be entitled to seek relief under section 107(a) and would be limited to pursuing a contribution remedy against other PRPs under CERCLA.  In two important decisions focusing closely on the language of section 107(a) and 113(f), the Supreme Court has re-shaped CERCLA law and removed several non-statutory glosses that lower courts had added to the statute.  It is now clear that a PRP who has been sued under section 106 or 107(a) may pursue contribution under section 113(f).  It is equally clear that a PRP who has carried out a voluntary cleanup may seek recovery of its costs from other PRPs under section 107(a).  As the Supreme Court explained, "section 113(f) authorizes a contribution action to PRPs with common liability stemming from an action instituted under § 106 or § 107(a).  And 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs."  *Atlantic Research*, 551 U.S. at 139.

Only PRPs who have been sued under CERCLA section 106 or 107(a) may turn around and seek contribution from other PRPs under section 113(f)(1).  *Cooper Industries*, 543 U.S. at 160-61.  Trockman and General Waste have not been sued under section 106 or 107(a).[4]  Nor has the Trust.  Participation as a defendant in such a proceeding is a recognized statutory prerequisite to a contribution claim.  Whatever rights or liabilities the Greenway Trust may have

---

[4]The PRP Group has now sued General Waste and Trockman, among other third-party defendants, for contribution under section 113(f)(1), but to date neither General Waste nor Trockman has been sued under section 106 or 107(a).

acquired from settlors General Waste and Trockman, it is clear that the Trust did not acquire the right to bring a contribution claim.

If the Heritage Coal defendants were correct and General Waste and Trockman would also be barred from seeking relief under section 107(a), that conclusion would make the voluntary PRP extinct.  No rational PRP would step forward and take upon itself the costs of cleanup if it had no prospect of recovering any share of those costs from other PRPs, yet that is the result advocated by the Heritage Coal defendants.  But section 107(a) says nothing about the plaintiff having to be "innocent," and it is now clear that a section 107(a) plaintiff need not be innocent, at least not after *Atlantic Research*, which overruled contrary decisions by many circuits.

Known as the "innocent landowner" exception, the exception originated in the Seventh Circuit in *Azko Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994).  When *Azko Coatings* was decided, it was widely held that a claim by one PRP against another must be brought, if at all, as a section 113(f) contribution claim.  The *Azko Coatings* exception permitted a PRP-landowner to bring a section 107(a) action rather than a section 113(f) contribution action to recover for its direct injuries if it was not responsible for having caused any of the hazardous materials to be spilled onto the property.  *Azko Coatings*, 30 F.3d at 764; see also *Metropolitan Water Reclamation Dist.*, 473 F.3d at 828-29 (explaining that the exception "blunt[ed] the force of a rule that limits the rights of . . . 'innocent'

parties to contribution under § 113(f)," such as an absentee landowner who might

be liable under §107(a) for the full cost of remedying a hazardous site caused by

its tenant).  Another panel explained before *Atlantic Research*:

> Nevertheless, one of two outcomes would follow from a landowner suit
> under § 107(a):  either the facts would establish that the landowner was
> truly blameless, in which case the other PRPs would be entitled to bring a
> suit under § 113(f) within three years of the judgment to establish their
> liability among themselves, or the facts would show that the landowner was
> also partially responsible, *in which case it would not be entitled to recover
> under its § 107(a) theory and only the § 113(f) claim would go forward.*

*Rumpke of Indiana, Inc. v. Cummins Engine Co., Inc.*, 107 F.3d 1235, 1240 (7th Cir.

1997) (emphasis added); see also *Metropolitan Water Reclamation Dist.*, 473 F.3d

at 828-29 (under the "innocent landowner" exception, "a joint and several cost

recovery under Section 107(a) remains available [after *Cooper Industries*] to

'landowners who allege that they did not pollute the site in any way.'")


But after *Cooper Industries* and *Atlantic Research*, it is clear that the

question is no longer one of "innocence."  Sticking to the terms of the statute

itself, if a party has incurred "any other necessary costs of response . . . consistent

with the national contingency plan,"  that party is eligible to seek recoupment of

those response costs via § 107(a) *even if it is itself a PRP*.  See *Atlantic Research*,

551 U.S. at 139-40.  If a party has been sued under § 106 or § 107(a), it may seek

contribution under § 113(f).  The Supreme Court reasoned that a "guilty" party,

or PRP, could not avoid equitable distribution of reimbursement costs by seeking

to impose joint and several liability on another PRP in an action under § 107(a).

The Court explained that "a defendant PRP in such a 107(a) suit could blunt any inequitable distribution of costs by filing a § 113(f) counterclaim." *Atlantic Research*, 551 U.S. at 140.  The Heritage Coal defendants concede that the Greenway Trust has incurred response costs.  The Trust's claim falls under the broad sweep of CERCLA section 107(a), and is not defeated as a result of its settlors' status as liable PRPs.[5]

### 3.     *City of Evansville's "Innocent Owner" Status*

The Heritage Coal defendants also argue that the Trust cannot avail itself of any exemption from liability that the City of Evansville might enjoy, even though the City assigned its rights under CERCLA to the Trust.  Dkt. No. 426 at 20.  The Heritage Coal defendants contend that when the City became the owner of the Main Yard site in 2004, it became an "owner" of the site under CERCLA section 107(a)(1) and thus is subject to liability as a PRP.  As a PRP, they argue, the City would be entitled to seek contribution from other PRPs under section 113(f), but could not impose joint and several liability on the defendants under section 107(a).  The court disagrees with the Heritage Coal defendants on this point.

Again, the split between sections 107(a) and 113(f) is no longer as simple as the Heritage Coal defendants have contended.  After *Atlantic Research*, the path

_____

[5]Because of these changes in the law since the Trust was created, the court need not address the Heritage Coal defendants' arguments against use of the trust device to "whitewash" the liability of General Waste and Trockman.  There is no longer any legal need to create or find an "innocent" party to conduct the cleanup.

to strict liability under § 107(a) is open to PRPs as plaintiffs if they have incurred response costs.  Nevertheless, the court considers whether the City is exempt from CERCLA liability due not to whether it is "innocent" but whether it had a contractual relationship with Trockman or General Waste.

The City claims that it is exempt from CERCLA liability under sections 107(b) and 101(35)(A)(ii), 42 U.S.C. §§ 9607(b) and 9601(35)(A)(ii).  Section 107(b) exempts persons otherwise liable who can establish by a preponderance of the evidence that the releases of a hazardous substance were caused solely by an act of God, an act of war, or:

> an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . , if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned . . . and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions . . . or any combination of the foregoing.

42 U.S.C. § 9607(b).  For purposes of section 107(b), the definition of "contractual relationships" includes "land contracts, deeds, easements, leases, or other instruments transferring title or possession."  42 U.S.C. § 9601(35).

This issue turns on section 101(35)(A)(ii), which excludes from the definition of "contractual relationships" situations in which the real property was acquired by the defendant after the disposal of the hazardous substance and "the defendant

is a government entity which acquired the facility by escheat, or through any other involuntary transfer or acquisition, *or through the exercise of eminent domain authority by purchase or condemnation.*"   42 U.S.C. § 9601(35)(A)(ii) (emphasis added).  That provision is essential for local and state governments who would like to help solve a problem without turning themselves into deep-pocket PRPs who might be subjected to vast and unexpected liability.

The Heritage Coal defendants do not contend that the City contributed any hazardous substances to either the Main Yard or the River Yard.   They also do not contend the City had a contractual relationship with General Waste, Trockman, or any other defendant connected with the disposal of hazardous substances at the General Waste Sites.  The Heritage Coal defendants also do not argue that the City failed to exercise due care with respect to the hazardous substances concerned or failed to take precautions against foreseeable acts or omissions of any third party.  (The Heritage Coal defendants state in reply only that they "take no position" on that point.  Dkt. No. 481 at 16.)  But the Heritage Coal defendants argue that the City did not acquire the Main Yard site through eminent domain because it acquired the site through a purchase rather than through a court order condemning the property.  According to these defendants, the City's acquisition of the property in this manner did not satisfy the eminent domain requirements of section 101(35)(A)(ii), and the City is a PRP under section 107.

The record shows that the City paid $912,000 to acquire the Main Yard in September 2004 after entering into a settlement agreement with General Waste and the insurers.  Dkt. No. 426, Ex. C.  Reference to the contamination of the site was made in the settlement agreement, and the parties to the agreement specifically referenced 42 U.S.C. §§ 9601(35)A(ii) and 9607(b) in the recitals of the agreement, acknowledging that the City was acquiring the Main Yard through the exercise of eminent domain by purchase.  *Id.*  The recitals also state that as a condition to the City's acquisition of the Main Yard, General Waste had committed to remediating the Main Yard under the Indiana Voluntary Remediation Program.  The settlement agreement provided that the City had required financial assurances to ensure that the remediation of the Main Yard was completed in accordance with the voluntary remedial work plan approved by IDEM.

By its terms, CERCLA section 101(35)(A)(ii) acknowledges that a formal condemnation action and court judgment are not always necessary for a public entity's acquisition of property to be deemed an exercise of eminent domain so that the government can avoid becoming a PRP.  The statute refers explicitly to "the exercise of eminent domain authority *by purchase or condemnation*."  Also, at least in Indiana, eminent domain is governed by Ind. Code § 32-24-1-1 *et seq.*  Indiana Code § 32-24-1-3(a) directs that "any person that may exercise the power of eminent domain for any public use under any statute may exercise the power *only* in the manner provided in this article, except as otherwise provided by law." (emphasis added).  The first requirement following that statutory directive is that

"before proceeding to condemn, the person . . . *must* make an effort to purchase for the use intended the land, right-of-way, easement, or other interest, in the property."  Ind. Code § 32-24-1-3(b)(2) (emphasis added).  The Indiana Court of Appeals has held that a purchase agreed upon without resorting to condemnation proceedings in court can be a taking by use of eminent domain power, such that leases of the property are also cancelled (when they could not be as part of an ordinary sale).  See *P.C. Management, Inc. v. Page Two, Inc.*, 573 N.E.2d 434, 437-38 (Ind. App. 1991).  Without direct reference to the statutory provision, the Indiana Court of Appeals has also recognized that "a conveyance in lieu of actual condemnation of real property constitutes a condemnation proceeding because it is tantamount to a taking under the power of eminent domain."  *Schwartz v. Castleton Christian Church*, 594 N.E.2d 473, 475 (Ind. App. 1992).  Indiana law clearly recognizes that a condemnation action is not necessary for a public entity to acquire property by eminent domain.

The cases relied on by the Heritage Coal defendants do not support their contention that a condemnation action is required for acquisition by eminent domain.  The courts in *City of Wichita v. Aero Holdings, Inc.*, 177 F. Supp. 2d 1153, 1167-69 (D. Kan. 2000), and *United States v. Occidental Chemical Corp.*, 965 F. Supp. 408, 413-14 (W.D.N.Y. 1997), held – prior to *Atlantic Research*, of course – that the cities of Wichita and Niagara Falls, respectively, were not innocent owners because those cities had acquired the polluted properties voluntarily through negotiated purchases and not through eminent domain.  Those courts were

considering whether the cities might be exempt from being "owners or operators" under section 101(20)(D), without discussing the meaning of the eminent domain language in section 101(35)(A)(ii).  The Heritage Coal defendants also rely on *City of Toledo v. Beazer Materials and Services, Inc.*, 923 F. Supp. 1013 (N.D. Ohio 1996), which is a CERCLA § 101(35)(A)(ii) case.   In that case the court was persuaded by a plain reading of the Ohio eminent domain statute, which required not only that the agency seeking to acquire the property negotiate with the owner of the property, but that the agency and the property owner be unable to agree prior to a taking by eminent domain.  *City of Toledo,* 923 F. Supp. at 1020-21. Because Toledo was able to reach an agreement with the property owner, the court did not find Toledo's purchase to be an act of eminent domain.   *Id*. However, the *City of Toledo* court did not address the plain language of CERCLA section 101(35)(A)(ii), which plainly assumes that eminent domain may be exercised *by purchase*, indicating that the impasse required by Ohio law is not a federal requirement under CERCLA.

Indiana's eminent domain law, by contrast, does not require that the public entity and the property owner disagree.  Indiana law requires only that the public entity make an effort to purchase the property, which the City successfully did here.  Both CERCLA and Indiana law recognize eminent domain by purchase, and the Heritage Coal defendants have not shown that the City's acquisition of the General Waste sites was not through eminent domain.   The Heritage Coal defendants' motion is denied in its entirety.

IV.    *Greenway Trust's Motion for Partial Summary Judgment against SIGECO*

The Greenway Trust has also moved for summary judgment against defendant SIGECO seeking a determination that SIGECO is in fact a PRP. SIGECO concedes properly that it is, and the Trust's motion is granted to that extent.  The Trust also seeks a determination that SIGECO is jointly and severally liable under section 107 of CERCLA for all costs of remediation of the soil contamination of both the Main Yard and River Yard sites.  If the Trust is correct, then SIGECO would be on the hook for 100 percent of the remediation costs, a liability that could be limited only in the form of contribution orders directed to other (solvent) PRPs under CERCLA section 113(f)(1).  On this issue, the court denies summary judgment and will defer a definitive ruling on the issue until the parties have presented their evidence at trial.

A.    *Facts Related to the Trust's Motion for Summary Judgment*

Most of the facts set forth above are also relevant for the Trust's motion against SIGECO and are incorporated here.  SIGECO was a utility company that provided energy delivery services to residents of southwestern Indiana.  Dkt. No. 67, ¶ 55.  It used batteries at its facilities located in and near Evansville, Indiana, and at various times between 1935 and 1998, SIGECO entered into agreements to sell scrap metal to General Waste.  Dkt. No. 389, Ex. 1, ¶¶ 14-15; Ex. 2 at 394-95; Ex. 3, No. 7-8.  SIGECO was one of General Waste's most regular customers.  Dkt. No. 389, Ex. 1, ¶ 14; Ex. 2 at 389-95.  General Waste hauled scrap metal from SIGECO's main facility and its substations, and SIGECO brought material to General Waste using its own trucks.  Dkt. No. 389, Ex. 1, ¶ 14; Ex. 2 at 395-96.  The materials sold by SIGECO to General Waste included used batteries.  Dkt. No. 389, Ex. 1, ¶ 29; Ex. 3, No. 19.  SIGECO was General Waste's largest source of batteries, and the batteries contained lead.  Dkt. No. 389, Ex. 2 at 400; Ex. 3, No. 20.  General Waste transported scrap, including batteries, from SIGECO to both the Main Yard and the River Yard sites.  Dkt. No. 389, Ex. 1, ¶ 8; Ex. 2 at 395.

B.    *Analysis*

1.    *SIGECO's Liability Under CERCLA § 107(a)(4)(B)*

As discussed above, CERCLA section 107(a)(4)(B) provides that PRPs are liable for "necessary costs of response incurred by any other person consistent

with the National Contingency Plan."  42 U.S.C. § 9607(a)(4)(B).  This section governs cost recovery for parties who voluntarily incur response costs in responding to releases of hazardous substances.  *Atlantic Research*, 551 U.S. at 139, n.6.  Cleanups are deemed voluntary where the plaintiff has neither settled any liability with a  government entity nor been the subject of a CERCLA suit.  See *id.* at 139; *Metropolitan Water Reclamation Dist.*, 473 F.3d at 835.  Neither General Waste, Trockman, nor the Greenway Trust has been under the legal compulsion of a consent decree or has been the subject of a CERCLA enforcement action under section 106 or 107.  SIGECO admits that the General Waste sites are "facilities," that a "release of hazardous substances" has occurred at the sites, that "response costs" were incurred in remediation of the sites, and that it is a PRP under CERCLA.[6]  Dkt. No. 67, ¶ 119;  Dkt. No. 389, Ex. 3, Nos. 22-24, 27; Dkt. No. 419 at 3.  Under the plain language of the statute, the Greenway Trust argues, it is entitled to hold SIGECO jointly and severally liable for the costs it has incurred in remediating the sites.

---

[6]In its response to the Trust's Request for Admissions, SIGECO admitted that response costs were incurred at the sites, but denied that the Trust incurred those costs.  See Dkt. No. 389, Ex. 3, Nos. 24, 26, 27, 29.  In response to the Trust's motion for summary judgment, SIGECO did not raise and thus waived for purpose of summary judgment any argument related to the source of the response costs.  SIGECO also denied that the response costs were necessary and consistent with the national contingency plan, but failed to raise necessity or consistency in response to the Trust's motion for summary judgment.  See Dkt. No. 389, Ex. 3, Nos. 25, 28.  The court considers those points to have been waived for purposes of summary judgment as well.

SIGECO argues that only an innocent landowner may impose *joint and several* liability on another for its response costs, and that the Trust, as assignee of General Waste, Trockman and the insurers, is not an innocent landowner.[7] SIGECO argues that the Supreme Court's *Atlantic Research* decision supports its position. The court addressed these arguments above. *Atlantic Research* did not turn on the relative innocence of the parties. The key for purposes of section 107(a) was whether the parties incurred response costs. The key for purposes of section 113(f)(1) was whether a party had been sued in a civil action under section 106 or 107(a). The Supreme Court specifically held that a PRP – a potentially responsible party under section 107(a)(1) – could bring suit against its fellow PRPs under section 107(a)(4)(B). Any inequity in this result could be remedied by a section 113(f) counterclaim, the resolution of which "would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the 107(a) action." *Atlantic Research*, 551 U.S. at 140. Allowing courts to sort out the equities among PRPs through a section 113(f) contribution action is very different from not allowing a voluntary PRP to set the CERCLA ball in motion through a section 107(a) action.

Once liability is established under section 107(a) of CERCLA, section 113(g) of CERCLA requires entry of a declaratory judgment as to liability for future response costs. That section states that in any action for recovery of costs under

---

[7]The parties do not address the fact that the City of Evansville also assigned its claims to the Trust, and neither will the court.

section 107, "the court *shall* enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  42 U.S.C. § 9613(g)(2) (emphasis added).  SIGECO argues that a declaratory judgment is premature because it is likely that many other parties, some unknown, are also liable under CERCLA for lead contamination.  Again, however, to the extent that SIGECO might pay more than its equitable share, it has a remedy available by bringing section 113(f) contribution claims as third-party claims or counterclaims.  The Greenway Trust has established that SIGECO is liable for response costs related to lead remediation, and the Trust is entitled to a declaratory judgment to that effect.

### 2.    *Divisibility of Harm and Joint and Several Liability*

Is SIGECO jointly and severally liable for the entire costs of the cleanups? The Seventh Circuit has said that the only defense to joint and several liability under section 107(a) is to demonstrate that the harm is divisible, but "this is a rare scenario."  *Metropolitan Water Reclamation Dist.*, 473 F.3d at 827 n.3.  The Trust argues that both sites were contaminated with high levels of lead, that General Waste's activities were conducted so that the River Yard and the Main Yard sites were a single operation, and that it would be impossible for SIGECO to meet its burden to show that the harm done was divisible.  SIGECO responds that it might have met its burden if General Waste had not destroyed its detailed business records showing the source, type, quantity, and value of the scrap it

purchased.  Dkt. No. 419 at 15;  Ex. C at 69-71.  It argues that General Waste's act of destroying its business records makes it impossible for SIGECO or the other defendants to attempt to prove that the harm is divisible between the various PRPs or between the sites.

Prior to the Supreme Court's decision in *Burlington Northern and Santa Fe Railway Co. v. United States*, 129 S. Ct. 1870 (2009), issued during the course of the briefing on the Trust's motion against SIGECO, the court would have had little difficulty concluding that the harm here is not divisible, that SIGECO would be jointly and severally liable for all remediation costs of both sites, and that SIGECO could rely on contribution claims under section 113(f)(1) to force other PRPs to share the costs of remediation.  SIGECO argues, however, that *Burlington Northern* reflects a significant change in the law governing the apportionment of CERCLA responsibility.

In *Burlington Northern*, a company called Brown & Bryant had operated an agricultural chemical distribution business on property it owned.  Over the years, Brown & Bryant had expanded its operations by leasing two tracts of land owned jointly by two railroads.  Brown & Bryant's operations had resulted in various spills and leaks of hazardous substances that had contaminated both the original site and the tracts owned by the railroads.  129 S. Ct. at 1874-76.  Brown & Bryant became insolvent, and the federal government eventually spent more than eight million dollars to remediate the property.  The government also ordered the

railroads to clean up the property, and they spent more than three million dollars to do so. (The liability of another party, Shell, was also in dispute, but the Supreme Court eventually held that it was not liable under CERCLA.)

For present purposes, the key point is that the district court found that the contamination of the site created a "single harm" but that the harm was divisible and was subject to apportionment among the several PRPs, without imposing joint and several liability. 129 S. Ct. at 1876. Based on several factors – the percentage of land owned by the railroads, the duration of the railroads' lease divided by the duration of Brown & Bryant's operations, and the relative roles of the different spilled chemicals in requiring remediation – the district court apportioned the liability so that the railroads were responsible for only nine percent of the government's total cleanup costs.

The Ninth Circuit had reversed and held that the railroads were jointly and severally liable for all of the government's cleanup costs. The Supreme Court in turn reversed the Ninth Circuit and affirmed the district court's apportionment of liability to the railroads. The Supreme Court explained that the scope of liability in a CERCLA case is to "'be determined from traditional and evolving principles of common law.'" 129 S. Ct. at 1881, quoting *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 808 (S.D. Ohio 1983). The starting point for analyzing divisibility of the harm is § 433A of the Restatement (Second) of Torts. Under the Restatement,

> "when two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused.  Restatement (Second) of Torts, §§ 433A, 881 (1976); Prosser, Law of Torts, pp. 313-314 (4th ed. 1971). . . .  But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm.  Restatement (Second) of Torts, § 875; Prosser, at 315-316."

*Burlington Northern*, 129 S. Ct. at 1881, quoting *Chem-Dyne Corp.,* 572 F.Supp., at 810.  In other words, as the Court explained, "apportionment is proper when 'there is a *reasonable* basis for determining the contribution of each cause to a single harm.'"  *Id.* (emphasis added), quoting Restatement (Second) of Torts, § 433A(1)(b), 434 (1963-64).

Although equitable factors relevant to section 113(f)(1) contribution claims do not play a role in determining the divisibility of the harm, reasonableness does. *Burlington Northern*, 129 S. Ct. at 1881-82 & n. 9 (2009).  "Apportionment [of the harm] is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs."  *Id.* at 1882, n.9. In *Burlington Northern*, the lower courts had agreed that the harm created by contamination of the site was "singular" but was at least theoretically capable of apportionment.  129 S. Ct. at 1881.  The issue was whether the record provided a reasonable basis for doing so. As noted, the district court had apportioned harm based on the portion of the surface area each party had controlled, the volume of hazardous waste released as a result of each party's activities, and the time over which those activities

extended, with a generous allowance for imprecision in the estimates of those matters.  *Id.* at 1882.  The Supreme Court held that the district court's approach was reasonable and upheld its apportionment of liability for the government's cleanup costs, which did not hold each party jointly and severally liable for the entire loss.  For present purposes, the Supreme Court held that joint and several liability was not required for all PRPs where the harm was "singular," so long as the record provided a reasonable basis for apportioning the harm among the PRPs.

The full import of *Burlington Northern* is hotly debated, in this case and elsewhere.  SIGECO argues that it effected a dramatic change that will make it much easier for PRPs to avoid the burden of joint and several liability.  The Trust argues that *Burlington Northern* amounts to nothing new; it merely restated the old principles widely adopted since *Chem-Dyne* was decided in 1983.  The court declines at this point to commit to a particular interpretation of *Burlington Northern* and how it might apply in a case like this one, in which a trust formed by the owner-operators of the site has carried out part of the remediation and might have found a way to protect the owner-operators from joint and several liability for the full amount of remediation.  This is a case in which the Supreme Court's new decision has presented what might be called genuine questions of material law.

The court could try to answer those questions on the basis of the existing record, but the timing of the Supreme Court's decision has meant that the record

-46-

is more limited than it otherwise would have been.  More important, where the applicable law appears to be in flux like this, perhaps the best role the district court can play in the process is to hold a trial and make the detailed findings of fact needed to inform higher courts as they address the questions of law.  See, *e.g.*, *Lalonde v. Textron, Inc.*, 369 F.3d 1, 6 (1st Cir. 2004) (reversing Rule 12(b)(6) dismissal to allow further development of record in emerging area of law); *Nelson v. IPALCO Enterprises, Inc.*, 2005 WL 1924332, at *3-4 (S.D. Ind. Aug. 11, 2005) (denying cross-motions for summary judgment to allow for more complete presentation and determination of facts); *In re JDS Uniphase Corp. ERISA Litigation*, 2005 WL 1662131, at *8 (N.D. Cal. July 14, 2005) (denying in principal part a motion to dismiss in emerging area of law).  The court expects to hold a trial that will allow each side to present evidence relevant to its own and its opponents' different interpretations of *Burlington Northern*.  That approach will allow full development of a record and a decision on the basis of real facts rather than the artificial and even hypothetical versions of facts the court must assume for purposes of deciding motions for summary judgment.  The court recognizes that this approach might delay the remediation of the River Yard while these issues are sorted out.  But *Burlington Northern* raises new questions and legal uncertainty sufficient to make this approach of a full airing of apportionment issues the better approach at this time.

Accordingly, the court grants plaintiff's motion to the extent that it holds SIGECO liable for remediation costs under section 107(a) and declares that

SIGECO will be liable for future remediation costs, pursuant to section 113(g) of CERCLA.   The court denies plaintiff's motion to the extent that it seeks a conclusive determination that SIGECO would be jointly and severally liable for all past and future remediation costs of the General Waste sites.  A portion of the trial will need to focus on the issue of apportionment of liability to SIGECO and to other PRPs.

VI.     *PRP Group's Motion to Strike Jury Trial Demand*

Arguing that the contribution claims it has brought against the third-party defendants are all equitable in nature, the PRP Group moves to strike the third-party defendants' requests for trial by jury.  That motion is granted, and the third-party defendants' demands for a jury trial are stricken.

With its third-party complaint, the PRP Group seeks contribution and a declaratory judgment under CERCLA (42 U.S.C. § 9613) (Counts I and II) and the Indiana Environmental Legal Actions ("ELA") Statute (Ind. Code § 13-30-9-1 *et seq.*) (Counts III and IV).  The PRP group argues that its claims are equitable in nature and that, because the Seventh Amendment guarantees a jury trial only in suits that would have been tried in courts of law rather than courts of equity before the merger of law and equity, the third-party defendants have no right to a trial by jury in this case.  Some third-party defendants have raised various

arguments in opposition to the PRP Group's motion.  The court discusses those arguments in turn.

A.    *Jury Trials Under CERCLA*

Third-party defendant Frontier Kemper, joined by third-party defendant Sears, argues in response that sometimes juries do play a role in CERCLA actions. Dkt. No. 240, 247.  In support of its argument, Frontier Kemper cites *GL Industries of Michigan v. Forstmann-Little*, 800 F. Supp. 695 (S.D. Ind. 1991) (Barker, J.).  According to Frontier Kemper, Judge Barker "left open the possibility" that a party may be entitled to a jury on a CERCLA liability question. Dkt. No. 240 at 2, citing *GL Industries*, 800 F. Supp. at 699.  Judge Barker did not leave open the possibility of a jury trial.  She relied on the line of authority holding that no right to a jury trial exists in CERCLA cases, and she noted that the party seeking to preserve the possibility of a jury trial had not developed an argument in support of its position.  *GL Industries*, 800 F. Supp. at 699.  Frontier Kemper's reliance on this case is misplaced.

Frontier Kemper also relies on cases from other circuits that articulated the summary judgment standard in terms of the familiar "reasonable jury."  See Dkt. No. 240 at 2-3, citing *Consolidated Edison Co. v. UGI Utilities, Inc.*, 153 Fed. Appx. 749, 751-52 (2d Cir. 2005) (reviewing grant of summary judgment); *Concrete Sales and Services, Inc. v. Blue Bird Body Co.*, 211 F.3d 1333, 1337 (11th Cir. 2000)

(same).  Those courts were applying the usual standard for summary judgment, which is often stated in terms of whether or not a "reasonable jury" (or more generically, a reasonable trier of fact) could find in favor of a particular plaintiff as articulated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  These decisions are silent with regard to the litigants' right to a jury trial in CERCLA cases.  They offer no support for the third-party defendants' jury demands.

B.    *Jury Trials Under the Indiana ELA*

Indiana's ELA statute echoes CERCLA, providing that "a court shall allocate the costs of the [cleanup] . . . using legal and equitable factors that the court determines are appropriate." Ind. Code § 13-30-9-3(a).  Although Frontier Kemper argues that the ELA leaves the issue open, the statutory language clearly states that the *court* shall allocate costs between the parties, and the parallels to CERCLA are apparent.  This court has previously indirectly recognized the equitable nature of the ELA, and Frontier Kemper has raised no argument sufficient to prompt reconsideration of that finding.  See *Armstrong Cleaners, Inc. v. Erie Ins. Exchange*, 364 F. Supp. 2d 797, 811-13 (S.D. Ind. 2005).

C.    *Jury Trials in Declaratory Judgment Actions*

For purposes of deciding a right to jury trial in an action seeking a declaratory judgment, the answer depends on whether the underlying dispute "is the counterpart of a suit in equity" or "is essentially an inverted lawsuit – an

action brought by one who would have been a defendant at common law."

*Marseilles Hydro Power, LLC v. Marseilles Land and Water Co.*, 299 F.3d 643, 649 (7th Cir. 2002), quoting *Owens-Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1189 (3d Cir. 1979).  Here, the PRP Group seeks a declaratory judgment to ensure that any equitable allocation of response costs that might be made by this court under CERCLA or the ELA will apply to future response costs.  The declaratory judgments sought here, then, are the "counterpart" to the PRP Group's CERCLA and ELA claims and are equitable in nature.

Third-party defendant Frontier Kemper argues that in Indiana, juries may be and have been used in declaratory judgment actions.  Citing *Jamrosz v. Resource Benefits, Inc.*, 839 N.E.2d 746, 764-65 (Ind. App. 2005), Frontier Kemper argues that any issues of fact relating to the PRP Group's claims for declaratory relief may properly be submitted to a jury.  Dkt. No. 240 at 3.  However, the claims in *Jamrosz* centered on a contract dispute and included claims of breach of contract, fraud, conversion, and civil conspiracy.  839 N.E.2d at 754.  Although the propriety of a jury trial was not discussed by the court in *Jamrosz*, the claims underlying the declaratory judgment action would have been properly tried before a jury – unlike the CERCLA and ELA claims underlying the PRP Group's declaratory judgment action here.  The PRP Group's declaratory judgment action is based entirely on equitable claims.  Its declaratory judgment also sounds in equity, so there is no right to a jury trial.

D.     *Ripeness*

Third-party defendant White County Coal, LLC ("White County"), joined by Duke Energy, Sears, and the City of Evansville, argues that striking a demand for a jury trial at this stage would be premature because not every third-party defendant has answered the PRP Group's complaint and because certain deadlines – amending the pleadings, the trial date – had not been established. Dkt. No. 244 at 2-3.  Thus, White County argues, the court cannot determine whether a jury trial is proper because it does not know what claims will be litigated at trial.  *Id.* at 3.  A trial date has been set and every third-party defendant who has appeared and participated in the lawsuit has now answered. This issue is ripe for decision.  If a particular claim is legal in nature, the Seventh Amendment guarantees a right to trial by jury.  All of the claims between the PRP Group and the third-party defendants are equitable in nature, and there is no right to a jury trial on equitable claims.  The PRP Group's motion to strike the third-party defendants' requests for a jury trial is granted.

VII.    *PRP Group's Motion for Leave to File First Amended Complaint*

This action began on May 21, 2007, when the Trust initially filed suit. The Trust's complaint was amended on May 6, 2008, and on July 3, 2008, the PRP Group filed its third-party complaint.  Dkt. Nos. 1, 62, 103.  At argument on September 22, 2009, the parties assured the court that they stand ready to try this case in the summer of 2010.  However, the PRP Group has moved for leave to amend its third-party complaint to add the United States Navy as a defendant. Dkt. No. 492.  The Trust opposes the PRP Group's motion, arguing that the addition of the Navy as a third-party defendant at this time will lead to undue delay and will prejudice both the Trust and Trockman.[8]  Dkt. No. 508.  The PRP Group's motion for leave to amend is denied.

Under the Federal Rules of Civil Procedure, leave to amend a complaint should be "freely given" except in circumstances where an amendment would cause undue delay, would unduly prejudice the non-moving party, would be futile, or was prompted by the movant's bad faith or dilatory motive.  Fed. R. Civ. P. 15(a)(2); see also *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The court believes that undue delay would result from granting the PRP Group's motion for leave to amend.  This litigation is already two years old, discovery is underway and heading towards resolution, dispositive motions have been filed and are being

_____

[8]The Trust argued in the alternative that if the court were to allow the PRP Group's contribution claim to proceed against the Navy, it should move forward on a track separate from the main litigation.  Because the court denies the PRP Group's motion, it does not address that suggestion.

resolved, and trial is around the corner.  The addition of a new third-party defendant is not sufficient reason to stall or slow these proceedings.  Remediation of the General Waste sites has been already too long in coming, and both the parties and the court have a strong interest in seeing the immediate case come to a close.

The PRP Group will not be prejudiced by the court's refusal to allow it to amend its complaint.  The PRP Group or its individual PRP members still might seek contribution from the Navy or any other previously unidentified PRP as part of a separate contribution action under CERCLA section 113(f).  A separate action is obviously not an ideal solution, for it would probably be less efficient than rolling all PRPs and their claims and defenses into one action.  As a trailing action, however, a separate contribution action could take advantage of much work that has already been done.  After a trial in this action as it is currently framed, the interested parties should know most of the facts and should have good information about the extent of any Navy responsibility.  As between these two less than palatable alternatives – delay final resolution until the Navy can be brought up to speed, or separate the overall dispute into two cases – the court opts in favor of the course that should speed up the eventual clean-up of the River Yard.

*Conclusion*

The PRP Group's motion for summary judgment against General Waste and Trockman under CERCLA section 113(f) (Dkt. No. 200) is granted.  The Heritage Coal defendants' motion for summary judgment against the Greenway Trust (Dkt. No. 425) is denied.  The Trust's motion for leave to file a response to SIGECO's surreply (Dkt. No. 474) is granted.  The Trust's motion for a finding of liability on summary judgment against SIGECO under CERCLA section 107(a) (Dkt. No. 388) is granted in part and denied in part, as explained above.  The PRP Group's motion to strike the third party defendants' requests for a jury trial (Dkt. No. 226) is granted.   The PRP Group's motion for leave to file its first amended third-party complaint (Dkt. No. 491) is denied.

So ordered.

Date:  September 29, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Scott R. Alexander
TAFT STETTINIUS & HOLLISTER LLP
salexander@taftlaw.com, docket@taftlaw.com

John P. Arranz
SWANSON MARTIN & BELL
jarranz@smbtrials.com, mhernandez@smbtrials.com

Stephen J. Axtell
THOMPSON HINE LLP
steve.axtell@thompsonhine.com, diane.macleod@thompsonhine.com

Jennifer C. Baker
HUNSUCKER GOODSTEIN & NELSON
jbaker@hgnlaw.com

Brian C. Bosma
KROGER GARDIS & REGAS, LLP
bcb@kgrlaw.com

Jayna Morse Cacioppo
TAFT STETTINIUS & HOLLISTER LLP
jcacioppo@taftlaw.com, akwilosz@taftlaw.com, docket@taftlaw.com

Gregory P. Cafouros
KROGER GARDIS & REGAS, LLP
gpc@kgrlaw.com, pad@kgrlaw.com

Michael D. Chambers
TAFT STETTINIUS & HOLLISTER LLP
mchambers@taftlaw.com, docket@taftlaw.com

Robert R. Clark
TAFT STETTINIUS & HOLLISTER LLP
rclark@taftlaw.com, docket@taftlaw.com, malexander@taftlaw.com

Travis A. Crump
STOLL KEENON OGDEN PLLC
Travis.Crump@skofirm.com

Michael E. DiRienzo
KAHN DEES DONOVAN & KAHN
mdirienzo@kddk.com, sherri.k.sprinkle@travelers.com

EVANSVILLE GREEWAY PRP GROUP
gpc@kgrlaw.com

Hallie Miller Fahey
TROUTMAN SANDERS LLP
hallie.fahey@troutmansanders.com

Andrew Rudolph Falk
KROGER GARDIS & REGAS LLP
arf@kgrlaw.com

Maria V. Gillen
TENNESSEE VALLEY AUTHORITY
mvgillen@tva.gov

Adam T. Goebel
STOLL KEENON OGDEN PLLC
adam.goebel@skofirm.com, jessica.mcgee@skofirm.com

Michael D. Goodstein
HUNSUCKER GOODSTEIN & NELSON PC
mgoodstein@hgnlaw.com

Edward S. Griggs
BARNES & THORNBURG LLP
sean.griggs@btlaw.com, nancy.wagner@btlaw.com

Timothy A. Haley
BARNES & THORNBURG LLP
thaley@btlaw.com

Elizabeth Schroer Harvey
SWANSON MARTIN & BELL LLP
eharvey@smbtrials.com

Samuel D. Hinkle, IV
STOLL KEENON OGDEN PLLC
sam.hinkle@skofirm.com, adam.goebel@skofirm.com, travis.crump@skofirm.com,
ashley.ragsdale@skofirm.com

David L. Jones
JONES WALLACE, LLC
djones@joneswallace.com, nevans@joneswallace.com, ljones@joneswallace.com

Jody E. Kahn
SWANSON MARTIN & BELL LLP
jkahn@smbtrials.com, jodykahn@gmail.com

G. Daniel Kelley, Jr.
ICE MILLER LLP
daniel.kelley@icemiller.com, chris.webb@icemiller.com

Matthew Theron Kinst
SWANSON MARTIN & BELL LLP
mkinst@smbtrials.com

Thomas A. Knoth
THOMPSON HINE LLP
tom.knoth@thompsonhine.com, diane.macleod@thompsonhine.com

John Milton Kyle, III
BARNES & THORNBURG LLP
john.kyle@btlaw.com

Douglas W. Langdon
FROST BROWN & TODD, LLC
dlangdon@fbtlaw.com, tdooley@fbtlaw.com

Kyle Andrew Lansberry
LEWIS & WAGNER
klansberry@lewiswagner.com, gbrackett@lewiswagner.com

Richard J. Lewandowski
WHYTE HIRSCHBOECK DUDEK S.C.
rlewandowski@whdlaw.com

Michael John Maher
SWANSON MARTIN & BELL
mmaher@smbtrials.com, jpodlin@smbtrials.com

Stacey H. Myers
HUNSUCKER GOODSTEIN & NELSON PC
smyers@hgnlaw.com, cdavis@hgnlaw.com

Michael Orville Nelson
HUNSUCKER, GOODSTEIN & NELSON
mnelson@hgnlaw.com, mschulz@boselaw.com, wgarrison@hgnlaw.com

Reed W Neuman
NOSSAMAN, LLP/ O'CONNOR & HANNAN
rneuman@nossaman.com, kbrayton@nossaman.com

Victoria L. Nilles
THOMPSON HINE LLP
victoria.nilles@thompsonhine.com, diane.macleod@thompsonhine.com

Anthony W. Overholt
FROST BROWN TODD LLC
aoverholt@fbtlaw.com, sdunn@fbtlaw.com

Tina Marie Richards
BAKER & DANIELS - Indianapolis
tina.richards@bakerd.com, dianne.armstroff@bakerd.com

Robert W. Rock
JONES WALLACE LLC
rrock@joneswallace.com,   cheim@joneswallace.com,   nevans@joneswallace.com,
ljones@joneswallace.com

Keith E. Rounder
TERRELL BAUGH SALMON & BORN
krounder@tbsblaw.com, pperry@tbsblaw.com

Ross E. Rudolph
RUDOLPH FINE PORTER & JOHNSON
rer@rfpj.com, smo@rfpj.com, mch@rfpj.com, trg@rfpj.com

James P. Ryan
NOSSAMAN, LLP/O'CONNOR & HANNAN
jryan@nossaman.com

Douglas B. Sanders
BAKER & McKENZIE LLP
douglas.b.sanders@bakernet.com

G. Michael Schopmeyer
KAHN DEES DONOVAN & KAHN
mschopmeyer@kddk.com

John A. Sheehan
HUNTON & WILLIAMS LLP
JSheehan@hunton.com, STerrell@hunton.com

Kate E. Shelby
TAFT STETTINIUS & HOLLISTER LLP
kshelby@taftlaw.com, dinville@taftlaw.com

Katherine L. Shelby
BINGHAM MCHALE LLP
kshelby@binghammchale.com, kbarnett@binghammchale.com

Donald M. Snemis
ICE MILLER LLP
donald.snemis@icemiller.com, nikki.hunter@icemiller.com

William T. Terrell
TENNESSEE VALLEY AUTHORITY
wtterrell@tva.gov, ogcecffiles@tva.gov

Kevin Morris Toner
BAKER & DANIELS - Indianapolis
kevin.toner@bakerd.com, judy.ferber@bakerd.com, kay.cook@bakerd.com

John William Watson, III
BAKER & McKENZIE LLP
john.w.watson@bakernet.com

Thomas E. Wheeler, II
FROST BROWN TODD LLC
twheeler@fbtlaw.com, kdickerson@fbtlaw.com

Kenneth Thomas Williams, II
STOLL KEENON & OGDEN PLLC
kt.williams@skofirm.com

David E. Wright
KROGER GARDIS & REGAS LLP
dew@kgrlaw.com, mem@kgrlaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| EVANSVILLE GREENWAY AND | ) | |
| REMEDIATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:07-cv-0066-DFH-WGH |
| | ) | |
| SOUTHERN INDIANA GAS | ) | |
| AND ELECTRIC COMPANY, | ) | |
| INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON PENDING MOTIONS

Several pending motions for summary judgment present issues under the
federal Comprehensive Environmental Response, Compensation and Liability Act,
better known as CERCLA, 42 U.S.C. § 9601 *et seq.*  From approximately 1956
through 1998, third-party defendant General Waste Products owned and operated
two adjacent sites that have become known as the "River Yard" and the "Main
Yard."  The "Main Yard" site is located at 201 South Seventh Street, and the "River
Yard" site is located at 2350 Broadway (Rear) Avenue, both where Pigeon Creek
empties into the Ohio River in downtown Evansville, Indiana.  General Waste
operated a scrap metal business at the sites.  Over the course of its business at
the sites, General Waste arranged for the transport and/or disposal or hazardous
substances at both sites.  Third-party defendant Allan Trockman is the former

president and shareholder of General Waste.  He operated the Main Yard and River Yard sites at the time hazardous substances were disposed on the sites.

After General Waste had closed its business, the City of Evansville became interested in acquiring both sites to include them in a "greenway" of bicycle and walking trails in the city.  Analysis of the sites showed high concentrations of lead and polychlorinated biphenyls (PCBs) in the soil.  General Waste sought clean-up costs from its liability insurers.  The insurers disputed coverage, and litigation ensued.

As part of the settlement of that lawsuit in 2004, General Waste, Trockman, and General Waste's insurers entered into the Evansville Greenway and Remediation Trust Agreement ("the Greenway Trust" or "the Trust").  The Trust Agreement stated that the purposes of the Greenway Trust were to "collect and disburse amounts for 'environmental remediation'" and to "engage in the activities in furtherance of its obligation to collect and disburse amounts for environmental remediation."  Dkt. No. 426, Ex. F at 1, ¶ 2.3.  The funds deposited in the Greenway Trust were to be used exclusively for the purpose of implementing the investigative, remedial, and enforcement actions required by the Trust Agreement. The insurers of General Waste contributed approximately $3.5 million to the Greenway Trust.  Most of that money has been spent to remediate the Main Yard. That remediation has been completed, and the Main Yard is now part of the

Evansville Greenway.  The Greenway Trust has little money left now, however, and does not have funds to remediate the River Yard.

This action began when the Greenway Trust brought suit against defendants Southern Indiana Gas and Electric Company ("SIGECO"), Heritage Coal Co., Mead Johnson and Co., Midwest Coal Co., Black Beauty Coal Co., Squaw Creel Coal Co., and Mulzer Crushed Stone, Inc. under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and the Indiana Environmental Legal Actions statute, Ind. Code § 13-30-9-1 *et seq.*  Section 107(a) allows a party who has voluntarily undertaken to clean up a hazardous waste site to recover its costs from parties legally responsible for the contamination.  The Greenway Trust alleges that the defendants are responsible for lead and/or PCB contamination of the General Waste sites.  Dkt. No. 62, ¶ 268.  The Trust brought suit on its own behalf and as assignee of General Waste, Trockman, and the City of Evansville, although it purports to bring its section 107(a) claim only as itself and as the assignee of the City.  Dkt. No. 62, ¶¶ 262-74.

Several of the named defendants assigned their claims against the Greenway Trust, other defendants, and third party defendants to the third-party plaintiff PRP Group.  Dkt. No. 103 ¶ 3.  The PRP Group then filed a third-party complaint against third-party defendants General Waste, Trockman, the City of Evansville, General Electric Co., Indianapolis Power and Light Company, National Tire and Battery, Old Ben Coal Co., Solar Sources, Inc., Tennessee Valley

Authority, Whirlpool, White County Coal, PSI Energy, Tell City Electric Department, Frontier Kemper, and Speed Queen.  The third-party complaint alleges that those third-party defendants are liable or potentially liable under section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for contribution to the necessary costs of response allegedly incurred by the Greenway Trust, General Waste, Trockman, and the City of Evansville.

Three summary judgment motions are now ripe.  First, the PRP Group has moved for summary judgment on the issue of contributor liability against General Waste and Trockman under CERCLA section 113(f).  Dkt. No. 200.  The court grants the motion.  Second, defendants Heritage Coal, Mead Johnson, and Black Beauty Coal have moved for summary judgment against plaintiff Greenway Trust on the claims raised in the Trust's first amended complaint.  Dkt. No. 425.  The court denies that motion in all respects.  Third, Greenway Trust has moved for summary judgment holding that defendant Southern Indiana Gas and Electric Company ("SIGECO") is jointly and severally liable for all clean-up costs for both the Main Yard and the River Yard under CERCLA section 107(a).  Dkt. No. 388. That motion is granted in part and denied in part.  The court also grants the PRP Group's motion to strike the third party defendants' requests for a jury trial (Dkt. No. 226) and denies the PRP Group's motion for leave to amend its third-party complaint to add the United States Navy as a party (Dkt. No. 491).

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party. See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255. However, a party must present more than mere speculation or conjecture to defeat a summary judgment motion. The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record. *Id.* at 251-52. These standards apply to all pending motions for summary judgment and require the court to change the lenses through which it views the record evidence so as to give the non-moving parties the benefits of all conflicts in the evidence and favorable inferences from that evidence.

*Discussion*

I.      *CERCLA*

The federal Comprehensive Environmental Response, Compensation and Liability Act was "designed to effectuate the cleanup of toxic waste sites [and] to compensate those who have attended to the remediation of environmental hazards." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996) (comparing purposes of CERCLA with purposes of Resource Conservation and Recovery Act). To achieve that purpose, Congress expressly provided for the recovery of cleanup costs in CERCLA.  Section 107 of the statute (42 U.S.C. § 9607) provides a private right of action for the recovery of such costs in certain circumstances.   To establish a case for reimbursement of clean-up costs under section 107(a), a plaintiff must establish four elements:  (1) the property is a facility; (2) there has been a release or threatened release of a hazardous substance; (3) the release has caused the plaintiff to incur necessary costs of response that are consistent with the National Contingency Plan; and (4) the defendant is in one of four categories of potentially responsible parties.  See *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994); *City of Martinsville v. Masterwear Corp.*, 2006 WL 2710628 at *2 (S.D. Ind. Sept. 20, 2006).

The four categories of potentially responsible parties or "PRPs" under section 107(a) are:

(1)      the owner and operator of a vessel or a facility,

(2)     any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3)     any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4)     any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

42 U.S.C. §§ 9607(a).  The definition is so broad "as to sweep in virtually all persons likely to incur cleanup costs."  *United States v. Atlantic Research Corp.*, 551 U.S. 128, 136 (2007).

Once identified as a PRP, an entity may be compelled by the government to clean up a contaminated area.  See *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 161 (2004).  PRPs may also be held liable for:

(A)     all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B)     any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C)     damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D)      the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. §§ 9607(a)   The Supreme Court held in *Atlantic Research* that the meaning of the phrase "any other person" in section 107(a)(4)(B) includes other PRPs, so that a PRP who has incurred necessary response costs may bring suit against other PRPs to recover those costs.  551 U.S. at 131.

The courts have interpreted liability under this section in most cases to be strict, joint, and several.  The only established exception to liability is when the harm is divisible.  See *Metropolitan Water Reclamation Dist. of Greater Chicago v. North American Galvanizing & Coatings, Inc.*, 473 F.3d 824, 827 & n.3 (7th Cir. 2007) (describing divisible harm as "rare").   Joint and several liability under section 107(a) enables the government or another party who has incurred cleanup costs to follow the path of least resistance by suing one or only a few PRPs for all of the costs, leaving those targeted PRPs the task of finding other PRPs and seeking allocation of liability in an equitable way under section 113(f)(1) of CERCLA.

CERCLA section 113(f)(1) complements section 107(a) by permitting private parties to seek contribution from joint tortfeasors during or following a civil action under § 106 or § 107(a).  42 U.S.C. § 9613(f)(1); *Atlantic Research*, 551 U.S. at 139; *Cooper Industries*, 543 U.S. at 168 (holding that a private party could not seek contribution from other liable parties under § 113(f)(1) where it had not been sued

under § 106 or § 107(a)).   Section 113(f)(3)(B) permits private parties to seek contribution after they have settled their liability with the government.   42 U.S.C. § 9613(f)(3)(B).   But a so-called "voluntary" PRP – a potentially responsible party who incurs cleanup costs voluntarily and not after being sued under section 106 or 107(a) – cannot sue for contribution from its fellow PRPs under section 113(f) of CERCLA.   *Cooper Industries*, 543 U.S. at 160-61.   A PRP who carries out a voluntary cleanup, as General Waste and Trockman have done through the Greenway Trust in this case, can seek recovery from other PRPs only by suing under 107(a).

As noted, the remedies available under sections 107(a) and 113(f) are meant to complement each other.   *Atlantic Research*, 551 U.S. at 139.   As the Supreme Court explained:

> [A] PRP that pays money to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution.   But by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a).   As a result, though eligible to seek contribution under § 113(f)(1), the PRP cannot simultaneously seek to recover the same expenses under § 107(a).
>
> *     *     *
>
> For similar reasons, a PRP could not avoid § 113(f)'s equitable distribution of reimbursement costs among PRPs by instead choosing to impose joint and several liability on another PRP in an action under 107(a). The choice of remedies simply does not exist.   In any event, a defendant PRP in such a 107(a) suit could blunt any inequitable distribution of costs by filing a § 113(f) counterclaim.   Resolution of a § 113(f) counter-claim would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the § 107(a) action.

*Atlantic Research*, 551 U.S. at 139-40 (internal citations omitted).

II.     *PRP Group's Motion for Partial Summary Judgment*

By naming General Waste and Trockman as third-party defendants in its third-party complaint, the PRP Group in essence seeks to close the circle of liability here.   General Waste and Trockman and their insurers set up the Greenway Trust, which sued the members of the PRP Group.  The PRP Group then sued other PRPs, including General Waste and Trockman.   The third-party complaint seeks contribution and a declaratory judgment under section 113(f)(1) of   CERCLA  (42  U.S.C.  §  9613(f)(1))  (Counts  I  and  II)  and  the  Indiana Environmental Legal Actions ("ELA") statute (Ind. Code § 13-30-9-1 *et seq.*) (Counts III and IV) against the third-party defendants, including General Waste and Trockman.  The PRP Group has moved for partial summary judgment against third-party defendants General Waste and Trockman.   The PRP Group seeks judgment on the issue of the liability of General Waste and Trockman under CERCLA section 113(f)(1), which allows "any person" to "seek contribution from any other person who is liable or potentially liable under section 9607(a) . . . during or following any civil action under section 9606 . . . or section 9607(a)." For  purposes  of  its  motion,  the  PRP  Group  does  not  seek  now  a  specific contribution *allocation* under section 113(f)(1), but only a finding of *liability*.  The PRP Group's motion for partial summary judgment is granted.

A.     *Undisputed Facts*

The PRP Group's claims arise from the disposal and cleanup of hazardous substances at the General Waste sites.  General Waste admitted that it was the owner of the River Yard site.  Dkt. No. 178, ¶ 10. It owned and operated the General Waste sites at a time when hazardous substances were disposed of at the sites.  *Id.* at ¶ 11.  It also arranged for transport or disposal of hazardous waste products on the General Waste sites.  *Id.* at ¶ 28.

Likewise, in his answer, Trockman admitted that he operated the General Waste sites at a time when hazardous substances were disposed of at the General Waste sites.  Dkt. No. 177, ¶ 12.  He also admitted that he arranged for transport or disposal of hazardous waste products at the General Waste sites.  *Id.* at ¶ 28.

The Greenway Trust sued the members of the PRP Group pursuant to section 107(a) of CERCLA on its own behalf and in its position as an assignee of the City of Evansville.  See Dkt. No. 62, ¶¶ 267-74; Dkt. No. 103, ¶ 2.

At least some members of the PRP Group – SIGECO, Heritage Coal, and Mead Johnson – have incurred "PRP search costs" by investigating the history of operation at the General Waste sites to identify other PRPs.  They have incurred costs reviewing documents, taking and evaluating witness statements, and in other activities to identify other PRPs who have been brought into this case as

-11-

third-party defendants.  Dkt. No. 267, Ex. A, ¶¶ 2, 4; Ex. B, ¶¶ 3-4; Ex. C, ¶ 5. Also, PRP Group member SIGECO has engaged the services of an environmental consulting firm to assist in the remediation effort.  That firm has incurred costs developing a remediation plan.  Dkt. No. 267, Ex. D, ¶¶ 2-4.

B.    *Analysis*

The PRP Group seeks summary judgment on the question of whether General Waste and Trockman are liable or potentially liable parties as defined by section 107(a) of CERCLA.  If and when that finding is made, the members of the PRP Group, as defendants to the Trust's CERCLA section 107(a) lawsuit, will have a right of contribution from General Waste and Trockman under section 113(f) of CERCLA, assuming that the PRP Group is able to account satisfactorily for its response costs.  See 42 U.S.C. § 9613(f)(1); *Cooper Industries*, 543 U.S. at 168 (holding that a private party could seek contribution under § 113(f) from other liable parties only after having been sued under § 106 or 107(a)).  General Waste and Trockman oppose the PRP Group's motion, arguing that the PRP Group must first show that it has actually paid response costs and that its members have already paid more than their fair shares.

The Greenway Trust sued the members of the PRP Group under section 107(a) of CERCLA.  Dkt. No. 62, ¶¶ 267-74.  Under the plain language of section 113(f), therefore, the PRP Group is entitled to seek contribution from any liable or

potentially liable party under section 107(a).  42 U.S.C. § 9613(f).  Once more, that section includes the following categories of individuals:

(1)   the owner and operator of a vessel or a facility,

(2)   any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3)   any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances . . . and

(4)   any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . .

42 U.S.C. §§ 9607(a).  By their own admissions, General Waste and Trockman are potentially liable parties as defined by section 107(a).  General Waste was the owner of the River Yard site and admitted that it owned and operated both sites at the time hazardous substances were disposed of at those locations.  Dkt. No. 178, ¶¶ 10, 11.  It also admitted that it arranged for the transport or disposal of hazardous substances at both sites.  *Id.* at ¶ 28.  Likewise, Trockman admitted that he operated the sites at the time hazardous substances were disposed and that he arranged for the transport to or disposal of hazardous substances at the sites.  Dkt. No. 177, ¶¶ 12, 28.  The PRP Group, as assignee of defendants on the section 107(a) claim brought by the Greenway Trust created by General Waste and Trockman, is entitled to seek contribution from General Waste and Trockman

under section 113(f) as liable parties or potentially liable parties as defined by CERCLA.

In *Atlantic Research*, the Supreme Court defined "contribution" as the word is used in section 113(f) as the "'tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault.'"  551 U.S. at 138, quoting Black's Law Dictionary 353 (8th ed. 1999).  Because section 113(f) permits a PRP to seek liability for contribution "during or following" a suit under section 106 or 107(a), the Court explained that section 113(f) "permits suit before or after the establishment of common liability.  In either case, a PRP's right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties."  *Id.* at 138-39.

Focusing on this language, General Waste and Trockman argue that the PRP Group must show that its members have *already* incurred response costs disproportionate to their fair share of liability as a prerequisite to the PRP Group's contribution claim under section 113(f).  Dkt. No. 232 at 7-8; Dkt. No. 274 at 3.  In response to this argument, the PRP Group provided affidavits showing that its members have incurred some costs.  General Waste and Trockman argue that the affidavits are insufficient because they are "conclusory," do not provide an "accurate accounting," and do not demonstrate that the PRP Group members have already paid more than their proportionate shares.  Dkt. No. 274 at 4-6.  The

capstone of General Waste's and Trockman's argument is that "the PRP Group is not entitled to judgment until it can satisfy the elements required for establishing liability under CERCLA section 113, including that the members of the PRP Group have themselves been held liable under CERCLA section 107, and that there has been an 'inequitable distribution of common liability among liable parties.'"  Dkt. No. 274 at 7, citing *Atlantic Research*, 551 U.S. at 138.  Arguing that because the PRP Group has failed to satisfy its section 113 case (Count I), the third-party defendants further argue that a declaratory judgment (Count II) would be inappropriate under the Declaratory Judgment Act because there is no case or controversy.  Dkt. No. 232 at 10-13.

General Waste's and Trockman's argument is not persuasive.  The PRP Group's motion seeks a finding only that General Waste and Trockman are PRPs who are subject to claims for contribution if allocation of cleanup costs would otherwise be inequitable.  If and when such a finding might be made in the future, the PRP Group would presumably return to the court with a detailed accounting of its response costs and arguments regarding how and why those response costs were more than the PRP Group's proportionate share.  That day has not yet come, and the question of allocation of that liability for purposes of contribution under section 113(f)(1) is not yet before the court.  But on the immediate, narrow question of whether General Waste and Trockman, based on their own admissions, are liable or potentially liable parties under section 107(a), the undisputed facts show that they are.  There is no point in delaying that

determination.  The PRP Group's motion is granted on the issue of liability on Counts I and II of its third-party complaint against General Waste and Trockman.

III.   *Heritage Coal Motion for Summary Judgment*

The Greenway Trust seeks joint and several liability against PRP defendants Heritage Coal Co., Mead Johnson Nutrition Co., and Black Beauty Coal Co., among others, for soil contamination of the Main Yard and River Yard sites under section 107(a) of CERCLA.  Heritage Coal, Mead Johnson, and Black Beauty (for purposes of the court's discussion of Dkt. No. 425 and related filings only, the "Heritage Coal defendants") have moved for summary judgment against the Greenway Trust on all of its claims, arguing that the Trust is not a valid legal entity and thus lacks capacity to bring suit.  The Heritage Coal defendants also move for summary judgment on Count I of the Trust's amended complaint on the ground that the Trust is not entitled to joint and several liability under CERCLA 107(a) because it is not an innocent party.  For reasons set forth below, the court denies the Heritage Coal defendants' motion in its entirety.

A.   *Undisputed Facts*

General Waste admitted that in the course of its scrap metal business, it arranged for the transport and/or disposal of hazardous substances, including lead acid contained in batteries, at both sites.  Dkt. No. 178, ¶¶ 10-12.  Allan Trockman admitted that he operated the sites at the time hazardous substances,

including lead, were disposed on the sites.  Dkt. No. 426, Ex. A ¶¶ 2, 6; Dkt. No. 177, ¶ 12.   General Waste reclaimed the lead contained in the batteries by breaking them open and extracting the plates, causing battery acid to seep into the soil.  Because General Waste stored batteries outside to avoid damaging the concrete floor of the warehouse, battery acid leaked onto the ground.  Dkt. No. 426, Ex. A, ¶¶ 24, 30, 32; Ex. B, 162-64, 429.   Stacks of batteries would sometimes fall, be knocked over, or be crushed by trucks, resulting in battery acid and lead leaking into the ground.  Dkt. No. 426, Ex. A, ¶ 32.  Sometimes when the batteries arrived, they were already damaged.  Dkt. No. 426, Ex. A, ¶ 27.  The batteries stored at the sites came from customers including the Heritage Coal defendants.  *Id.* at ¶¶ 26-27.

Mead Johnson admitted that it used batteries in at least one of its manufacturing facilities in Evansville and that General Waste transported spent lead-acid forklift batteries that were not used in the direct manufacture of its products for a brief period from Mead Johnson's Evansville facility.  Dkt. No. 87, ¶¶ 144-46.

Heritage Coal, formerly known as Peabody Coal, once had mining interests in Indiana.  Dkt. No. 69, ¶ 21.  Black Beauty also operated coal mines in Indiana.  Dkt. No. 193, ¶ 59.  Trockman testified that General Waste received batteries from several coal mining operations, including Heritage and Black Beauty.  Dkt. No. 426, Ex. A, ¶ 27.  The batteries contained lead and were not operational.  *Id.* at ¶

24.  General Waste commonly found crushed batteries or lead battery plates in the bottom of trailers received from the mining companies.  *Id.* at ¶ 27.  Trockman testified that Heritage Coal sent spent lead batteries to General Waste for more than a decade, that Black Beauty had also been a General Waste customer for more than a decade, and that most of the loads General Waste received from Black Beauty contained a battery.  Dkt. No. 458, Ex. 2 at 143, 176, 422-24.

Collectively, SIGECO, Mead Johnson, and Heritage Coal provided between 80 and 85 percent of the batteries received by General Waste, with SIGECO as the largest contributor, and with Mead Johnson and Heritage Coal as the next two largest contributors.  Dkt. No. 458, Ex. 2 at 520-21, 544-45.

On June 4, 2002, General Waste invited SIGECO, Mead Johnson, and Heritage Coal to participate in the remediation of the Main Yard.  Dkt. No. 458, Ex. 4, ¶ 4 & Att. A.  In November 2002, court-sponsored settlement discussions began, overseen by Magistrate Judge Hussman.  SIGECO and Mead Johnson were invited to attend those discussions.  Although settlement conferences were held, a settlement was not reached.

On July 29, 2004, Trockman, General Waste and General Waste's insurers entered into the Evansville Greenway and Remediation Trust Agreement.  Dkt. No. 426, Ex. F ("Trust Agreement").  The "Whereas" clauses of the Trust Agreement

stated that "General Waste and Trockman have actual or potential liability or a reasonable expectation of liability under federal, state or local laws for environmental remediation of the Main Yard Site and the River Yard Site." The introductory clauses also stated that the Greenway Trust was:

> being established to resolve and satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that have occurred and have given rise to at least one claim asserting liability under state and federal environmental statutes, including, but not limited to [CERCLA] and The Indiana Environmental Legal Action Statute.

Dkt No. 426, Ex. F (internal citations omitted). The Trust Agreement stated that the purposes of the Greenway Trust were to "collect and disburse amounts for 'environmental remediation'" and to "engage in the activities in furtherance of its obligation to collect and disburse amounts for environmental remediation." Dkt. No. 426, Ex. F at 1, ¶ 2.3. It also stated that the funds deposited in the Trust were to be used exclusively for the purpose of implementing the investigative, remedial, and enforcement actions required by the Trust Agreement. Dkt. No. 426, Ex. F at 2. The Trust Agreement mandated that the Trust would "enter into contracts and agreements as needed to fulfill the purposes of this Trust Agreement." Dkt. No. 426, Ex. F, ¶ 2.3(6). The Trust had a federal tax identification number, and it filed federal, state, and local tax returns but did not conduct business for profit. Dkt. No. 426, Ex. F, ¶¶ 4.6.1, 4.7; Ex. G (letter from the Internal Revenue Service to the Trust dated September 2, 2004); Dkt. No.

458, Ex. 1, ¶ 5.  The Trust itself had not been subject to a CERCLA lawsuit or a consent decree.  Dkt. No. 389, Ex. 6, ¶¶ 11-12.

The Greenway Trust was required to provide General Waste, Trockman, and the insurers an accounting of the Trust's assets every month and an accounting of all Trust activity.  Dkt No. 426, Ex. F, ¶¶ 6.3, 6.5.  The Trust was bound to provide a defense for General Waste and Trockman for claims asserted against them "as the result of the contamination that is the subject of the lawsuits that will be asserted against the PRPs."[1]  *Id.* at ¶ 10.1.  Once the River Yard site was remediated and a covenant not to sue was obtained from the Governor of Indiana, the Trust would be obligated to reimburse CNA for amounts "loaned" to the Trust.  To the extent any recoveries remained after that, lawyers representing the Trust, General Waste, and Trockman would be reimbursed for their costs, and then if any funds remained, fifty percent would go to Trockman and fifty percent would go to the insurers.  *Id.* at ¶¶ 9.2.2, 9.2.3.

On August 31, 2004, Magistrate Judge Hussmann entered an order declaring that the Greenway Trust was a qualified settlement fund pursuant to Treasury Regulation 26 C.F.R. § 1.468B-1 *et seq.*  Dkt. No. 426, Ex. H.  The Trust was not registered as a business trust, a corporation, a limited liability company,

---

[1]In this lawsuit, the Greenway Trust, General Waste, and Trockman are represented by the same attorneys.

or any other business entity registered with the Indiana Secretary of State.  Dkt. No. 426, Exs. I & J.

Contemporaneously with the creation of the Greenway Trust, on July 29, 2004, the insurers irrevocably assigned to the Trust any rights they possessed or later would acquire "in connection with the environmental conditions at the Main Yard Site and any rights it has for costs incurred . . . for the River Yard Site."  Dkt. No. 426, Ex. D, ¶ 2.1.  General Waste and Trockman also entered an assignment of rights with the Trust, which provided:

> 2.1   In exchange for the Trust's agreement to remediate the Main Yard Site and to the extent possible, the River Yard Site, and to pursue the PRPs for the remediation of the Main Yard Site and River Yard Site, General Waste and Trockman hereby agree as follows:
>
> 2.1.1  General Waste and Trockman irrevocably assign, transfer, and convey to the Trust any and all rights General Waste and Trockman have or may have for contribution from the PRPs relating to the Main Yard Site and the River Yard Site, including but not limited to, any rights to obtain payment of Response Costs of attorney's fees from the PRPs.
>
> 2.1.2  General Waste and Trockman irrevocably assign, transfer, and convey to the Trust any and all rights General Waste and Trockman have or may have in the proceeds of sale of the River Yard Site.
>
> 2.1.3  General Waste and Trockman agree that the Trust will cause this Assignment to be filed with the Recorder of Deeds for Vanderburgh County, Indiana and any other applicable governmental or regulatory agency responsible for maintaining such records.

Dkt. No. 426, Ex. E.  When these rights were assigned, General Waste was the owner of the Main Yard site and the River Yard site, and Trockman was the president of General Waste.

On September 15, 2004, the City of Evansville purchased the Main Yard site from General Waste through a settlement agreement among General Waste, the City of Evansville, and the insurers.  Dkt. No. 426, Ex. C.

The Greenway Trust paid in excess of three million dollars for work necessary to investigate and clean up the PCB and lead contamination of the Main Yard site.  Dkt. No. 389, Ex. 6, ¶ 16.  On April 18, 2007, the Indiana Department of Environmental Management issued a Certificate of Completion to the City of Evansville for the successful completion of the remediation of the Main Yard site. Dkt. No. 389, Ex. 5, Att. C.  Also, the Greenway Trust has spent more than one hundred thousand dollars for remedial work at the River Yard, including preparation of a remedial work plan necessary to meet IDEM's requirements for investigation of PCB and lead contamination.  Dkt. No. 389, Ex. 5, ¶¶ 24-25; Ex. 6, ¶ 18.  The Trust lacked the funds necessary to clean up the River Yard or to pay the ongoing costs of the Trust.  Dkt. No. 458, Ex. 1, ¶ 7.

On May 6, 2008, the Greenway Trust filed its six-count first amended complaint against defendants SIGECO, Heritage Coal Company, Mead Johnson Nutrition Company, Midwest Coal Company, Black Beauty Coal Company, Squaw Creek Coal Company, and Mulzer Crushed Stone.  Dkt. No. 62.  The Trust brought claims against the defendants pursuant to CERCLA section 107(a).  Dkt. No. 62, ¶ 80.

B.    *Analysis*

1.    *Trust's Validity and Capacity to Sue*

The Heritage Coal defendants argue that the Trust is not a valid trust under Indiana law and thus lacks capacity to sue.  See *Miller's Estate v. St. Joseph County Home*, 87 N.E.2d 886, 887 (Ind. App. 1949) ("[The plaintiff] is not a legal entity of any kind.  It is merely the name of a place.  It therefore lacks the right or power to maintain in action.").  The trust has a clear purpose, but it lacks a beneficiary and is not a charitable trust.  The parties' briefs on this issue of trust validity have not collided directly.  The Heritage Coal defendants argued that the Greenway Trust did not qualify as a business trust under Indiana Code § 23-5-1-2(a), and the Trust agrees.  It does not conduct activity for purposes of making a profit.

The trust relies on the Indiana Trust Code generally and on Indiana Code § 30-4-2-19, which allows the creation of a trust for a noncharitable purpose without an identifiable beneficiary.  The Indiana Trust Code does not require formal language for the trust to be created, but it requires written terms that are sufficiently definite so that the trust property, the identity of the trustee, the nature of the trustee's interest and the purpose of the trust may be ascertained with reasonable certainty.  See Ind. Code § 30-4-2-1(b).  The Trust Agreement satisfies these requirements.  See Dkt. No. 426, Ex. F, § 2.3 (purposes of the

trust), § 3.1 (designation of trustee), § 4 (duties and responsibilities of the trustee), § 5 (funding of the Trust), § 7 (trustee compensation).

The Trust Code also requires a beneficiary, Ind. Code § 30-4-2-1(b), but provides that noncharitable trusts established under section 30-4-2-19 are deemed to have beneficiaries.   Ind. Code § 30-4-2-1(d).[2]   The Heritage Coal defendants focus on the absence of a beneficiary and point out that section 30-4-2-19 took effect only on July 1, 2005, a year after the Greenway Trust was created.   The defendants contend that the 2005 statute cannot retroactively

---

[2]Section 19 provides:

(a) Except as provided in section 18 of this chapter, a trust may be created for a:
    (1) noncharitable purpose without a beneficiary; or
    (2) noncharitable and valid purpose to be selected by the trustee.
(b) A trust authorized by this section may be enforced for not more than twenty-one (21) years.
(c) A trust authorized by this section may be enforced by the following:
    (1) A person appointed in the terms of the trust.
    (2) A person appointed by the court, if the terms of the trust do not appoint a person.
(d) Property of a trust authorized by this section may be applied only to the trust's intended use, except to the extent the court determines that the value of the trust property exceeds the amount required for the trust's intended use.
(e) Except as provided in the terms of the trust, property not required for the trust's intended use must be distributed to the following:

    (1) The settlor, if the settlor is living.
    (2) The settlor's successors in interest, if the settlor is deceased.

validate a trust created improperly, in defendants' view, in 2004.   The court disagrees for three reasons.

First, it is not at all clear that applying the 2005 statute to allow the Trust to file a lawsuit in 2007 amounts to giving the law retroactive effect.   See *Landsgraf v. USI Film Products*, 511 U.S. 244, 270 (1994) ("The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event."); *Estate of Moreland v. Dieter*, 576 F.3d 691 (7th Cir. 2009) (analyzing whether an Indiana statutory amendment applied retroactively); *Stewart v. Marson Construction Corp.*, 191 N.E.2d 320, 321 (Ind. 1963) (construing statute so as not to "impose liabilities not existing at the time of its passage" or to "affect an existing liability to the detriment of a defendant").   Applying the 2005 statute here does not impair any vested rights, create new liabilities, or create new rights not intended by the Trust's settlors.

Second, the Indiana Trust Code shows a strong preference for upholding the validity of trusts and enforcing them according to their terms.   When the Trust Code was enacted, it did away with overly formal requirements and provided that its terms would apply to already existing trusts to the extent that doing so would not impair vested rights or create new rights that a settlor did not intend to create. Ind. Code § 30-4-1-4.   It is reasonable to apply that same approach to the 2005

legislation and to already existing trusts.  Doing so does not impair any vested rights, create new liabilities, or create new rights not intended by the settlors.

Third, and more generally, the Trust Code provides:

> The rules of law contained in this article shall be interpreted and applied to the terms of the trust so as to implement the intent of the settlor and the purposes of the trust.  If the rules of law and the terms of the trust conflict, the terms of the trust shall control unless the rules of law clearly prohibit or restrict the article which the terms of the trust purport to authorize.

Ind. Code § 30-4-1-3.  In other words, the Trust Code is designed to empower the creation of trusts and to uphold their validity and enforce their intended terms, unless doing so is "clearly" prohibited or restricted.  There is no such clear prohibition or restriction here.  The court is confident that Indiana courts would uphold the validity of the Greenway Trust under the 2005 legislation.

The Heritage Coal defendants also contend that the Greenway Trust is invalid because its purpose is contrary to public policy.  This argument is a non-starter.  The undisputed facts show that the Greenway Trust was created to settle a lawsuit and to fund and carry out the remediation of a hazardous waste site so that it could become part of a significant civic improvement, the Evansville Greenway.  Despite these salutary purposes, defendants argue, the Greenway Trust is contrary to public policy because it is an attempt to shield General Waste and Trockman from liability for their role in causing the environmental harm and to shift financial responsibility for the harm to other PRPs under CERCLA.

To the extent the Trust was intended to shield General Waste and Trockman, the trust device will not and cannot work, as explained above and below.   To the extent the Trust may have been intended to shift financial responsibility, the public policy argument begs the questions discussed below.  If the courts find that the Trust has some valid role in causing other PRPs to take all or most of the financial responsibility for cleanup of these hazardous waste sites, there would be no public policy problem at all.  If the courts disregard the creation and existence of the Trust in resolving these issues among the many PRPs, the failure to achieve one possible purpose among several would not undermine the validity of the trust.  See Ind. Code § 30-4-2-12 (trust may not require trustee to commit act contrary to public policy; invalid but severable provisions do not undermine validity of trust or other provisions).  In sum, the Greenway Trust is a valid trust and has the capacity to sue the other PRPs, including the Heritage Coal defendants, under section 107(a) of CERCLA.[3]

2.    *The Greenway Trust's "Innocent Party" Status*

The Heritage Coal defendants argue that the creation and use of the Greenway Trust to file this suit under section 107(a) of CERCLA is an attempt to manipulate CERCLA to impose joint and several liability on companies of its choosing while "whitewashing" the liabilities of the trust settlors, who owned and

---

[3]Because this court finds that the Trust is a valid entity under Indiana law, the Heritage Coal defendants' argument regarding Judge Hussmann's order in the insurance coverage lawsuit is moot.   See *General Waste Products, Inc. v. Continental Casualty Co.*, EV 01-96-c-H/Y (S.D. Ind. Aug. 31, 2004).

operated the sites and oversaw their contamination.  The Heritage Coal defendants argue that as settlors of the Trust, General Waste and Trockman could assign to the Trust only the right to pursue contribution (liability that is several but not joint), and that General Waste and Trockman could not assign rights to the Trust without assigning corresponding liabilities.

The Heritage Coal defendants are correct that under Indiana law, an assignee stands in the shoes of the assignor.  See *Press-A-Dent v. Weigel*, 849 N.E.2d 661, 669 (Ind. App. 2006); see also *In re Doctors Hospital of Hyde Park, Inc.*, 337 F.3d 951, 957 (7th Cir. 2006) (purpose of the rule is to prevent "shucking off [existing] obligations"); *Brown v. Indiana Nat'l Bank*, 476 N.E.2d 888, 894 (Ind. App. 1985) ("The assignee takes no greater rights than those possessed by the assignor.").  It is also true that General Waste and Trockman were owners and operators of the sites during the time those sites became contaminated and that they arranged for the disposal and transport of hazardous substances to the sites. General Waste and Trockman are PRPs under CERCLA.  The court assumes for purposes of discussion that the Greenway Trust may have assumed General Waste's and Trockman's mantle as PRPs.

When the Greenway Trust was created in 2004, it was not clear how a voluntary PRP – a liable (and thus not "innocent") party who stepped forward and spent money to clean a hazardous waste site without a court order – might have been able to obtain compensation from other PRPs.  By now, however, the path

is open and clear.  The Heritage Coal defendants are not correct in their assertion that, as PRPs, General Waste and Trockman would not be entitled to seek relief under section 107(a) and would be limited to pursuing a contribution remedy against other PRPs under CERCLA.  In two important decisions focusing closely on the language of section 107(a) and 113(f), the Supreme Court has re-shaped CERCLA law and removed several non-statutory glosses that lower courts had added to the statute.  It is now clear that a PRP who has been sued under section 106 or 107(a) may pursue contribution under section 113(f).  It is equally clear that a PRP who has carried out a voluntary cleanup may seek recovery of its costs from other PRPs under section 107(a).  As the Supreme Court explained, "section 113(f) authorizes a contribution action to PRPs with common liability stemming from an action instituted under § 106 or § 107(a).  And 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs."  *Atlantic Research*, 551 U.S. at 139.

Only PRPs who have been sued under CERCLA section 106 or 107(a) may turn around and seek contribution from other PRPs under section 113(f)(1).  *Cooper Industries*, 543 U.S. at 160-61.  Trockman and General Waste have not been sued under section 106 or 107(a).[4]  Nor has the Trust.  Participation as a defendant in such a proceeding is a recognized statutory prerequisite to a contribution claim.  Whatever rights or liabilities the Greenway Trust may have

---

[4]The PRP Group has now sued General Waste and Trockman, among other third-party defendants, for contribution under section 113(f)(1), but to date neither General Waste nor Trockman has been sued under section 106 or 107(a).

acquired from settlors General Waste and Trockman, it is clear that the Trust did not acquire the right to bring a contribution claim.

If the Heritage Coal defendants were correct and General Waste and Trockman would also be barred from seeking relief under section 107(a), that conclusion would make the voluntary PRP extinct.  No rational PRP would step forward and take upon itself the costs of cleanup if it had no prospect of recovering any share of those costs from other PRPs, yet that is the result advocated by the Heritage Coal defendants.  But section 107(a) says nothing about the plaintiff having to be "innocent," and it is now clear that a section 107(a) plaintiff need not be innocent, at least not after *Atlantic Research*, which overruled contrary decisions by many circuits.

Known as the "innocent landowner" exception, the exception originated in the Seventh Circuit in *Azko Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994).  When *Azko Coatings* was decided, it was widely held that a claim by one PRP against another must be brought, if at all, as a section 113(f) contribution claim.  The *Azko Coatings* exception permitted a PRP-landowner to bring a section 107(a) action rather than a section 113(f) contribution action to recover for its direct injuries if it was not responsible for having caused any of the hazardous materials to be spilled onto the property.  *Azko Coatings*, 30 F.3d at 764; see also *Metropolitan Water Reclamation Dist.*, 473 F.3d at 828-29 (explaining that the exception "blunt[ed] the force of a rule that limits the rights of . . . 'innocent'

parties to contribution under § 113(f)," such as an absentee landowner who might be liable under §107(a) for the full cost of remedying a hazardous site caused by its tenant).  Another panel explained before *Atlantic Research*:

> Nevertheless, one of two outcomes would follow from a landowner suit under § 107(a):  either the facts would establish that the landowner was truly blameless, in which case the other PRPs would be entitled to bring a suit under § 113(f) within three years of the judgment to establish their liability among themselves, or the facts would show that the landowner was also partially responsible, *in which case it would not be entitled to recover under its § 107(a) theory and only the § 113(f) claim would go forward.*

*Rumpke of Indiana, Inc. v. Cummins Engine Co., Inc.*, 107 F.3d 1235, 1240 (7th Cir. 1997) (emphasis added); see also *Metropolitan Water Reclamation Dist.*, 473 F.3d at 828-29 (under the "innocent landowner" exception, "a joint and several cost recovery under Section 107(a) remains available [after *Cooper Industries*] to 'landowners who allege that they did not pollute the site in any way.'")

But after *Cooper Industries* and *Atlantic Research*, it is clear that the question is no longer one of "innocence."  Sticking to the terms of the statute itself, if a party has incurred "any other necessary costs of response . . . consistent with the national contingency plan," that party is eligible to seek recoupment of those response costs via § 107(a) *even if it is itself a PRP*.  See *Atlantic Research*, 551 U.S. at 139-40.  If a party has been sued under § 106 or § 107(a), it may seek contribution under § 113(f).  The Supreme Court reasoned that a "guilty" party, or PRP, could not avoid equitable distribution of reimbursement costs by seeking to impose joint and several liability on another PRP in an action under § 107(a).

The Court explained that "a defendant PRP in such a 107(a) suit could blunt any inequitable distribution of costs by filing a § 113(f) counterclaim." *Atlantic Research*, 551 U.S. at 140.   The Heritage Coal defendants concede that the Greenway Trust has incurred response costs.   The Trust's claim falls under the broad sweep of CERCLA section 107(a), and is not defeated as a result of its settlors' status as liable PRPs.[5]

### 3.   *City of Evansville's "Innocent Owner" Status*

The Heritage Coal defendants also argue that the Trust cannot avail itself of any exemption from liability that the City of Evansville might enjoy, even though the City assigned its rights under CERCLA to the Trust.   Dkt. No. 426 at 20.   The Heritage Coal defendants contend that when the City became the owner of the Main Yard site in 2004, it became an "owner" of the site under CERCLA section 107(a)(1) and thus is subject to liability as a PRP.   As a PRP, they argue, the City would be entitled to seek contribution from other PRPs under section 113(f), but could not impose joint and several liability on the defendants under section 107(a).   The court disagrees with the Heritage Coal defendants on this point.

Again, the split between sections 107(a) and 113(f) is no longer as simple as the Heritage Coal defendants have contended.   After *Atlantic Research*, the path

---

[5]Because of these changes in the law since the Trust was created, the court need not address the Heritage Coal defendants' arguments against use of the trust device to "whitewash" the liability of General Waste and Trockman.   There is no longer any legal need to create or find an "innocent" party to conduct the cleanup.

to strict liability under § 107(a) is open to PRPs as plaintiffs if they have incurred response costs.  Nevertheless, the court considers whether the City is exempt from CERCLA liability due not to whether it is "innocent" but whether it had a contractual relationship with Trockman or General Waste.

The City claims that it is exempt from CERCLA liability under sections 107(b) and 101(35)(A)(ii), 42 U.S.C. §§ 9607(b) and 9601(35)(A)(ii).  Section 107(b) exempts persons otherwise liable who can establish by a preponderance of the evidence that the releases of a hazardous substance were caused solely by an act of God, an act of war, or:

> an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . , if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned . . . and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions . . . or any combination of the foregoing.

42 U.S.C. § 9607(b).  For purposes of section 107(b), the definition of "contractual relationships" includes "land contracts, deeds, easements, leases, or other instruments transferring title or possession."  42 U.S.C. § 9601(35).

This issue turns on section 101(35)(A)(ii), which excludes from the definition of "contractual relationships" situations in which the real property was acquired by the defendant after the disposal of the hazardous substance and "the defendant

is a government entity which acquired the facility by escheat, or through any other involuntary transfer or acquisition, *or through the exercise of eminent domain authority by purchase or condemnation*." 42 U.S.C. § 9601(35)(A)(ii) (emphasis added). That provision is essential for local and state governments who would like to help solve a problem without turning themselves into deep-pocket PRPs who might be subjected to vast and unexpected liability.

The Heritage Coal defendants do not contend that the City contributed any hazardous substances to either the Main Yard or the River Yard. They also do not contend the City had a contractual relationship with General Waste, Trockman, or any other defendant connected with the disposal of hazardous substances at the General Waste Sites. The Heritage Coal defendants also do not argue that the City failed to exercise due care with respect to the hazardous substances concerned or failed to take precautions against foreseeable acts or omissions of any third party. (The Heritage Coal defendants state in reply only that they "take no position" on that point. Dkt. No. 481 at 16.) But the Heritage Coal defendants argue that the City did not acquire the Main Yard site through eminent domain because it acquired the site through a purchase rather than through a court order condemning the property. According to these defendants, the City's acquisition of the property in this manner did not satisfy the eminent domain requirements of section 101(35)(A)(ii), and the City is a PRP under section 107.

The record shows that the City paid $912,000 to acquire the Main Yard in September 2004 after entering into a settlement agreement with General Waste and the insurers.  Dkt. No. 426, Ex. C.  Reference to the contamination of the site was made in the settlement agreement, and the parties to the agreement specifically referenced 42 U.S.C. §§ 9601(35)A(ii) and 9607(b) in the recitals of the agreement, acknowledging that the City was acquiring the Main Yard through the exercise of eminent domain by purchase.  *Id.*  The recitals also state that as a condition to the City's acquisition of the Main Yard, General Waste had committed to remediating the Main Yard under the Indiana Voluntary Remediation Program.  The settlement agreement provided that the City had required financial assurances to ensure that the remediation of the Main Yard was completed in accordance with the voluntary remedial work plan approved by IDEM.

By its terms, CERCLA section 101(35)(A)(ii) acknowledges that a formal condemnation action and court judgment are not always necessary for a public entity's acquisition of property to be deemed an exercise of eminent domain so that the government can avoid becoming a PRP.  The statute refers explicitly to "the exercise of eminent domain authority *by purchase or condemnation*."   Also, at least in Indiana, eminent domain is governed by Ind. Code § 32-24-1-1 *et seq.*  Indiana Code § 32-24-1-3(a) directs that "any person that may exercise the power of eminent domain for any public use under any statute may exercise the power *only* in the manner provided in this article, except as otherwise provided by law." (emphasis added).  The first requirement following that statutory directive is that

"before proceeding to condemn, the person . . . *must* make an effort to purchase for the use intended the land, right-of-way, easement, or other interest, in the property." Ind. Code § 32-24-1-3(b)(2) (emphasis added). The Indiana Court of Appeals has held that a purchase agreed upon without resorting to condemnation proceedings in court can be a taking by use of eminent domain power, such that leases of the property are also cancelled (when they could not be as part of an ordinary sale). See *P.C. Management, Inc. v. Page Two, Inc.*, 573 N.E.2d 434, 437-38 (Ind. App. 1991). Without direct reference to the statutory provision, the Indiana Court of Appeals has also recognized that "a conveyance in lieu of actual condemnation of real property constitutes a condemnation proceeding because it is tantamount to a taking under the power of eminent domain." *Schwartz v. Castleton Christian Church*, 594 N.E.2d 473, 475 (Ind. App. 1992). Indiana law clearly recognizes that a condemnation action is not necessary for a public entity to acquire property by eminent domain.

The cases relied on by the Heritage Coal defendants do not support their contention that a condemnation action is required for acquisition by eminent domain. The courts in *City of Wichita v. Aero Holdings, Inc.*, 177 F. Supp. 2d 1153, 1167-69 (D. Kan. 2000), and *United States v. Occidental Chemical Corp.*, 965 F. Supp. 408, 413-14 (W.D.N.Y. 1997), held – prior to *Atlantic Research*, of course – that the cities of Wichita and Niagara Falls, respectively, were not innocent owners because those cities had acquired the polluted properties voluntarily through negotiated purchases and not through eminent domain. Those courts were

-36-

considering whether the cities might be exempt from being "owners or operators" under section 101(20)(D), without discussing the meaning of the eminent domain language in section 101(35)(A)(ii).  The Heritage Coal defendants also rely on *City of Toledo v. Beazer Materials and Services, Inc.*, 923 F. Supp. 1013 (N.D. Ohio 1996), which is a CERCLA § 101(35)(A)(ii) case.  In that case the court was persuaded by a plain reading of the Ohio eminent domain statute, which required not only that the agency seeking to acquire the property negotiate with the owner of the property, but that the agency and the property owner be unable to agree prior to a taking by eminent domain.  *City of Toledo,* 923 F. Supp. at 1020-21. Because Toledo was able to reach an agreement with the property owner, the court did not find Toledo's purchase to be an act of eminent domain.  *Id*. However, the *City of Toledo* court did not address the plain language of CERCLA section 101(35)(A)(ii), which plainly assumes that eminent domain may be exercised *by purchase*, indicating that the impasse required by Ohio law is not a federal requirement under CERCLA.

Indiana's eminent domain law, by contrast, does not require that the public entity and the property owner disagree.  Indiana law requires only that the public entity make an effort to purchase the property, which the City successfully did here.  Both CERCLA and Indiana law recognize eminent domain by purchase, and the Heritage Coal defendants have not shown that the City's acquisition of the General Waste sites was not through eminent domain.  The Heritage Coal defendants' motion is denied in its entirety.

IV.    *Greenway Trust's Motion for Partial Summary Judgment against SIGECO*

The Greenway Trust has also moved for summary judgment against defendant SIGECO seeking a determination that SIGECO is in fact a PRP. SIGECO concedes properly that it is, and the Trust's motion is granted to that extent.  The Trust also seeks a determination that SIGECO is jointly and severally liable under section 107 of CERCLA for all costs of remediation of the soil contamination of both the Main Yard and River Yard sites.  If the Trust is correct, then SIGECO would be on the hook for 100 percent of the remediation costs, a liability that could be limited only in the form of contribution orders directed to other (solvent) PRPs under CERCLA section 113(f)(1).  On this issue, the court denies summary judgment and will defer a definitive ruling on the issue until the parties have presented their evidence at trial.

A.    *Facts Related to the Trust's Motion for Summary Judgment*

Most of the facts set forth above are also relevant for the Trust's motion against SIGECO and are incorporated here.  SIGECO was a utility company that provided energy delivery services to residents of southwestern Indiana.  Dkt. No. 67, ¶ 55.  It used batteries at its facilities located in and near Evansville, Indiana, and at various times between 1935 and 1998, SIGECO entered into agreements to sell scrap metal to General Waste.  Dkt. No. 389, Ex. 1, ¶¶ 14-15; Ex. 2 at 394-95; Ex. 3, No. 7-8.  SIGECO was one of General Waste's most regular customers.  Dkt. No. 389, Ex. 1, ¶ 14; Ex. 2 at 389-95.  General Waste hauled scrap metal from SIGECO's main facility and its substations, and SIGECO brought material to General Waste using its own trucks.  Dkt. No. 389, Ex. 1, ¶ 14; Ex. 2 at 395-96.  The materials sold by SIGECO to General Waste included used batteries.  Dkt. No. 389, Ex. 1, ¶ 29; Ex. 3, No. 19.  SIGECO was General Waste's largest source of batteries, and the batteries contained lead.  Dkt. No. 389, Ex. 2 at 400; Ex. 3, No. 20.  General Waste transported scrap, including batteries, from SIGECO to both the Main Yard and the River Yard sites.  Dkt. No. 389, Ex. 1, ¶ 8; Ex. 2 at 395.

B.    *Analysis*

1.    *SIGECO's Liability Under CERCLA § 107(a)(4)(B)*

As discussed above, CERCLA section 107(a)(4)(B) provides that PRPs are liable for "necessary costs of response incurred by any other person consistent

with the National Contingency Plan."  42 U.S.C. § 9607(a)(4)(B).  This section governs cost recovery for parties who voluntarily incur response costs in responding to releases of hazardous substances.  *Atlantic Research*, 551 U.S. at 139, n.6.  Cleanups are deemed voluntary where the plaintiff has neither settled any liability with a  government entity nor been the subject of a CERCLA suit.  See *id.* at 139; *Metropolitan Water Reclamation Dist.*, 473 F.3d at 835.  Neither General Waste, Trockman, nor the Greenway Trust has been under the legal compulsion of a consent decree or has been the subject of a CERCLA enforcement action under section 106 or 107.  SIGECO admits that the General Waste sites are "facilities," that a "release of hazardous substances" has occurred at the sites, that "response costs" were incurred in remediation of the sites, and that it is a PRP under CERCLA.[6]  Dkt. No. 67, ¶ 119;  Dkt. No. 389, Ex. 3, Nos. 22-24, 27; Dkt. No. 419 at 3.  Under the plain language of the statute, the Greenway Trust argues, it is entitled to hold SIGECO jointly and severally liable for the costs it has incurred in remediating the sites.

---

[6]In its response to the Trust's Request for Admissions, SIGECO admitted that response costs were incurred at the sites, but denied that the Trust incurred those costs.  See Dkt. No. 389, Ex. 3, Nos. 24, 26, 27, 29.  In response to the Trust's motion for summary judgment, SIGECO did not raise and thus waived for purpose of summary judgment any argument related to the source of the response costs.  SIGECO also denied that the response costs were necessary and consistent with the national contingency plan, but failed to raise necessity or consistency in response to the Trust's motion for summary judgment.  See Dkt. No. 389, Ex. 3, Nos. 25, 28.  The court considers those points to have been waived for purposes of summary judgment as well.

SIGECO argues that only an innocent landowner may impose *joint and several* liability on another for its response costs, and that the Trust, as assignee of General Waste, Trockman and the insurers, is not an innocent landowner.[7] SIGECO argues that the Supreme Court's *Atlantic Research* decision supports its position.  The court addressed these arguments above.  *Atlantic Research* did not turn on the relative innocence of the parties.  The key for purposes of section 107(a) was whether the parties incurred response costs.  The key for purposes of section 113(f)(1) was whether a party had been sued in a civil action under section 106 or 107(a).  The Supreme Court specifically held that a PRP – a potentially responsible party under section 107(a)(1) – could bring suit against its fellow PRPs under section 107(a)(4)(B).  Any inequity in this result could be remedied by a section 113(f) counterclaim, the resolution of which "would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the 107(a) action."  *Atlantic Research*, 551 U.S. at 140.  Allowing courts to sort out the equities among PRPs through a section 113(f) contribution action is very different from not allowing a voluntary PRP to set the CERCLA ball in motion through a section 107(a) action.

Once liability is established under section 107(a) of CERCLA, section 113(g) of CERCLA requires entry of a declaratory judgment as to liability for future response costs.  That section states that in any action for recovery of costs under

---

[7]The parties do not address the fact that the City of Evansville also assigned its claims to the Trust, and neither will the court.

section 107, "the court *shall* enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  42 U.S.C. § 9613(g)(2) (emphasis added).  SIGECO argues that a declaratory judgment is premature because it is likely that many other parties, some unknown, are also liable under CERCLA for lead contamination.  Again, however, to the extent that SIGECO might pay more than its equitable share, it has a remedy available by bringing section 113(f) contribution claims as third-party claims or counterclaims.  The Greenway Trust has established that SIGECO is liable for response costs related to lead remediation, and the Trust is entitled to a declaratory judgment to that effect.

### 2.    *Divisibility of Harm and Joint and Several Liability*

Is SIGECO jointly and severally liable for the entire costs of the cleanups?  The Seventh Circuit has said that the only defense to joint and several liability under section 107(a) is to demonstrate that the harm is divisible, but "this is a rare scenario."  *Metropolitan Water Reclamation Dist.*, 473 F.3d at 827 n.3.  The Trust argues that both sites were contaminated with high levels of lead, that General Waste's activities were conducted so that the River Yard and the Main Yard sites were a single operation, and that it would be impossible for SIGECO to meet its burden to show that the harm done was divisible.  SIGECO responds that it might have met its burden if General Waste had not destroyed its detailed business records showing the source, type, quantity, and value of the scrap it

purchased.  Dkt. No. 419 at 15;  Ex. C at 69-71.  It argues that General Waste's act of destroying its business records makes it impossible for SIGECO or the other defendants to attempt to prove that the harm is divisible between the various PRPs or between the sites.

Prior to the Supreme Court's decision in *Burlington Northern and Santa Fe Railway Co. v. United States*, 129 S. Ct. 1870 (2009), issued during the course of the briefing on the Trust's motion against SIGECO, the court would have had little difficulty concluding that the harm here is not divisible, that SIGECO would be jointly and severally liable for all remediation costs of both sites, and that SIGECO could rely on contribution claims under section 113(f)(1) to force other PRPs to share the costs of remediation.  SIGECO argues, however, that *Burlington Northern* reflects a significant change in the law governing the apportionment of CERCLA responsibility.

In *Burlington Northern*, a company called Brown & Bryant had operated an agricultural chemical distribution business on property it owned.  Over the years, Brown & Bryant had expanded its operations by leasing two tracts of land owned jointly by two railroads.  Brown & Bryant's operations had resulted in various spills and leaks of hazardous substances that had contaminated both the original site and the tracts owned by the railroads.  129 S. Ct. at 1874-76.  Brown & Bryant became insolvent, and the federal government eventually spent more than eight million dollars to remediate the property.  The government also ordered the

railroads to clean up the property, and they spent more than three million dollars to do so.   (The liability of another party, Shell, was also in dispute, but the Supreme Court eventually held that it was not liable under CERCLA.)

For present purposes, the key point is that the district court found that the contamination of the site created a "single harm" but that the harm was divisible and was subject to apportionment among the several PRPs, without imposing joint and several liability.   129 S. Ct. at 1876.   Based on several factors – the percentage of land owned by the railroads, the duration of the railroads' lease divided by the duration of Brown & Bryant's operations, and the relative roles of the different spilled chemicals in requiring remediation – the district court apportioned the liability so that the railroads were responsible for only nine percent of the government's total cleanup costs.

The Ninth Circuit had reversed and held that the railroads were jointly and severally liable for all of the government's cleanup costs.   The Supreme Court  in turn reversed the Ninth Circuit and affirmed the district court's apportionment of liability to the railroads.   The Supreme Court explained that the scope of liability in a CERCLA case is to "'be determined from traditional and evolving principles of common law.'" 129 S. Ct. at 1881, quoting *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 808 (S.D. Ohio 1983).   The starting point for analyzing divisibility of the harm is § 433A of the Restatement (Second) of Torts.   Under the Restatement,

"when two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused.  Restatement (Second) of Torts, §§ 433A, 881 (1976); Prosser, Law of Torts, pp. 313-314 (4th ed. 1971). . . .  But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm.  Restatement (Second) of Torts, § 875; Prosser, at 315-316."

*Burlington Northern*, 129 S. Ct. at 1881, quoting *Chem-Dyne Corp.,* 572 F.Supp., at 810.  In other words, as the Court explained, "apportionment is proper when 'there is a *reasonable* basis for determining the contribution of each cause to a single harm.'"  *Id*. (emphasis added), quoting Restatement (Second) of Torts, § 433A(1)(b), 434 (1963-64).

Although equitable factors relevant to section 113(f)(1) contribution claims do not play a role in determining the divisibility of the harm, reasonableness does.  *Burlington Northern*, 129 S. Ct. at 1881-82 & n. 9 (2009).  "Apportionment [of the harm] is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs."  *Id*. at 1882, n.9. In *Burlington Northern*, the lower courts had agreed that the harm created by contamination of the site was "singular" but was at least theoretically capable of apportionment.  129 S. Ct. at 1881.  The issue was whether the record provided a reasonable basis for doing so.  As noted, the district court had apportioned harm based on the portion of the surface area each party had controlled, the volume of hazardous waste released as a result of each party's activities, and the time over which those activities

extended, with a generous allowance for imprecision in the estimates of those matters.  *Id.* at 1882.  The Supreme Court held that the district court's approach was reasonable and upheld its apportionment of liability for the government's cleanup costs, which did not hold each party jointly and severally liable for the entire loss.  For present purposes, the Supreme Court held that joint and several liability was not required for all PRPs where the harm was "singular," so long as the record provided a reasonable basis for apportioning the harm among the PRPs.

The full import of *Burlington Northern* is hotly debated, in this case and elsewhere.  SIGECO argues that it effected a dramatic change that will make it much easier for PRPs to avoid the burden of joint and several liability.  The Trust argues that *Burlington Northern* amounts to nothing new; it merely restated the old principles widely adopted since *Chem-Dyne* was decided in 1983.  The court declines at this point to commit to a particular interpretation of *Burlington Northern* and how it might apply in a case like this one, in which a trust formed by the owner-operators of the site has carried out part of the remediation and might have found a way to protect the owner-operators from joint and several liability for the full amount of remediation.  This is a case in which the Supreme Court's new decision has presented what might be called genuine questions of material law.

The court could try to answer those questions on the basis of the existing record, but the timing of the Supreme Court's decision has meant that the record

is more limited than it otherwise would have been.  More important, where the applicable law appears to be in flux like this, perhaps the best role the district court can play in the process is to hold a trial and make the detailed findings of fact needed to inform higher courts as they address the questions of law.  See, *e.g.*, *Lalonde v. Textron, Inc.*, 369 F.3d 1, 6 (1st Cir. 2004) (reversing Rule 12(b)(6) dismissal to allow further development of record in emerging area of law); *Nelson v. IPALCO Enterprises, Inc.*, 2005 WL 1924332, at *3-4 (S.D. Ind. Aug. 11, 2005) (denying cross-motions for summary judgment to allow for more complete presentation and determination of facts); *In re JDS Uniphase Corp. ERISA Litigation*, 2005 WL 1662131, at *8 (N.D. Cal. July 14, 2005) (denying in principal part a motion to dismiss in emerging area of law).  The court expects to hold a trial that will allow each side to present evidence relevant to its own and its opponents' different interpretations of *Burlington Northern*.  That approach will allow full development of a record and a decision on the basis of real facts rather than the artificial and even hypothetical versions of facts the court must assume for purposes of deciding motions for summary judgment.  The court recognizes that this approach might delay the remediation of the River Yard while these issues are sorted out.  But *Burlington Northern* raises new questions and legal uncertainty sufficient to make this approach of a full airing of apportionment issues the better approach at this time.

Accordingly, the court grants plaintiff's motion to the extent that it holds SIGECO liable for remediation costs under section 107(a) and declares that

SIGECO will be liable for future remediation costs, pursuant to section 113(g) of CERCLA.  The court denies plaintiff's motion to the extent that it seeks a conclusive determination that SIGECO would be jointly and severally liable for all past and future remediation costs of the General Waste sites.  A portion of the trial will need to focus on the issue of apportionment of liability to SIGECO and to other PRPs.

VI.    *PRP Group's Motion to Strike Jury Trial Demand*

Arguing that the contribution claims it has brought against the third-party defendants are all equitable in nature, the PRP Group moves to strike the third-party defendants' requests for trial by jury.  That motion is granted, and the third-party defendants' demands for a jury trial are stricken.

With its third-party complaint, the PRP Group seeks contribution and a declaratory judgment under CERCLA (42 U.S.C. § 9613) (Counts I and II) and the Indiana Environmental Legal Actions ("ELA") Statute (Ind. Code § 13-30-9-1 *et seq.*) (Counts III and IV).  The PRP group argues that its claims are equitable in nature and that, because the Seventh Amendment guarantees a jury trial only in suits that would have been tried in courts of law rather than courts of equity before the merger of law and equity, the third-party defendants have no right to a trial by jury in this case.  Some third-party defendants have raised various

arguments in opposition to the PRP Group's motion.  The court discusses those arguments in turn.


A.    *Jury Trials Under CERCLA*

Third-party defendant Frontier Kemper, joined by third-party defendant Sears, argues in response that sometimes juries do play a role in CERCLA actions. Dkt. No. 240, 247.   In support of its argument, Frontier Kemper cites *GL Industries of Michigan v. Forstmann-Little*, 800 F. Supp. 695 (S.D. Ind. 1991) (Barker, J.).   According to Frontier Kemper, Judge Barker "left open the possibility" that a party may be entitled to a jury on a CERCLA liability question. Dkt. No. 240 at 2, citing *GL Industries*, 800 F. Supp. at 699.  Judge Barker did not leave open the possibility of a jury trial.  She relied on the line of authority holding that no right to a jury trial exists in CERCLA cases, and she noted that the party seeking to preserve the possibility of a jury trial had not developed an argument in support of its position.  *GL Industries*, 800 F. Supp. at 699.  Frontier Kemper's reliance on this case is misplaced.


Frontier Kemper also relies on cases from other circuits that articulated the summary judgment standard in terms of the familiar "reasonable jury."  See Dkt. No. 240 at 2-3, citing *Consolidated Edison Co. v. UGI Utilities, Inc.*, 153 Fed. Appx. 749, 751-52 (2d Cir. 2005) (reviewing grant of summary judgment); *Concrete Sales and Services, Inc. v. Blue Bird Body Co.*, 211 F.3d 1333, 1337 (11th Cir. 2000)

(same).  Those courts were applying the usual standard for summary judgment, which is often stated in terms of whether or not a "reasonable jury" (or more generically, a reasonable trier of fact) could find in favor of a particular plaintiff as articulated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  These decisions are silent with regard to the litigants' right to a jury trial in CERCLA cases.  They offer no support for the third-party defendants' jury demands.

### B.   *Jury Trials Under the Indiana ELA*

Indiana's ELA statute echoes CERCLA, providing that "a court shall allocate the costs of the [cleanup] . . . using legal and equitable factors that the court determines are appropriate."  Ind. Code § 13-30-9-3(a).  Although Frontier Kemper argues that the ELA leaves the issue open, the statutory language clearly states that the *court* shall allocate costs between the parties, and the parallels to CERCLA are apparent.  This court has previously indirectly recognized the equitable nature of the ELA, and Frontier Kemper has raised no argument sufficient to prompt reconsideration of that finding.  See *Armstrong Cleaners, Inc. v. Erie Ins. Exchange*, 364 F. Supp. 2d 797, 811-13 (S.D. Ind. 2005).

### C.   *Jury Trials in Declaratory Judgment Actions*

For purposes of deciding a right to jury trial in an action seeking a declaratory judgment, the answer depends on whether the underlying dispute "is the counterpart of a suit in equity" or "is essentially an inverted lawsuit – an

action brought by one who would have been a defendant at common law." *Marseilles Hydro Power, LLC v. Marseilles Land and Water Co.*, 299 F.3d 643, 649 (7th Cir. 2002), quoting *Owens-Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1189 (3d Cir. 1979).  Here, the PRP Group seeks a declaratory judgment to ensure that any equitable allocation of response costs that might be made by this court under CERCLA or the ELA will apply to future response costs.  The declaratory judgments sought here, then, are the "counterpart" to the PRP Group's CERCLA and ELA claims and are equitable in nature.

Third-party defendant Frontier Kemper argues that in Indiana, juries may be and have been used in declaratory judgment actions.  Citing *Jamrosz v. Resource Benefits, Inc.*, 839 N.E.2d 746, 764-65 (Ind. App. 2005), Frontier Kemper argues that any issues of fact relating to the PRP Group's claims for declaratory relief may properly be submitted to a jury.  Dkt. No. 240 at 3.  However, the claims in *Jamrosz* centered on a contract dispute and included claims of breach of contract, fraud, conversion, and civil conspiracy.  839 N.E.2d at 754.  Although the propriety of a jury trial was not discussed by the court in *Jamrosz*, the claims underlying the declaratory judgment action would have been properly tried before a jury – unlike the CERCLA and ELA claims underlying the PRP Group's declaratory judgment action here.  The PRP Group's declaratory judgment action is based entirely on equitable claims.  Its declaratory judgment also sounds in equity, so there is no right to a jury trial.

D.    *Ripeness*

Third-party defendant White County Coal, LLC ("White County"), joined by Duke Energy, Sears, and the City of Evansville, argues that striking a demand for a jury trial at this stage would be premature because not every third-party defendant has answered the PRP Group's complaint and because certain deadlines – amending the pleadings, the trial date – had not been established. Dkt. No. 244 at 2-3.  Thus, White County argues, the court cannot determine whether a jury trial is proper because it does not know what claims will be litigated at trial.  *Id.* at 3.  A trial date has been set and every third-party defendant who has appeared and participated in the lawsuit has now answered. This issue is ripe for decision.  If a particular claim is legal in nature, the Seventh Amendment guarantees a right to trial by jury.  All of the claims between the PRP Group and the third-party defendants are equitable in nature, and there is no right to a jury trial on equitable claims.  The PRP Group's motion to strike the third-party defendants' requests for a jury trial is granted.

VII.    *PRP Group's Motion for Leave to File First Amended Complaint*

This action began on May 21, 2007, when the Trust initially filed suit. The Trust's complaint was amended on May 6, 2008, and on July 3, 2008, the PRP Group filed its third-party complaint.  Dkt. Nos. 1, 62, 103.  At argument on September 22, 2009, the parties assured the court that they stand ready to try this case in the summer of 2010.  However, the PRP Group has moved for leave to amend its third-party complaint to add the United States Navy as a defendant. Dkt. No. 492.  The Trust opposes the PRP Group's motion, arguing that the addition of the Navy as a third-party defendant at this time will lead to undue delay and will prejudice both the Trust and Trockman.[8]  Dkt. No. 508.  The PRP Group's motion for leave to amend is denied.

Under the Federal Rules of Civil Procedure, leave to amend a complaint should be "freely given" except in circumstances where an amendment would cause undue delay, would unduly prejudice the non-moving party, would be futile, or was prompted by the movant's bad faith or dilatory motive.  Fed. R. Civ. P. 15(a)(2); see also *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The court believes that undue delay would result from granting the PRP Group's motion for leave to amend.  This litigation is already two years old, discovery is underway and heading towards resolution, dispositive motions have been filed and are being

---

[8]The Trust argued in the alternative that if the court were to allow the PRP Group's contribution claim to proceed against the Navy, it should move forward on a track separate from the main litigation.  Because the court denies the PRP Group's motion, it does not address that suggestion.

resolved, and trial is around the corner. The addition of a new third-party defendant is not sufficient reason to stall or slow these proceedings. Remediation of the General Waste sites has been already too long in coming, and both the parties and the court have a strong interest in seeing the immediate case come to a close.

The PRP Group will not be prejudiced by the court's refusal to allow it to amend its complaint. The PRP Group or its individual PRP members still might seek contribution from the Navy or any other previously unidentified PRP as part of a separate contribution action under CERCLA section 113(f). A separate action is obviously not an ideal solution, for it would probably be less efficient than rolling all PRPs and their claims and defenses into one action. As a trailing action, however, a separate contribution action could take advantage of much work that has already been done. After a trial in this action as it is currently framed, the interested parties should know most of the facts and should have good information about the extent of any Navy responsibility. As between these two less than palatable alternatives – delay final resolution until the Navy can be brought up to speed, or separate the overall dispute into two cases – the court opts in favor of the course that should speed up the eventual clean-up of the River Yard.

*Conclusion*

The PRP Group's motion for summary judgment against General Waste and Trockman under CERCLA section 113(f) (Dkt. No. 200) is granted.  The Heritage Coal defendants' motion for summary judgment against the Greenway Trust (Dkt. No. 425) is denied.  The Trust's motion for leave to file a response to SIGECO's surreply (Dkt. No. 474) is granted.  The Trust's motion for a finding of liability on summary judgment against SIGECO under CERCLA section 107(a) (Dkt. No. 388) is granted in part and denied in part, as explained above.  The PRP Group's motion to strike the third party defendants' requests for a jury trial (Dkt. No. 226) is granted.   The PRP Group's motion for leave to file its first amended third-party complaint (Dkt. No. 491) is denied.

So ordered.

Date:  September 29, 2009

_David F. Hamilton_

_____

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Scott R. Alexander
TAFT STETTINIUS & HOLLISTER LLP
salexander@taftlaw.com, docket@taftlaw.com

John P. Arranz
SWANSON MARTIN & BELL
jarranz@smbtrials.com, mhernandez@smbtrials.com

Stephen J. Axtell
THOMPSON HINE LLP
steve.axtell@thompsonhine.com, diane.macleod@thompsonhine.com

Jennifer C. Baker
HUNSUCKER GOODSTEIN & NELSON
jbaker@hgnlaw.com

Brian C. Bosma
KROGER GARDIS & REGAS, LLP
bcb@kgrlaw.com

Jayna Morse Cacioppo
TAFT STETTINIUS & HOLLISTER LLP
jcacioppo@taftlaw.com, akwilosz@taftlaw.com, docket@taftlaw.com

Gregory P. Cafouros
KROGER GARDIS & REGAS, LLP
gpc@kgrlaw.com, pad@kgrlaw.com

Michael D. Chambers
TAFT STETTINIUS & HOLLISTER LLP
mchambers@taftlaw.com, docket@taftlaw.com

Robert R. Clark
TAFT STETTINIUS & HOLLISTER LLP
rclark@taftlaw.com, docket@taftlaw.com, malexander@taftlaw.com

Travis A. Crump
STOLL KEENON OGDEN PLLC
Travis.Crump@skofirm.com

Michael E. DiRienzo
KAHN DEES DONOVAN & KAHN
mdirienzo@kddk.com, sherri.k.sprinkle@travelers.com

EVANSVILLE GREEWAY PRP GROUP
gpc@kgrlaw.com

Hallie Miller Fahey
TROUTMAN SANDERS LLP
hallie.fahey@troutmansanders.com

Andrew Rudolph Falk
KROGER GARDIS & REGAS LLP
arf@kgrlaw.com

Maria V. Gillen
TENNESSEE VALLEY AUTHORITY
mvgillen@tva.gov

Adam T. Goebel
STOLL KEENON OGDEN PLLC
adam.goebel@skofirm.com, jessica.mcgee@skofirm.com

Michael D. Goodstein
HUNSUCKER GOODSTEIN & NELSON PC
mgoodstein@hgnlaw.com

Edward S. Griggs
BARNES & THORNBURG LLP
sean.griggs@btlaw.com, nancy.wagner@btlaw.com

Timothy A. Haley
BARNES & THORNBURG LLP
thaley@btlaw.com

Elizabeth Schroer Harvey
SWANSON MARTIN & BELL LLP
eharvey@smbtrials.com

Samuel D. Hinkle, IV
STOLL KEENON OGDEN PLLC
sam.hinkle@skofirm.com, adam.goebel@skofirm.com, travis.crump@skofirm.com,
ashley.ragsdale@skofirm.com

David L. Jones
JONES WALLACE, LLC
djones@joneswallace.com, nevans@joneswallace.com, ljones@joneswallace.com

Jody E. Kahn
SWANSON MARTIN & BELL LLP
jkahn@smbtrials.com, jodykahn@gmail.com

G. Daniel Kelley, Jr.
ICE MILLER LLP
daniel.kelley@icemiller.com, chris.webb@icemiller.com

Matthew Theron Kinst
SWANSON MARTIN & BELL LLP
mkinst@smbtrials.com

Thomas A. Knoth
THOMPSON HINE LLP
tom.knoth@thompsonhine.com, diane.macleod@thompsonhine.com

John Milton Kyle, III
BARNES & THORNBURG LLP
john.kyle@btlaw.com

Douglas W. Langdon
FROST BROWN & TODD, LLC
dlangdon@fbtlaw.com, tdooley@fbtlaw.com

Kyle Andrew Lansberry
LEWIS & WAGNER
klansberry@lewiswagner.com, gbrackett@lewiswagner.com

Richard J. Lewandowski
WHYTE HIRSCHBOECK DUDEK S.C.
rlewandowski@whdlaw.com

Michael John Maher
SWANSON MARTIN & BELL
mmaher@smbtrials.com, jpodlin@smbtrials.com

Stacey H. Myers
HUNSUCKER GOODSTEIN & NELSON PC
smyers@hgnlaw.com, cdavis@hgnlaw.com

Michael Orville Nelson
HUNSUCKER, GOODSTEIN & NELSON
mnelson@hgnlaw.com, mschulz@boselaw.com, wgarrison@hgnlaw.com

Reed W Neuman
NOSSAMAN, LLP/ O'CONNOR & HANNAN
rneuman@nossaman.com, kbrayton@nossaman.com

Victoria L. Nilles
THOMPSON HINE LLP
victoria.nilles@thompsonhine.com, diane.macleod@thompsonhine.com

Anthony W. Overholt
FROST BROWN TODD LLC
aoverholt@fbtlaw.com, sdunn@fbtlaw.com

Tina Marie Richards
BAKER & DANIELS - Indianapolis
tina.richards@bakerd.com, dianne.armstroff@bakerd.com

Robert W. Rock
JONES WALLACE LLC
rrock@joneswallace.com, cheim@joneswallace.com, nevans@joneswallace.com, ljones@joneswallace.com

Keith E. Rounder
TERRELL BAUGH SALMON & BORN
krounder@tbsblaw.com, pperry@tbsblaw.com

Ross E. Rudolph
RUDOLPH FINE PORTER & JOHNSON
rer@rfpj.com, smo@rfpj.com, mch@rfpj.com, trg@rfpj.com

James P. Ryan
NOSSAMAN, LLP/O'CONNOR & HANNAN
jryan@nossaman.com

Douglas B. Sanders
BAKER & McKENZIE LLP
douglas.b.sanders@bakernet.com

G. Michael Schopmeyer
KAHN DEES DONOVAN & KAHN
mschopmeyer@kddk.com

John A. Sheehan
HUNTON & WILLIAMS LLP
JSheehan@hunton.com, STerrell@hunton.com

Kate E. Shelby
TAFT STETTINIUS & HOLLISTER LLP
kshelby@taftlaw.com, dinville@taftlaw.com

Katherine L. Shelby
BINGHAM MCHALE LLP
kshelby@binghammchale.com, kbarnett@binghammchale.com

Donald M. Snemis
ICE MILLER LLP
donald.snemis@icemiller.com, nikki.hunter@icemiller.com

William T. Terrell
TENNESSEE VALLEY AUTHORITY
wtterrell@tva.gov, ogcecffiles@tva.gov

Kevin Morris Toner
BAKER & DANIELS - Indianapolis
kevin.toner@bakerd.com, judy.ferber@bakerd.com, kay.cook@bakerd.com

John William Watson, III
BAKER & McKENZIE LLP
john.w.watson@bakernet.com

Thomas E. Wheeler, II
FROST BROWN TODD LLC
twheeler@fbtlaw.com, kdickerson@fbtlaw.com

Kenneth Thomas Williams, II
STOLL KEENON & OGDEN PLLC
kt.williams@skofirm.com

David E. Wright
KROGER GARDIS & REGAS LLP
dew@kgrlaw.com, mem@kgrlaw.com